FILED
CLERKS OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

2005 AUG 25 P 2: 33

U.S. DISTRICT COURT
DISTRICT OF MASS

ROBERT DOWNER and          )
NANCY DOWNER               )
        Plaintiff,         )
                           )   Bowler MS
V.                         )
                           )   RECEIPT # 66492
                           )   CIVIL ACTION NO.
TOWN OF BURLINGTON,        )   AMOUNT $ 25
ROBERT MERCIER individually and in  )   SUMMONS ISSUED
his capacity as Town Manager,       )   LOCAL RULE 4.1
FRANCIS HART, individually and in his  )   WAIVER FORM
capacity as Chief of Police, and   )   MCF ISSUED
HARRY SAWYER,              )   BY DPTY. CLK.
        Defendants         )   DATE 8/25/05
                           )

05 - 11761 RCL

## COMPLAINT AND JURY DEMAND

1. Plaintiff Robert Downer is a resident of the Town of Burlington and has been
employed as a police officer for the Town of Burlington for approximately twenty years.

2. Plaintiff Nancy Downer is the wife of Robert Downer and is a resident of
Burlington.

3. Defendant Town of Burlington is a municipal corporation.

4. Defendant Robert Mercier is the Town Manager of the Town of Burlington. He is
sued individually and in his official capacity.

5. Defendant Francis Hart is the Chief of Police of the Town of Burlington. He is
sued individually and in his official capacity.

6. Defendant Harry Sawyer is a Burlington Police Officer and a resident of the
Town of Burlington.

7. Mr. Downer was hired as a police officer in 1985. In March 1996 he was promoted to the rank of sergeant.

8. Mr. Downer had an exemplary career as a police officer. His annual evaluations consistently included rankings of excellent and outstanding, the highest possible ranks. He received numerous awards, certificates and letters of commendation, from both civilians and superior officers, during his career. Mr. Downer also obtained several grants for the police department, including grants for the bicycle unit and a community policing plan. He had no record of any discipline of any significance.

9. Hiring and promotion within the Burlington Police Department are governed by Massachusetts Civil Service Laws which include promotional examinations. Mr. Downer regularly scored at the top of civil service promotional examinations.

10. Mr. Downer spoke openly of his desire to be promoted through the ranks, and of his hope to reach the rank of chief of police.

11. Mr. Downer's primary competition for promotion to the rank of Chief was from Defendant Hart. Mr. Hart also did very well on promotional examinations, but had been on the police force longer than Sgt. Downer.

12. Sgt. Downer was told to stop taking promotional examinations, wait ten years for other officers to be promoted and then to seek promotion. He refused, and was punished by being reassigned from some of his positions.

13. In 1999 Sgt. Downer had the highest score on the civil service list for promotion to lieutenant in the Burlington Police Department. At the time Mr. Hart already held the rank of lieutenant.

14. In or about September 1999 Burlington Police Officer Harry Sawyer posted a caricature in the police station which referred to Sgt. Downer. The caricature was perhaps meant in humor. Postings, emails, jokes, gossip, rumors and comments relating to police officers were, and still are, rampant in the Burlington Police Department. These materials ran from satire to obscenity, and included nudity and sexual materials and innuendos. They occurred throughout the police station, during roll call, at department social events and were a daily occurrence. They were well known to management within the department.

15. In this case Officer Sawyer's caricature of Sgt. Downer was accompanied by hand written statement, "If they don't indict me first I'll be the next Chief." Officer Sawyer now concedes that he wrote the statement and that it was meant to refer to Sgt. Downer.

16. Sgt. Downer believed that suggesting that he was subject to indictment went too far, and he called Officer Sawyer in and asked if he put up the caricature. Officer Sawyer lied and stated that he did not do it. As a result, Sgt. Downer referred the matter up the ranks for an investigation and discipline.

17. In an attempt to head off discipline Officer Sawyer made a complaint that Sgt. Downer had called him a faggot and insinuated that he was gay, and that constituted sexual harassment. Sawyer had never heard those remarks from Sgt. Downer, and instead relied on and was urged on by two other Burlington Police Officers.

18. In fact, use of the term "faggot" and numerous other terms was common throughout the Burlington Police Department. Despite being aware of their usage, neither the Police Department nor the Town of Burlington had ever made any attempt to curtail the use of any such terms or to discipline any officer for their use. Similarly, the

Police Department and the Town had never made any attempt to curtail the distribution of any of the postings, rumors, gossip, emails or comments that were common within the department.

19. In addition, the officers who helped Officer Sawyer formulate his accusations had themselves told civilians that Officer Sawyer was gay.

20. Officer Sawyer's purpose in making accusations against Sgt. Downer was to avoid the prospect of discipline by causing Sgt. Downer to be disciplined.

21. The Town of Burlington launched an investigation regarding Sgt. Downer, including whether he had sexually harassed Officer Sawyer. The investigation was headed by Assistant Town Manager Rittenberg, who had no experience in investigations, and no experience in the area of sexual harassment. The Town also retained Attorney Leo Pelloquin to help design the investigation.

22. Messrs. Pelloquin and Rittenberg created new definitions of terms to be considered sexual harassment. These definitions had never previously been used by the Town of Burlington. They and the Burlington police chief forced every officer in the Burlington Police Department to give statements regarding Sgt. Downer.

23. Forcing every officer to give a statement in an investigation is unprecedented.

24. Mr. Rittenberg was told that he could only investigate Sgt. Downer.

25. It was made clear to all Burlington police officers that the investigation was focused on Sgt. Downer, that he would be disciplined, and that only he would be disciplined. When Mr. Rittenberg questioned police officers he advised them that he was only interested in Sgt. Downer. Officers told him about statements made by other officers, about rumors and gossip that circulated through the department, many of which

had sexual overtones, and about the rampant use of the term faggot and similar terms throughout the department. Messrs. Rittenberg and Pelloquin ignored these facts.

26. Despite the fact that Officer Sawyer had lied to a superior officer he was told that he would not be subject to any discipline or investigation.

27. Civil Service laws provide that Sgt. Downer could only be disciplined for just cause. Just cause does not exist where an employed is disciplined for political motives, where rules are selectively enforced, or where an employee is disciplined for alleged conduct that is widely tolerated amongst other employees.

28. Established principles require that towns adhere to policies of progressive discipline in which they make their policies known to employees, start with simple warnings to curb violations of those policies, and then progress to more severe discipline only if the conduct is undeterred. The Civil Service laws and principles were well known to Burlington's labor counsel, Mr. Pelloquin, to Mr. Mercier, its town administrator, and to the Chief of Police.

29. On or about October 31, 2000 Mr. Mercier gave notice to Sgt. Downer that the Town of Burlington proposed to discipline him, and that the discipline could include demotion or discharge. These are very serious disciplinary steps.

30. Mr. Mercier made the decision to propose discipline and also acted as the hearing officer. Subsequently the Town held nine days of hearing with Mr. Mercier acting as the hearing officer. The length and scope of that hearing is unprecedented.

31. The case against Mr. Downer was prosecuted by Mr. Pelloquin, who at the same time continued to act as counsel to the Town of Burlington and Mr. Mercier about the

proceedings. On information and belief Mr. Pelloquin drafted the ultimate decision and consulted and advised Mr. Mercier about that decision.

32. During the hearings police officers were pressured to testify against Sgt. Downer. Pressure came from the Town, its counsel, Officer Sawyer and other officers who had aligned with Officer Sawyer.

33. During the hearings virtually every police officer admitted to the use of the term faggot, and to many other terms including fag, queer, homo, etc. On cross examination the officers admitted that these terms were used at all levels within the department, that they were used at roll call and in other official and social functions, that superior officers were well aware of their use, that the comments were at times made in anger and behind an individuals back, and that the Burlington Police Department had never made any attempt to curtail the use of any derogatory terms nor had it ever imposed any significant discipline for their use. As hearing officer, Mr. Mercier heard all this testimony.

34. Sgt. Downer was also accused of spreading rumors of a sexual nature about two other police officers, one of them being defendant Hart. Numerous officers testified to hearing these and similar rumors spread around the police department by officers other than Sgt. Downer. The witnesses testified that rumors and gossip about officers were common in the department, that no effort was made to stop them, and that no one else was disciplined. As hearing officer, Mr. Mercier heard all of this testimony.

35. Neither Mr. Mercier, the chief of police, nor any other town official made any attempt to investigate the use of allegedly derogatory or sexual terms within the police department. They also made no attempt to stop the use or to provide training as to what was appropriate.

36. The Town added supplemental charges against Sgt. Downer, including allegations of making false statements. It took no action against Officer Sawyer for lying to Sgt. Downer, and took no action regarding false testimony against Sgt. Downer at the Town Hearings or subsequently at the Civil Service hearings.

37. In August 2001 the Town of Burlington demoted Mr. Downer to the rank of patrol officer and precluded him from retaking the sergeant's examination for two years.

38. Mr. Downer appealed his demotion to the Civil Service Commission. The Commission ultimately had 12 days of hearing on the appeal, hearing approximately 33 witnesses. Briefs were submitted, and the Commission eventually issued a 73 page decision. (Copy attached hereto as Exhibit A)

39. The decision states that it is "one of the longest and most involved cases in the history of the Commission." (Decision, Pg. 58). The 73 page decision is certainly one of the longest in its history. *Fifty-Seven* of those pages are devoted to Findings of Fact.

40. The Civil Service Commission found that other police officers and town officials had conspired to demote Mr. Downer. The Civil Service Commission ordered that Mr. Downer be reinstated to the rank of sergeant without loss of pay.

41. The Commission's decision is striking not just for its length, but for the strength of its findings. Civil Service Commissioner Daniel Henderson found that the investigation into Sgt. Downer was "political in nature", "motivated by personal animus and vindictiveness" towards Downer, and "arbitrary and capricious in "design, enforcement and conclusions." Decision, Pg. 70. Among the specific findings of the Commission were the following:

--Top ranking police officials, including current Police Chief Hart, set out "to get" Sgt. Downer. Pg. 14.

--The officers instigating and those investigating the allegations were biased against Sgt. Downer.

--Commissioner Henderson found that the Town and the Department designed the investigation solely to focus on Sgt. Downer. Pg. 33, 43-44, 70

--Sgt. Downer was disciplined for practices that were commonplace in the police department, well known and even practiced by its ranking officers, which the Police Department had made no attempt to stop or change, and for which other officers had not been disciplined. Pg. 20, 39, 43.

--Sgt. Downer's principal accusers were found to "manufacture testimony and evidence" against Sgt. Downer. Pg. 70. The Commissioner termed one of Downer's chief accusers, a "dangerous liar". Pg. 17.

--"...outrageous, open and notorious conduct and behavior was pervasive throughout the Department...and was well known to the (police) Command Staff including the (police) Chief..." Pg. 43.

--"...the Town and the (Police) Department...tolerated and allowed these prevalent practices....to go unchecked and unpunished in the Department, practices which they have only now termed a problem, and then *only as it relates to (Sgt. Downer's) behavior.*" Pg. 39.

--The Burlington Police Department launched an investigation which Commissioner Henderson found to be "focused exclusively on (Sergeant Downer) for behavior and comments that were common place in the Department for decades." Pg. 70.

--The Civil Service found that the Town, the Police Department Command Staff including the former and current police chiefs had a strong bias against Sgt. Downer. Pg. 19, 34, 39, 54., and that the Chiefs exhibited a strong bias against Sgt. Downer, they demonstrated a firm commitment to get him "at all cost." Pg. 54

36. The Commission also found great fault with the way in which the investigation

was conducted. The Commission found that:

--The Police Department quickly made it clear that only Sgt. Downer would be disciplined. Pg. 33

--There was a general perception that the process was designed to get Sgt. Downer and get him exclusively. This belief affected the testimony of many witnesses. Pg. 43-44

--Burlington Police Officers were allowed a pervasive and unrestrained right to influence the investigation and witnesses. Pg. 31

--Officer Sawyer lied to his superiors at the start of the investigation, but was quickly told that he would not face any discipline. Pg. 31

--The Town assigned officers to conduct the investigation who had no experience in conducting investigations and who were unfamiliar with basic labor principals. Pg. 39.

    37. The Civil Service Commission makes numerous references to a conspiracy

among Burlington Police officers and officials:

--Lt. O'Meara and current Police Chief Hart were "out to get" Downer. Pg. 14.

--The Town, (former police chief) Solomon, Hart, O'Meara and another police officer coordinated an attempt to manufacture serious charges against Downer. Pg. 14

--In another incident during the course of the investigation (former police chief) Soda and (then) Lt. Hart attempted to create additional charges against Sgt. Downer. They did so by pressuring and threatening another officer to testify against Sgt. Downer. The threats included a threat to fire the officer if he did not testify. Pg. 53

--Lt. Sciuto and (former police chief) Soda engaged in a conspiratorial conversation regarding Downer. Pg. 19. At the time Lt. Sciuto was in charge of the police department's internal affairs division: i.e. the person who is charged with investigating allegations of police misconduct. Pg. 19

--Lt. Sciuto and Officer Sawyer attempted to embellish a trivial matter and exploit it to make another claim against Sgt. Downer.

--Police officers organized an effort to *create* information to be used against Downer. Pg. 23. They organized a "concerted effort *with other officers* to create charges against… (Downer) and planned to take him down; get him fired." Pg. 27

--A police officer threatened that Downer was going to "go down". That officer knew details of how the investigation was to be conducted before those details were disclosed. Pg. 29.

    38. On or about August 19, 2001 Mr. Downer was allowed to return to work as a

patrol officer. The following day Officer Sawyer went to Burlington Police Officer

Robert Preston and told him that Mr. Downer had made racist remarks about Officer

Robert Preston. Officer Preston is African-American. Officer Sawyer's purpose was to attempt to get Mr. Downer fired by having Officer Preston make a complaint against him. Officer Preston did make that complaint.

39. The remarks referred to by Officer Sawyer had allegedly occurred years before. No complaints were made at the time. Only when Officer Sawyer learned that Mr. Downer would come back to work did he fabricate these new allegations.

40. Despite a lack of any credible supporting evidence that Mr. Downer had made any racist remark, Mr. Mercier notified Mr. Downer that it was planning to impose discipline for alleged racial bias. Another hearing was conducted, this one lasting several days. Mr. Mercier again made both the decision to seek discipline and acted as the hearing officer. Attorney Pelloquin again acted as both prosecutor and legal consultant to Mr. Mercier.

41. Officer Preston testified that Mr. Downer had never made any racist remarks in his presence, that he considered Mr. Downer a friend, that he had been to social gatherings at Mr. Downer's house, and that he did not believe that Mr. Downer was racially biased. Numerous other witnesses testified that Mr. Downer was not biased.

42. The officers testifying in support of the allegations could not give dates when the statements had been made, other than years earlier. The officers did not report the statements at the time.

43. Again the investigation focused solely on Mr. Downer. The Town chose to ignore racial statements made by a former Chief, and to ignore clearly false statements from one of the officers.

44. Mr. Mercier imposed an additional discipline of a fifteen day suspension and a further bar from taking the sergeant's examination for another two years.

45. Mr. Downer appealed that decision to Civil Service, which has not yet heard the appeal.

46. During these proceedings defendant Hart was promoted to Chief of Police. The Town of Burlington also blocked Mr. Downer from being considered for promotion to the open lieutenant position, despite the fact that he had the highest civil service score at the time.

47. The Town of Burlington, Mr. Mercier and Chief Hart continued the prosecution of Mr. Downer through the lengthy Civil Service process. Witnesses were forced to testify against Mr. Downer. They created an atmosphere where officers were forced to choose sides for or against Mr. Downer, with a clear understanding of which side the Town was taking.

48. The Town continued to investigate every rumor regarding Mr. Downer. In at least one case an officer was threatened with discipline if he did not implicate Mr. Downer in an allegation of misuse of an email account. That officer subsequently left the department.

49. Officer Sawyer's mother was induced to make a complaint against Mr. Downer about a conversation she allegedly overheard. The accusation was false. The Town hid the fact that the accusation came from Officer Sawyer's mother.

50. Chief Hart made sure that a copy of the Town's discipline was furnished to the District Attorney, so that it would be distributed to defense attorneys for use against Mr. Downer when he testified in criminal cases. After the Civil Service Commission

overturned the Town's decision, Chief Hart refused to send that decision to the District
Attorney until forced to do so. Even then he sent the District Attorney a letter insisting
that the Civil Service decision had language affecting Mr. Downer's credibility. On
information and belief that letter was written by Attorney Pelloquin.

51. Since the Civil Service Commission issued its decision Mr. Downer has been
subject to continued harassment and retaliation from Chief Hart. Chief Hart first
attempted to discipline Mr. Downer for taking sick leave that had been authorized by a
Captain and a lieutenant. Chief Hart next disciplined Mr. Downer for having to be
reminded of a court appearance. Other officers have had similar reminders and have
even missed court appearances, all without consequence.

52. Chief Hart has called Mr. Downer into his office screamed at him and threatened
him. Chief Hart has also been calling private citizens and asking them to make new
accusations against Mr. Downer. As police chief, Chief Hart would not normally be
involved in investigations of any type, let alone personally calling private citizens.

53. Chief Hart has refused to consider Mr. Downer for assignment to any position
despite his qualifications and has refused to consider him for any award or citation,
despite the fact that Mr. Downer has continued to do outstanding work.

54. As a consequence of the actions of the defendants Mr. Downer has incurred
legal fees and costs in excess of $100,000.00.

55. Mr. Downer is a life time resident of Burlington. His parents are residents of
Burlington. He has been subjected to persecution that has now lasted approximately six
years. There have been many newspaper stories in Burlington regarding this case,
including many stories reporting the charges against him and his demotion. The

demotion was extremely humiliating. The numerous stories and accusations have
caused extreme damage to his reputation in many segments of the community.

56. As a result of the stress Mr. Downer has been forced to seek counseling. He has
suffered a number of physical ailments which he did not have before the stress of these
accusations. The physical, financial and emotional stress has severely affected his
relationships with his wife and daughters.

57. When Mr. Downer was placed on administrative leave he lost income that he
would normally have received from details, overtime, and court time. Like most police
officers, his family depended on that extra income.

58. Mrs. Downer has stood by her husband during this entire time, but has seen their
relationship greatly affected by the stress placed on him. She has suffered extreme
stress herself and has had to seek counseling.

59. Defendants conspired amongst themselves and with other individuals and
Burlington police officers to bring false charges against Mr. Downer, to have him
disciplined if not fired, to deprive him of his civil service rights and job and to prevent
him from being promoted to lieutenant and chief of police.

## FIRST CAUSE OF ACTION

60. Plaintiffs reallege and incorporate herein the factual allegations of the preceding
paragraphs in this complaint.

61. Defendants individually and as part of a conspiracy have, by threats,
intimidation and harassment, retaliated against and attempted to terminate Mr.
Downer's employment and demote him in violation of his rights under the Civil Service

laws of Massachusetts as a result of his exercise of his First Amendment rights of free speech, all in violation of the Massachusetts Civil Rights Act, M.G.L. c.12, §11I.

## SECOND CAUSE OF ACTION

62. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

63. Defendants individually and as part of a conspiracy have, under color of law, retaliated against and attempted to terminate Mr. Downer's employment and demote him as a result of his exercise of his First Amendment rights of free speech, all in violation of the 42 U.S.C. §1983.

## THIRD CAUSE OF ACTION

64. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

65. Defendants have individually and as part of a conspiracy intentionally interfered with Plaintiff Robert Downer's contract of employment and his contractual rights.

## FOURTH CAUSE OF ACTION

66. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

67. Plaintiffs have been held up to ridicule in the community where they live and where Mr. Downer works, and have suffered severe emotional distress as a result of the actions of the Defendants.

68. Defendants have individually and as part of a conspiracy intentionally inflicted emotional distress upon the Plaintiffs.

## FIFTH CAUSE OF ACTION

69. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

70. Defendants have individually and as part of a conspiracy slandered and libeled the Plaintiffs and have knowingly caused those statements to be published and republished throughout the community.

## SIXTH CAUSE OF ACTION

71. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

72. Defendants have individually and as part of a conspiracy conspired together for the purpose of interfering with Plaintiff Robert Downer's constitutional, statutory and rights of employment and therefore are jointly and severally responsible under the doctrine of common law conspiracy.

## SEVENTH CAUSE OF ACTION

73. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

74. Defendants' actions have individually and as part of a conspiracy caused the Plaintiff Nancy Downer a loss of consortium.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues.

Wherefore Plaintiffs pray judgment against the Defendants as follows:

1. For fair and reasonable compensation for their emotional distress.

2. For fair and reasonable compensation for damage to Plaintiffs' reputation and standing in the community.

3. For compensation for Plaintiffs' consequential damages.

4. For Plaintiff Nancy Downer's loss of consortium.

5. For punitive damages for violation of Plaintiff Robert Downer's rights under the Massachusetts Civil Rights Act and 42 U.S.C. §1983.

6. For their reasonable attorneys fees.

7. For such other and further relief as this court may deem just and proper.

For the Plaintiffs
By their attorney,

August 24, 2005

Brian Rogal, Esq., BBO #424920
LAW OFFICES OF TIMOTHY M. BURKE
160 Gould Street, Suite 111
Needham, MA 02494-2300
(781) 455-0707

EXHIBIT A

Robert Downer V. Town of Burlington                    D-01-1326

COMMONWEALTH OF MASSACHUSETTS                    MAY 3 1 2005

SUFFOLK, ss.                         CIVIL SERVICE COMMISSION

Robert Downer,
    Appellant

v.                                   D-01-1326

Town of Burlington,
    Respondent

Appellant's Attorney:                Brian Rogal, Esq.
                                     Law Offices of Timothy M. Burke
                                     160 Gould Street, Suite 111
                                     Needham, MA 02494-2300

Respondent's Attorney:               Leo J. Peloquin, Esq.
                                     Collins, Loughran & Peloquin, PC
                                     320 Norwood Park South
                                     Norwood, MA 02062

Commissioner:                        Daniel M. Henderson, Esq.

## DECISION

Pursuant to the provisions of M.G.L. c. 31 § 43, the Appellant, Robert Downer, is
appealing the action of the Respondent, Town of Burlington, in demoting him to the
position of Police Patrol Officer from Sergeant and suspending him without pay for thirty
(30) days for sexual harassment, interference with an internal police investigation,
making false statements to an investigatory body, distributing obscene materials via
email, and making false statements of fact to the Massachusetts Commission Against

1

Robert Downer V. Town of Burlington                                     D-01-1326

Discrimination ("MCAD"). The appeal was timely filed. Hearings were held on July 24,
August 13, August 16, September 23, October 22, October 25, November 4, December
10, December 12, and December 17, 2002, and March 11, and March 13, 2003 at the
offices of the Civil Service Commission. All parties appeared. Twelve (12) transcripts
were made of the hearing. Both parties, after extension of the filing deadline, submitted
post-hearing briefs.

## FINDINGS OF FACT

Based upon the articles entered into evidence (Exhibits 1-122), and the Testimony of the
Appellant, Town Administrator Robert Mercier, Assistant Town Administrator Larry
Rittenberg, Chief Francis Hart, Firefighter James Sorenson, Officers Harry Sawyer, Jr.,
Gregory Skehan, Paul Anderson, Richard Hanafin, Timothy Kirchner, Spiros Tsingos,
Edward Mackey, Thomas Fournier, John Walthall, Kevin Rogers, James Tigges, Charles
Ferguson, Ann Marie Brown, Paul Glejzer, Stephen O'Meara, Stephen Cross, Timothy
McDonough, Stephen Papagno, Christopher Priest, Michael Joyce, Sergeants; Ralph
Patuto, Edward Smith, Thomas Duffy, Gerald Mills, Lieutenants William Faria and
Walter Bevis, Captain George Devlin, and civilian George Cummings I make the
following findings of fact:

1.  On August 9, 2001, Town Administrator Robert Mercier determined that the
    Appellant committed the following offenses:
    - Disparaging comments about the sexual orientations of Sawyer, Hart and
      Anderson (separate charge for each)
    - Threatening/attempting to threaten a witness
    - Failing to tell the truth in an investigation, in violation of Department Rule
      6.4.2
    - Distributing obscene materials through the Department's email system in
      violation of an order issued on November 7, 2000
    - Making false statements in a complaint to the MCAD

The Appellant was suspended without pay for thirty (30) days, and demoted to the rank of patrolman for at least two (2) years (Exhibit 1).

2. The Appellant is employed by the Town of Burlington ("Town") as a police officer. He has been employed in the Burlington Police Department ("Department") since 1985. In March 1996, he was promoted to the rank of Sergeant (Testimony).

3. The Appellant had no record of prior discipline. However he did receive a written warning in 1993, from Chief Soda, for failing to follow proper procedure regarding a telephone company detail. This letter is given very little weight due to its age, procedural subject matter, the unappealablity of written warnings and that Chief Soda issued the warning (see bias finding on Soda). (Exhibit 100 and Testimony).

4. The Appellant has received numerous awards, certificates and letters of commendation from civilians and his superiors, during his career. (Exhibits 103, 110, Testimony).

5. The Appellant has routinely received exemplary annual performance evaluations, obtaining the highest grade of "outstanding" in most categories, over his career. The Appellant is generally believed throughout the Department to be a bright, competent and professional Officer. (Exhibit 109 and Testimony)

6. The Appellant has regularly scored among the highest in the Department on competitive civil service promotional examinations. (Testimony)

7. During his career, the Appellant has obtained grants to begin and operate the Department's bicycle unit, a community-policing program, and a fast hiring program for officers (Testimony).

3

Robert Downer V. Town of Burlington                                         D-01-1326

8. Harry Sawyer, Jr. has been an officer with the Department since 1988 (Testimony).

9. Sawyer has predominantly worked the day shift for the Department. His interaction with the Appellant, who works the night shift, would come as the two shifts overlapped (Testimony).

10. Several of the officers in the Department, including Richard Hanafin, Gregory Skehan, Charles Ferguson, Sawyer, Richard Covino and the Appellant, were friends outside of work. Often, they would go on trips together. Hanafin, Skehan and other officers socialized with the Appellant, sometimes with their wives. Many of the officers in the Department attended parties at the Appellant's home or at the home of George Cummings, a private citizen and resident of Burlington (Testimony).

11. At the time of the events in question, the friendship between Hanafin and the Appellant, which was once very close, had become ruptured, for reasons not fully contained in the record. However some observers were not aware of the change in their relationship. (Testimony & Exhibits).

12. Officers in the Department, while at the station, out on duty, or socializing together, had a long tradition of making cutting, derogatory, denigrating remarks, usually of a sexual nature to each other, sometimes in anger but usually in a joking manner while in the station, in the police locker area, offices, hallways or at roll call. These remarks, (e.g. fag, faggot, queer, queer boy, homo, butt buddy, cock sucker, etc.), would generally refer to an officer's appearance, demeanor, sexual preference or abilities. One example is that an officer would refer facetiously to another male officer's recent yeast infection or mammogram, not intending for anyone to actually believe that the officer referred to was a female, not a male. These remarks were usually made while in private conversations, between several Officers or among many. However these private conversations

4

were routine and many times loud and raucous, having all the earmarks of public
proclamations. These words were used in either a joking manner, to express one's
displeasure at another's actions, or to generate a reaction amongst other officers.
This practice had occurred routinely in the Department for decades. The added
complication of working and socializing together, sometimes extensively, seems
to have had the effect of erasing the line between private and professional
conversation among the officers. The Department also seems to have been a
rumor mill where no person or subject matter was sacrosanct. (Testimony,
Demeanor and Exhibits).

13. The regular use of obscene language or even specific, sexual reference to other
    officers around the station also occurred at the roll call. Over many years, the roll
    call developed an informal atmosphere where the officers would sit and talk for
    several minutes after receiving their assignments. Often command staff, up to and
    including the Chief would be present while the officers joked around using lewd
    language in their routine, demeaning fashion. This type of activity had gone on at
    roll call in the Department for decades. (Testimony).

14. Although most of the officers participated in this type of behavior to a more or
    lesser degree, over the past few decades, some officers merely observed it and
    laughed. Some of the officers who participated were superior officers and
    Command Staff, including Chief Soda and Acting Chief Solomon. Other
    members of the Command Staff were aware of it but choose to ignore it as best
    they could and thereby permitted it to continue. Some officers or pairs of officers
    were so persistent, open and notorious in this type of behavior, so as to prompt an
    expectation of antics and entertainment any time they were seen together, e.g.
    Captain Devlin with Sergeant Sheppard, and Officer Al Gagne with Officer Dick
    Horvass. The general attitude of the officers in the Department was that it all was
    "great fun" or "great entertainment". Absolutely no one in the Department felt it
    was misbehavior to be reported. Then the events which precipitated this

5

Robert Downer V. Town of Burlington                                    D-01-1326

investigation occurred, prompting reporting and counter-reporting by the
Appellant, Sawyer, Hanafin and aligned officers (Testimony and Exhibits)

15. Richard Horvass was one of the officers described as having a reputation for
bawdiness. He was known for creating obscene songs about other officers,
kissing officers on the neck, grabbing officers and simulating intercourse against
their legs saying to male officers, "I want to be with you" or "I could take care of
you". On one occasion, Horvass placed his finger in the Appellant's ear. When
the Appellant turned around, Horvass zipped up his pants, insinuating that he had
placed his penis in the Appellant's ear. Horvass particularly targeted new officers
with this type of behavior. These antics were well known throughout the
Department. No attempt was made to stop this behavior. (Testimony and
exhibits).

16. While some officers testified that the Appellant made some of the comments he
was charged with, many officers testified that they had never heard any such
comment. These included officers who were regularly at the Appellant's roll call and
supervisors and officers that he was friendly with and who would have been expected to
hear such comments from him if they were frequently made. It was evident that
some officers did not like The Appellant personally. As Sawyer testified, some
officers did not like The Appellant because he ran a "tight ship'. Others resented
his aspirations to move up in the Department (Testimony).

17. The Burlington Police Department, like many other workplaces, has long been a
place where rumors start and are repeated, sometimes over a long period of time
with the resulting permutation of details. Numerous witnesses testified that gossip
and rumors were repeated in the Department all day long (Kirchner, Faria).
Many of these rumors regarded other officers. Some of the rumors have had
sexual references or implications. Capt. Devlin testified that one of the rumors
was that an officer was involved in a rape. Other rumors involved himself,
including that he was selling cocaine, that he was in a limousine with women doing

6

cocaine, that he was a cross dresser, and that he visited prostitutes in New
Hampshire. Town Selectmen called inquiring into the prostitute rumor. Aside
from The Appellant, no one has ever been disciplined for starting or spreading
any rumor. Lt. Sciuto, the internal affairs officer, gave a statement, that he had
heard the Appellant make statements about Chief Hart and Mr. Anderson over the
years, but had done nothing more than talk to The Appellant about them on some
occasion. If we assume, *arguendo*, that this statement was accurate, it would
merely prove that discipline was never considered or warranted for rumors or
comments about other officers, even where a lieutenant heard them. Rumors were
not necessarily relayed maliciously, but merely as a practice to make private
conversation. (Testimony and demeanor).

18. One rumor was that the now-current Chief, Francis Hart, was a cross dresser.
    Downer was charged with spreading this rumor. However, numerous witnesses
    testified that they heard various versions of this rumor. Most common was that
    there was a cross dresser in the Department who had been seen coming out of a
    hair salon. A common variant was that the person had their nails done. Some of
    the rumors named Hart, others named Captain Devlin. Lt. Bevis, Sgt. Duffy and
    Capt. Devlin had heard the rumor. Capt. Devlin had heard that he was the alleged
    cross-dresser. Many witnesses testified that they had heard these rumors from a
    number of officers in the Department. In most instances the witness said they
    heard these rumors from someone other than The Appellant. There was no
    evidence that The Appellant started these rumors. Despite the facts that Lt. Bevis
    and Capt. Devlin had heard the rumors, no investigation was ever launched into·
    who was starting or spreading these rumors. No one other than The Appellant was
    ever disciplined for the rumors. There is no evidence that The Appellant started
    this rumor. Nor is there any indication as to who first instigated these rumors.
    (Testimony).

19. Former Officer and present U.S. Air Marshall Timothy Filep testified in a
    straightforward, clear and appropriate manner. Filep was a patrol officer in the

Department from June 1999 to April 2002. Testifying as a former member of the Department allowed him the freedom to testify with frankness. He was not constrained by considerations of personal and professional relationships with others in the Department. During his tenure in the Department, the use of the terms "faggot", "fag", "homo", "queer", "queer-boy", etc. were commonly and routinely used throughout the station ('normal talk"). The terms were used to needle or deride people, usually in a joking manner, both in private conversation between two officers, and before a larger audience, including roll call. Command Staff were present at roll call when these terms were used to needle or deride someone. On at least one occasion Chief Soda was present at roll call when these terms were used to deride or needle someone. Filep was not aware of any attempt by anyone in the Department to stop this behavior. It was also common practice in the Department to post cartoons and other items that ridiculed someone in the Department, usually in a sexual way. A cartoon was posted in 1999 that depicted a chicken with Sergeant stripes. Filep believed that this was a reference to the Appellant. It was not uncommon for officers to receive derogatory or sexually explicit pictures and/or writings on the Departmental e-mail system. He was not aware of any attempt to stop these postings or e-mails. Timothy Filep has a good demeanor as a witness and his credibility is high. His testimony is believable (Testimony, Demeanor).

20. Officer Filep heard Chief Soda state, "If we got rid of half the faggots in this town, we wouldn't have half the problems we have." Filep also received the "monkey business" e-mail on his Department system. His partner and best friend on the Force, Officer Steve Papagno received the "monkey business" e-mail before he did, on the Departmental system. On November 30, 2000, The Appellant, in the Sergeants' office, called back to him at the front desk and asked "how do I send or forward an e-mail". Filep answered by calling back through the wall, saying, "click on it, click on 'e-mail'". Sgt. O'Meara was standing behind Filep at the time. That was the entire extent of Filep's knowledge or involvement with this e-mail, later identified as the "monkey business" video clip attachment.

8

Robert Downer V. Town of Burlington                                    D-01-1326

This attachment was also later identified as being sent by e-mail from the
Appellant to Firefighter Sorenson. (Testimony)

21. Then Chief Barry Solomon directed Filep to write a report on the" e-mail
incident". Filep answered and said it wasn't an incident. Approximately a week
later, he did write a report, as directed. Shortly after that, Filep was telephoned at
home and told to come into the station to speak with the Chief. Filep went to the
station and found Sgt. O'Meara, Lt. Hart and Chief Solomon there, waiting to
meet with him. Filep was shocked to learn that he was being charged with helping
the Appellant break into Sgt. O'Meara's e-mail to send the "monkey business"
video to Sorenson. Lt. Hart made this accusation to Filep and also told him that
"If they found out more information, they were going to terminate (Filep) him".
Filep was kept in the office and under pressure from those officers for
approximately 45 minutes, in an attempt to extract an admission or any
information to use against the Appellant on this allegation of breaking into
O'Meara's e-mail, to send the monkey e-mail to Sorenson. Filep felt extreme
pressure and felt that he was "blackballed" by the Command Staff after that. The
Command Staff stopped talking to him or associating with him. He heard
comments in passing, in the hallways, by the Command Staff, such as; "don't do
your password in front of Filep, because he'll probably break into your e-mail".
This is an example of the bias against the Appellant held by the Command Staff,
especially from Hart, O'Meara and Solomon. They would go to great lengths to
exaggerate, create or manipulate a serious charge against the Appellant. They
would even use surprise, inordinate pressure and veiled threats to a subordinate
officer (Filep), to achieve this goal. It was admitted by most and I find that at the
time of this alleged break-in to O'Meara's e-mail, a prevalent problem existed in
the Departmental e-mail system, in which people would open another's e-mail
box by accident and even send e-mail from it without being aware of it. This
recurring problem was generally recognized, but left unfixed, until eventually the
departmental e-mail system was changed. The Appellant did not break into or
intentionally send the "monkey business" e-mail from O'Meara's box. Filep did

9

Robert Downer V. Town of Burlington                              D-01-1326

not assist or attempt to assist the Appellant in this alleged yet unfound activity. When initially asked by O'Meara about the e-mail, the Appellant answered unhesitantly, that he did send the e-mail to Sorenson. (Testimony, Demeanor)

22. During Filep's tenure in the Department, his best friend on the Force, Officer Steve Papagno, was incessantly harassed by Officer Priest for a period of at least two months. This harassment usually occurred during or shortly after roll call. However it did also occur else where in the station and outside while on duty. Papagno is a bright professional and gentlemanly officer. The harassment was that Priest regularly called Papagno names such as; queer boy, butt buddy and asking him to blow him and to give him a blow job etc., in the presence of other Officers and on at least one occasion calling him stupid or an Idiot in the presence of members of the public. This practice of calling Papagno names at roll call, regularly reduced Papagno to near tears, after which he would complain to Filep, working at the front desk. Papagno's eyes would water and he would choke up and stutter as he relayed to Filep, what Priest had said to him. Finally Papagno made a complaint to Lt. Boutwell. It took a second complaint to Boutwell before Priest's behavior was curtailed but that behavior still continues. Papagno had finally become fed up with the constant humiliation in front of the squad and members of the public, by Priest. I realize that by the time Papagno testified in this hearing he wanted to minimize the effect that Priest's past conduct had on him at the time. After all what is to be benefited by resurrecting old embarrassments. Each witness is a keeper of their own emotions and here Papagno wanted to forget his past humiliation at the hands of Priest and let sleeping dogs lie. However Priest was concerned enough, to contact Papagno when this investigation started, in an attempt to dissuade him from mentioning this harassment, if he (Papagno) were called as a witness. This is another example of selective enforcement and disparate treatment. This is a more egregious, continuous, open and public harassment that was complained about but did not result in any investigation or discipline. This is another example of the Towns complete refusal to address this type of harassment and allow this long standing

10

practice to continue except when the Appellant was the target. This is an example of the Town's decision to avoid addressing a departmental problem and focus entirely on the Appellant. This message was clearly conveyed to every person in the Department; the Town's attitude was to make an example out of him and him alone. This investigation, after all, was entitled the Downer/Sawyer Investigation. (Testimony and Demeanor, Exhibits 66-72 and 88-93)

23. Papagno relayed an incident that occurred a few weeks before testifying before the Commission where, in frustration, he lost his temper and raised his voice in a discussion with Sawyer, at the station. Papagno, normally a gentlemanly professional, lost his cool with Sawyer because he had been called as a witness in this matter. Papagno felt dragged into this matter between Sawyer and the Appellant. He desperately wanted to remain neutral between Sawyer and the Appellant, and felt the pressure and tension associated with testifying or "being backed into a corner". Papagno's stress and tension is representative of the emotions and feelings of most, if not all of the witnesses in this matter and everyone else in the Department. This stress and tension affected the reliability of the memory and testimony of every witness to some degree. The stress and tension is greater on the Appellant than anyone else involved since he is the sole target and the only one slated to suffer any loss. (Exhibits, Testimony and Demeanor)

24. Hanafin's testimony is not believable as he was motivated by a strong dislike of the Appellant. Hanafin's testimony had all the indicia of unreliability. He initially claimed that his friendship with the Appellant broke up over an incident that occurred outside of work. Then he contradicted himself and said it was due to the Appellant's accusation that he (Hanafin) posted the "indicted cartoon" at the station and threatened to take him to the Chief over it. Hanafin testified that, in total, he heard the Appellant make sexually derogatory comments about Sawyer, only "several times", the last time being August, 1999, at a bar in Newport, RI. Hanafin drove to the bar with his friends; Sawyer and Skehan. Then he went on to

11

contradict himself by saying he heard the comments from the Appellant while at the police station; at roll call and in the locker room and at the front desk, three places that I assume are three incidents. Hanafin was unclear as to the dates of these alleged incidents, not even the year, or who was present ("All different officers" or "different officers in the Department"). Hanafin claimed to have heard derogatory comments by the Appellant about Hart over a period of 16 years and 9 months and the last one about 3 years earlier. Hanafin claimed to have heard derogatory comments from the Appellant about Anderson over a period of 10 years with the last comment he heard was about 3 years earlier. However, again Hanafin was unclear on any details; of who were present, where it occurred and what was specifically said. Hanafin admitted to saying to someone that Sawyer was seen at Manray's, a gay nightclub in Cambridge. Then he backtracked and said he couldn't recall saying that about Sawyer. Hanafin was very vague, despite having prepared his Testimony by reviewing his Testimony from the town's disciplinary hearing. Even after having his memory reformed, prompted and refreshed, on numerous occasions he answered; "I don't recall" or "I can't be sure." I don't remember where or who was present. Hanafin also had the same faulty memory regarding the details of any alleged statements concerning Hart and Anderson, despite review, prompting and refreshing. Hanafin denied making any similar comments about Sawyer, Hart and Anderson. I find that his denial is not believable. Hanafin's original testimony at the Town's disciplinary hearing was not truthful and that was concerning events of many years earlier. He couldn't remember any unusual details that are usually associated with a long past memory, accurately recalled. He couldn't remember his generalized, prior testimony, despite review and preparation and then prompting and refreshing while on the stand. (Testimony and Demeanor)

25. Hanafin was cross-examined on two e-mails with attachments, sent through the departmental system. Exhibit 27, ("Titanic girls"), dated November 5, 1999 and sent by Hanafin to Officers; McDonough, O'Meara, Sawyer, Skehan and Tigges, marked "high priority". The e-mail indicated that on November 4th it had been

sent back to Hanafin from Officer Gerry Mills with the note, "(t)his is the Titanic you sent me this morning. You should be able to open it now." Hanafin denied knowing who "Gerry" was. The attachment was a photograph of a boatload of topless women. (Exhibit 28 "Pyramid Girls", dated January 2, 2000, sent by O'Meara to Paul Glejzer). The email had been sent on December 30, 1999 from Hanafin to; McDonough, Mills, O'Meara, Patuto, Sawyer and Skehan. Hanafin received this e-mail with attachment from a John Hanafin, on December 22, 1999. The Attachment was a photograph of a pyramid of nude women. When asked if he had received or sent these e-mails with attachments, Hanafin answered "I may have" and when asked if he had seen these e-mails and attachments before, Hanafin answered in his typical style, "I may have, I don't recall". Hanafin would have this hearing officer believe that vague, routine, long past and off-hand remarks about homosexuality are more memorable to him than more recent, distinctive e-mails sent and received by him, with attachments of group photos of nude attractive women, in distinctive pose. Hanafin is worse than an evasive witness, he is an incorrigible liar. I find that the Officers named here as receiving and sending the above e-mails with attachments are friendly with each other and are known to each other to enjoy receiving and viewing these photos and were not offended by these types of photographs. I also find that their friendship together, especially their friendship with Hanafin and Sawyer, the Appellant's co-protagonists, did influence their behavior and their testimony in this matter. These officers, who were friends, were emotionally aligned together and it was plain to everyone, from the beginning that the Appellant was in opposition to Hanafin and Sawyer in this matter. The design of this investigation, exclusively targeting the Appellant, influenced these witnesses, prompting, directing and enhancing their behavior, memories and testimony. They were not neutral witnesses and their memories and Testimony were tainted, possibly without their own awareness. (Testimony and Demeanor, Exhibits 27 & 28)

26. Hanafin eventually admitted to sending and receiving sexually explicit e-mails on the departmental system and posting his own cartoons about the Appellant and

other officers. He also started to soften on the witness stand. Regarding Exhibit
27, he finally admitted, "I may have sent it" and volunteered, in his own defense,
that "We had problems in the e-mail system" and it was common to get into other
people's e-mail. Regarding Exhibit 28, he cracked a little and answered; "I don't
recall sending it out, Sir, I don't know" and then added, in an attempt to spread
blame; "It was common for stuff like that to go through the e-mail system." He
also admitted that the "monkey business" e-mail came through his e-mail box.
However when asked if the added caption on the e-mail,- ("Bobby D. when he's
in a slump with his women or is it Buck Savage in the closet") referred to the
Appellant? Hanafin only answered, "It could be". Asked if he added that caption,
Hanafin denied it. "Buck Savage" is a nickname created and used by Hanafin to
refer to the Appellant. When questioned about the propriety of sending sexually
explicit e-mails, Hanafin answered defensively, "There was no e-mail policy in
January, 2000." The directive from Chief Hart prohibiting sexually explicit e-
mails was issued on November 7, 2000. Hanafin had the "monkey business" in
his e-mail box on November 28, 2000 and he sent it on from there. Hanafin
denied adding the caption to avoid violating the directive. Hanafin did admit at a
prior hearing to seeing the "Titanic Girls" photo, even before that hearing. He
impeached his own testimony with this prior inconsistent testimony. He lied when
he said that he did not add the Buck Savage caption to the "monkey business", e-
mail video clip. (Testimony and Demeanor).

27. The pervading bias, personal interest and motivation by the Town and some in the
Department is plainly obvious in the O'Meara e-mail box break-in investigation.
The Town, Chief Solomon, Lt. Hart, Sgt. O'Meara and even Officer Hanafin
expended a large amount of time and effort, in a coordinated attempt to
manufacture a more serious charge, (tampering or breaking-in to the e-mail box)
against the Appellant, for the alleged break-in to O'Meara's e-mail account, on
November 30, 2000. This coordinated attempt was made, under the guise of an
investigation, by people who held a strong bias against the Appellant. This is
another example the emotional permeation of and the serious taint and flaw of this

14

entire investigative process against the Appellant. (Testimony, demeanor and Exhibit 121)

28. Sgt. O'Meara, on November 30, 2000, immediately notified Lt. Hart of the Appellant's "monkey business" e-mail sent to Sorenson. O'Meara followed it up with a written report to Hart, as directed by Hart. The subject of the report was "E-Mail Tampering". This designation or characterization is premature, ominous and erroneous and chosen by a biased mind. O'Meara and Hart jumped the gun here because they were out to get the Appellant. O'Meara wrote the report without first contacting the Appellant for an explanation about it. In his initial report, O'Meara acknowledges the existing problems with the e-mail system; of officers unexplainably and unintentionally entering another's e-mail box and sending e-mails from it. O'Meara also acknowledges that he was sitting with Officer Filep at the front desk during the relevant time of the e-mail sending. O'Meara then followed up with a second written report to Lt. Hart, dated December, 2000, probably after Dec. 6th in which he states that the Appellant readily admitted, when asked; to sending the e-mail to Sorenson. O'Meara adds that the Appellant called over the loud speaker to Filep- "is it OK to send this? To which Fillip answered, "Yes". It is noted that loud speakers are not the normal choice of a medium for clandestine and incriminating communication. Now the matter takes a curious turn. Hanafin, a patrol officer and the Appellant's nemesis, either assigned himself or was assigned to investigate the e-mail tampering matter. Hanafin writes his 3 page narrative report to Chief Solomon, dated December 24, 2000. Hanafin begins by denying the charge contained in the Appellant's MCAD complaint, (just served on Hanafin), the charge that he distributed the "captioned, monkey business" e-mail within the Department for the purpose of embarrassing and humiliating the Appellant. Then Hanafin goes on to the separate e-mail tampering matter in an attempt to create evidence against the Appellant on that matter. Hanafin relays that he has been in several detailed discussions, (one on Dec. 18th), of that matter with O'Meara and received a lot of information from O'Meara on it. It would have been improper for O'Meara to

15

Robert Downer V. Town of Burlington                                D-01-1326

have discussed this matter with Hanafin, at this time or Hanafin is lying about the
discussions occurring. Hanafin goes on to describe the hearsay dialogue between
the Appellant and Filep on November 30th, during the sending of the e-mail to
Sorenson. However the dialogue is at variance with O'Meara's original version.
Hanafin also attributes suspicions to O'Meara, not expressed by O'Meara himself.
Now this is the humorous part; Hanafin then attributes to O'Meara, feelings of
disgust at the "vulgarity" O'Meara encountered and experienced when he opened
the "monkey business" e-mail. O'Meara and Hanafin were part of the e-mail
friends group that shared the mutual enjoyment, through Departmental system, of
group photos of nude women in distinctive poses, ("Titanic Girls" and "Pyramid
Girls"). Hanafin then described his own investigation of the e-mail tampering/
Sorenson matter. He talks to Sorenson and collects information. Hanafin then asks
Sorenson to provide a written statement. Then Hanafin accuses the Appellant of
making threats to him and Ferguson, through a mutual friend, George Cummings.
He further makes the unfounded accusation that the Appellant conspired with the
help of Officer Filep to tamper with the e-mail system and thereby creating the
caption on the monkey business that was distributed through the departmental
system. It is clear that Hanafin is very concerned about the MCAD ("He is trying
to set me up") complaint and trying furiously to throw some defensive mud in the
direction of the Appellant, George Cummings and Tim Filep. Hanafin's
implication of Filep in the alleged, e-mail tampering is base entirely on Hanafin's
feelings. Hanafin turns on his old friends; the Appellant and Cummings but also
tries to throw an innocent bystander, (Filep), under the bus, based entirely on his
feelings. Hanafin ends his report by asking Chief Solomon to investigate and
prosecute the Appellant for making false accusations against the Town and him.
The involvement of the Appellant's nemesis, Hanafin, in the investigation of the
nonexistent e-mail tampering is bizarre and a further example of his proactive bias
and vindictiveness against the Appellant. The excessive and unusual efforts by
O'Meara and Hart to increase the original, mere sending of an offensive e-mail
charge into an e-mail break-in, are an indication of the bias and collusion of each
against the Appellant. It is also noteworthy that these unusual contacts with and

16

solicitations from prospective witnesses occurred long after the Town sent the
Appellant a written warning letter, (November 22, 2000), regarding witness
tampering. The fact that the Appellant was cautioned in that warning letter
regarding 55 witness-officers, virtually the entire Department, is indicative of the
Town's bias against and disparate treatment of the Appellant. There is no
evidence that Sawyer, Hanafin or any other members of the Department were
similarly cautioned or warned.(Testimony and exhibits, 7, 8, 121)

29. We know that Hanafin, O'Meara and the rest of their group have a prurient
interest in certain, group photography. However, here Hanafin tries to cast himself
and O'Meara as priggish, by the use of the word "vulgarity", thereby creating the
inference of repulsion, felt when O'Meara opened the monkey business e-mail.
This is an example of Hanafin's flawed character. Hanafin believes that he has the
right to recast himself whenever it is advantageous in a particular situation. Since
playing the victim here suited his purpose of creating another offense for which to
charge the Appellant, it was OK for him to change his emotional persona. It also
seemed to him, as perfectly acceptable behavior to try and take down George
Cummings and Tim Filep as necessary, collateral damage, in his mad pursuit of
the Appellant's destruction. Hanafin believed that Cummings and Filep were
legitimate targets, base on their mere association with the Appellant. Hanafin is
more than a liar, he is a dangerous liar. This is another example selective
enforcement and of the attitude that pervaded the Department, which influenced
the behavior, memory and testimony of the witnesses. Here, Hanafin, the ·
protagonist, believing that, only the Appellant is being targeted; so that he may
conduct a proactive investigation against him and say whatever he pleases without
fear of repercussion. Hanafin also believes that his delivery of dirt against the
Appellant will be well received by the Chief. (Exhibits 27, 28, 121, testimony and
demeanor)

30. Neither Chief Hart nor Lt. Patuto had ever disclosed an officer's departmental
discipline, in a criminal case, so as to affect the testifying officer's credibility in
court, before doing so regarding the Appellant. Neither Hart nor Patuto had ever

17

been aware of it ever being done prior to this, either in the Burlington Police Department or anywhere else. By voluntarily raising the issue, they did intentionally and directly attempt to undermine the Appellants ability to testify in criminal cases in the future. The ability of a police officer to testify effectively in court, on criminal cases is a critical aspect of his job. Lt. Patuto has been a police officer since the 1970's and has been Police Prosecutor for the Burlington Police Department since 1990. At Woburn Court, where Lt. Patuto primarily works, there are also 7 other police prosecutors representing various cities and towns. There are also a certain number of Assistants District Attorneys regularly assigned to Woburn Court. Patuto learned, in August, 2001, that the Appellant had been disciplined by reduction in rank from Sgt. to Patrol Officer. Patuto did not know the basis for the discipline. Patuto inquired thereafter from the police prosecutors and Assistants District Attorneys at Woburn Court as to propriety or necessity of disclosure of departmental discipline of a police officer, in a criminal case. Nobody had ever had the experience in their own cases and nobody had ever seen it or heard of it before. Patuto was aware of many departmental discipline matters over his 13 years as police prosecutor. Patuto believed that any potential obligation to disclose departmental discipline might lie, only when the discipline involved dishonesty. Patuto did not know if the Appellant's discipline involved dishonesty. Patuto did go to Chief Solomon when he first learned about the Appellant's demotion. He told Solomon that there might be a problem if the Appellant were to testify in court as to whether the Appellant's departmental discipline should be voluntarily disclosed. Solomon instructed Patuto to wait until a trial required testimony before the issue should be raised. After that, Lt. Hart was promoted to Chief, then, Patuto went to him about the disclosure issue and asked for direction. Hart told him to call the District Attorney's office, which Patuto did and he spoke with First Assistant Lynn Rooney. Then Patuto reported back to Hart and Patuto got out of it, leaving it in Hart's hands. Before Hart ordered Patuto to contact the DA's office, both Patuto and Hart had considered the possible effect of creating a precedent by contacting the DA's office. That precedent might create the extra burden of having the police prosecutor examine

18

the personal file of each witness-police officer and then the voluntary disclosure of departmental discipline where appropriate. By notifying the District Attorney's office, a unique act that never had been done before, Patuto and Hart intentionally created an issue and gave notice to the DA's office, of the issue. In effect they dropped a hot potato in the DA's lap. It would be expected that the DA would react to it and that meant the possibility of routine voluntary disclosure of the Appellant's discipline in all of his criminal cases, to the obvious detriment of the Appellant. It is especially deliberate given that the discipline was not finally determined, as it has been appealed here. Lt. Patuto and Chief Hart exhibited their bias and vindictiveness against the Appellant with their highly unusual effort to voluntarily raise the issue of the Appellant's departmental discipline as exculpatory evidence. (Exhibits 117, 118, demeanor and testimony).

31. On December 30, 1999, Lieutenant Al Sciuto contacted the Appellant over the radio and told him that he wished to speak with him. When the Appellant asked what Sciuto wanted to talk about, Sciuto told the Appellant that it was "not important" and that it could wait until Monday (the Appellant was about to take a four day vacation). He did mention to the Appellant that it had something to do with an investigation he was conducting. Lt. Sciuto was in charge of the Internal Affairs Division. Sciuto then asked the Appellant to put him through to Chief Soda. After making sure that Soda was alone, Sciuto told Soda that he didn't want to explain to the Appellant why he called. This was to let the Appellant "sweat a little bit over the weekend", and that "between now and then it ought to be pretty near panic time." Chief Soda consented to Sciuto's plan. The Appellant subsequently made a tape of this conversation and had the tape transcribed. The Appellant was never formally charged with any offense. This is another example of the strong bias held by Sciuto and Soda against the Appellant. The reasonable inference here is that this is not the only such conversation or plan hatched between Soda and Sciuto against the Appellant. Neither Sciuto nor Soda expected the Appellant to become aware of the content of this conspiratorial conversation. (Exhibit 111, Testimony).

19

Robert Downer V. Town of Burlington                                    D-01-1326

32. The use of bawdy language to entertain by disparagement was persistently and
    consistently engaged in by many officers at the police station for the past several
    decades. This type of behavior extended to the posting on walls or bulletin board
    of cartoons with commentary and the use of the Departmental e-mail system.
    Little if any attempt by the Town officials or the Department's Command Staff
    was made to curtail this behavior. The frequency or degree of this language and
    behavior persisted, with waxing and waning periods, over the past several
    decades. (Testimony, Exhibits 23,,27, 28,  29, 30, 31, 36, 38, 105, 108, etc.)

33. There developed a widespread practice in the Department of "jumping on"
    someone else's computer station to send e-mails, if that station had not been
    logged off and left open. An officer, after jumping on, would send a facetious or
    outrageous e-mail to some or all of the other officers, under the name of the
    logged on officer. This type of activity was prevalent in the Department, reaching
    its peak in the late 1980's and continuing until November, 2000. Most officers
    considered this type of activity to be merely high jinx and "great fun". This
    "jumping on" or just sending sexually explicit e-mails, had gone on for decades
    before being curtailed by the then Chief Soda, due to such an e-mail being sent to
    the entire Department by Officer Glen Mills on March 2, 1999. The Chief took
    umbrage with some of the jocular but accurate references to him. Mills was forced
    to send an explanatory and apologetic e-mail to everyone in the Department;
    especially apologizing to Officer Paul Glejzer, whose e-mail he had "jumped".
    Because the facetious nature of the content apparently had been lost on many of
    the recipients,  Mills lamented in his apology e-mail that some people believe
    everything they read and hear. Mills received a letter of reprimand in his
    personnel file for this offense.  This did not affect his advancement in the
    Department; he was promoted to Sergeant after that. Official policy or policy
    change did not result from this e-mail episode, the Chief simply "raised a stink"
    over it and this type of activity stopped for a while and then continued. (Exhibits
    33, 34, Testimony).

Robert Downer V. Town of Burlington                                    D-01-1326

34. It was routine within the Department to receive e-mails on the Departmental
    system with outrageous content, usually sexually explicit pictures, language or
    both. It was not unusual for an officer to call another officer over to view his
    monitor showing the sexually explicit material and then send the material on to
    another officer in the Department. This practice occurred continuously over many
    years, right up to the beginning of the expansive investigation in this case
    (Exhibits 27, 28, 50, Testimony).

35. The type of language and dialogue in conversations or postings, which was
    routine around the station, was referred to by the various officers who testified in
    this case as normal and routine around the station and described as; "locker room
    talk", "black humor", "bitching", "jarhead humor", "sick humor", "work place
    banter", "police talk", "BS", "BS talk", "razzing", "faggot talk", "every day
    talk", "ball busting", "guy talk", "sexual banter", "normal talk" "stupid talk", etc.
    Even though the language and content became rough, personal and vicious at
    times, no one described it as harassment or sexual harassment. (Testimony)

36. Sawyer and the Appellant, who were cordial prior to this investigation, engaged in
    this type of banter between each other. When the two passed each other in the
    hall, the Appellant would call Sawyer "GQ Cop" or something to that effect,
    while Sawyer would make reference to the Appellant's physique, calling him
    "Steroid Bob" or something similar (Testimony).

37. Neither man appeared to take such comments as anything other than good-natured
    ribbing, and neither of them asked the other to stop making the comments
    (Testimony).

38. The Appellant is a married, personable, handsome man, with a large muscular
    build. Sawyer is a single, personable, handsome man, possibly even movie star
    handsome, with a medium muscular build. Both men are bright, egotistical, proud

21

and competitive. The Appellant is cocky to the point of arrogance, even hubris. The main difference between the two is a matter of style or approach. Where the Appellant is loud, boastful and provocative, collecting and playing to an audience, Sawyer is relatively quiet and indirect in his approach, dealing with people one on one, with an easy natural manner. The difference in style or manner allows Sawyer to hide his competitiveness or aggressiveness while the Appellant advertises his. The Appellant is confrontational, where Sawyer is indirect, subtle and at times sneaky. (Testimony, Demeanor and Exhibits)

39. If a popularity contest were held in the Department between the Appellant and Sawyer, Sawyer would win hands down. Some of this would be due to jealousy over the Appellant's success in the Department but most of it would be due to resentment of his personal style, (self-absorbed cockiness) and his personal approach to people and situations, (energetic aggressiveness). However if an officer were involved in serious trouble and had only one other officer backing him or her up, most in the Department would wish the back-up to be the Appellant. (Testimony, Demeanor and Exhibits)

40. At some uncertain point in time the friendly relationship between the Appellant and Sawyer ended. However it is certain that animosity existed between them, at least from around the time of the Sept/October, 1999 "indictment" cartoon incident, judging by the actions and reactions of each to the other. The actions and reactions of each to the other also showed their excessive pride, competitiveness and finally their immaturity in failing to resolve their differences in a reasonable manner before the entire police Department and town administration became involved. The Town's involvement and the pursuit of a personally targeted yet expansive investigation, with all the potential negative consequences for the Department and individual officers, were divisive and destructive. The Appellant and Sawyer exhibited excessive pride, selfishness and an ego-driven will to prevail over the other. Their personalities drove each to seek the other's defeat or destruction without any consideration of the collateral damage to other officers or

22

the entire Department. The police Department now has less cohesiveness, lower morale, lower esteem; greater suspicion and less effectiveness, as a result of this investigation. It is important to note that Sawyer's close friends and the Appellant's ex-close friends; Hanafin and Ferguson were instrumental in instigating and exacerbating the friction between Sawyer and the Appellant by providing alleged comments by the Appellant, to Sawyer. Hanafin and Ferguson continued to create and collect information to be used by Sawyer. They were and continued to be emotionally aligned with Sawyer against the Appellant. The Department has become divided as a result of this investigation (Exhibits, Demeanor and Testimony).

41. Captain George Devlin (who has over 33 years experience in the Department) knew the Appellant as a very capable and respected officer, but also as a person who was funny and entertaining, enjoying an audience. Captain Devlin was in a position to closely observe behavior and hear complaints, and he never heard any complaints about the Appellant's language or behavior from any officer. Devlin had never seen any friction or problems between Sawyer and the Appellant. Devlin was shocked and "dumbfounded" when he first learned through this case that a problem allegedly existed between the Appellant and Sawyer. (Testimony)

42. The Appellant, like many of the officers, used words such as "fag", "homo" and "queer" etc., routinely to refer to other officers, in his vocabulary in conversation with other officers and friends, whether on duty or socializing. The Appellant claims and it is found here that he does not use these terms in reference to one's sexual orientation, but in a joking or humorous way, a disquieting yet jocular sobriquet. (Testimony, Demeanor and Exhibits).

43. If, on the rare occasion an officer found a particular cartoon or joke to be offensive, the long standing practice was for the officer to informally deal with the matter, usually by meeting with the offender face to face and asking him stop what he was doing. Sometimes an officer would remove the offending cartoon or

23

posting, and sometimes after that it might be reposted. Generally the postings were done anonymously. (Testimony).

44. In September or October 1999, a caricature of a muscle-bound police officer was posted in the Department. A caption above the officer's head read, "If they don't indict me first, I'll be the next chief. Then I'll show everyone who ever picked on me". This is referred to as the indictment cartoon. The Appellant and most of the other officers viewed this cartoon to be a depiction of the Appellant. (Exhibit 23, Testimony).

45. On October 22, 1999, the Appellant had become very angry over the indictment reference in the cartoon and he issued a Department-wide email concerning the caricature. He expressed his anger at the drawing and the messages it implied, and asked the creator to approach him concerning what was meant. He also mentioned that if the creator did not step forward, he would seek disciplinary action (Exhibit 59).

46. On October 24, 1999 the Appellant, in an effort to identify the perpetrator, compared the handwriting on the caricature with that of other officers. The Appellant, after his own investigation, and comparing accident reports, believed that the handwriting matched that of Officer Sawyer (Exhibit 60, Testimony).

47. The Appellant confronted Sawyer about the caricature, accusing him of posting it. Sawyer denied the accusation. The Appellant threatened to bring the matter before the chief on a formal disciplinary charge. (Testimony).

48. Sawyer had not posted the caricature, but he had written the offending words (i.e. "if they don't indict me") on it. The words are the gravamen of the offending posting. (Testimony).

24

49. It was a serious mistake for Sawyer to use language, on an open posting, that created the inference or impression that the Appellant had done or was inclined to do something criminal, a felony no less. Police officers are well aware of the definition of the term indictment or indicted. Rumors could spread and the Appellant's reputation might be affected. Rumors did regularly circulate quickly, around the Police Department. The Department could be accurately described as a rumor mill. These rumors pertained to almost any subject including an officer's girlfriends, use of pornography, drug use, sexual preference, sexual fetishes, work related activities, etc. (Exhibits and Testimony)

50. On October 25, 1999, the Appellant filed a formal, written complaint with Chief Soda regarding the caricature. In the complaint, the Appellant asserted that Sawyer was the author of the caricature. (Exhibit 60).

51. Sometime in November 1999, at the intervention of Captain Devlin, the Appellant and Sawyer met informally, "in house" or "in office" to confront the problem between the two of them. The Appellant denied that he ever made any statements about Sawyer's sexuality. Sawyer refused to publicly apologize for the cartoon, as the Appellant wanted him to do. The meeting ended with both sides agreeing to try to "wipe the slate clean". Devlin believed the problem was over and everything was fine between Sawyer and the Appellant, only later did he learn that Sawyer had retained a lawyer who was pursuing a sexual harassment complaint and that the Appellant had continued to pursue his own formal complaint against Sawyer for the "indictment cartoon"(Testimony)

52. It was an error of judgment for the Appellant to have filed a formal, written complaint with the Chief, against Sawyer, for posting this "Indicted" caricature or cartoon, given that the Appellant had been a regular and willing participant in verbal and written high jinx of his own. Despite the serious overstepping in the use of the word "indicted" by Sawyer, the Appellant should have let the matter be resolved informally, by the "face to face" or the mediated "in house" method or

25

Robert Downer V. Town of Burlington                                      D-01-1326

some other informal method. It is noted that Downer tried the "face to face" approach but Sawyer denied the accusation. It is also noted that Sawyer's reaction to the accusation was to lie, which is not an unexpected reaction. It is not clear exactly why the mediation session with Captain Devlin did not finally resolve the differences between Sawyer and the Appellant. However it is clear that the excessive pride and competitiveness; the bull-headedness of Sawyer and the Appellant played a decisive role in this temporary failure to resolve their differences. (Exhibits, Demeanor and Testimony)

53. The Chief did not conduct an investigation and Sawyer did not suffer any official reproach or discipline for this act, which was a serious error by the Police Chief and Command Staff. An officer posting a cartoon regarding alleged felonious activities of a superior officer in a public place and then lying about it when confronted are very serious circumstances requiring immediate attention. By leaving this matter unaddressed and unresolved, the friction between Sawyer and the Appellant festered, inviting future acts of retaliation and recrimination between them. This is also exemplary of the practice of the Chief and the Command Staff to ignore problematic situations and of the general bias held by the Command Staff in favor of Sawyer and against the Appellant. The Chief, in keeping with past practice, should have forced Sawyer and the Appellant into mediation with a superior officer who was respected and trusted by both. This mediation ideally should not have ended without resolution, hopefully with mutual apologies and a handshake. A contributing factor to the Town and Department's failure to informally, resolve this relatively minor problem between Sawyer and the Appellant, was the motivation to use it as the nexus to begin the investigation and eventually get the Appellant. (Testimony, Demeanor, and Exhibits).

54. Prior to the sending of the letter of complaint by Sawyer's lawyer, officers Ferguson and Hanafin approached Sawyer and voluntarily informed him that the Appellant had made comments about Sawyer's sexual orientation, calling him a

26

"fag", "homo", or "queer", when Sawyer was not present. This was the first time that Sawyer heard these allegations. These allegations against the Appellant are false. These Allegations against the Appellant are actually a transference or attribution of statements to the Appellant, which were actually made by Hanafin and Ferguson. Hanafin and Ferguson were actually the more active purveyors of these rumors; albeit in crude language. They both informed at least one person, George Cummings outside of Sawyer's presence, during the summer of 1999, at Cummings' pool, repeatedly, in a serious tone and under circumstances to covey believability; "Well, you don't have to worry about Harry (chasing your wife). He takes it up the ass". Despite their own repeated comments about Sawyer's homosexuality, Hanafin and Ferguson remained friendly with Sawyer and began to organize an effort to support Sawyer against the Appellant. This approach was engineered by Ferguson and Hanafin to provide Sawyer with some ammunition against the Appellant. Ferguson and Hanafin believed that the Appellant was trying to get Sawyer fired and they believed they were providing Sawyer with his own counter charges. Hanafin and Ferguson organized a concerted effort with other officers to create charges against the Appellant and planned to take the Appellant down; get him fired.. Hanafin and Ferguson were also motivated by their animosity toward their old friend, the Appellant and their strong friendship with Sawyer. This is an example of the bias of Ferguson and Hanafin against the Appellant and in favor of Sawyer. However Hanafin and Ferguson were more apt than most officers to make derogatory comments about other officers, including Sawyer. It's ironic that the hypocritical Hanafin and Ferguson, became the main supporters and organizers for Sawyer against the Appellant. This is an example of the belief held by Hanafin and Ferguson; that the investigation was aimed only at the Appellant and the mud would only fly in the Appellant's direction. (Testimony, Exhibits and Demeanor).

55. Hanafin and Ferguson had actually made statements on more than one occasion to George Cummings, that Sawyer was a homosexual with the intent to convince Cummings of the truth of the statements. These statements were made by Hanafin and Ferguson despite their close friendship with Sawyer (Cummings at that point

Robert Downer V. Town of Burlington                                      D-01-1326

believed that Ferguson was Sawyer's best friend.) because Hanafin and Ferguson
had heard rumors and believed they were true or they were jealous. Ferguson
stayed at Cummings house while having marriage difficulties. Cummings and
Ferguson went out one night to the Marriot bar for drinks when Sawyer was
working there on a detail. Cummings described how Sawyer was so handsome
that he could be a model. Ferguson retorted that Sawyer was gay and then when
Cummings expressed disbelief; Ferguson answered, repeatedly, with all the
indicia of truthfulness- "I'm serious". Both Ferguson and Hanafin use the words;
fag or queer, almost reflexively both jokingly and angrily; as several examples
were provided by Cummings. Hanafin also uses profanity routinely and
reflexively to the point that he has to be calmed down or cautioned when women
and children are present. Cummings assessed it as "<u>Everybody knows it for a fact.</u>
<u>That's just the way he talks</u>." Cummings testified in a direct and spontaneous
manner, with great clarity of detail and recall of the temper, tone and
circumstances of the event. He did not try to exaggerate or state a detail he was
not sure of. He named places, events conversation and persons present in an
unhesitant manner. Much of the detail was drawn from him under cross
examination. Cummings believes that this entire matter is stupid and has been
blown out of proportion through this investigation. Cummings, who is friendly
with the Appellant, never heard the Appellant make comments about Sawyer
being a fag or queer or similar comments. This is an example of the transference
or attribution of comments and statements to the Appellant, which were actually
made by Hanafin and Ferguson. Cummings has good demeanor and high
credibility and his testimony is believed. (Testimony and demeanor)

56. It is clear that Sawyer is not a homosexual and he resents being referred to as one,
because it is mistaken. This type of talk, misidentifying him probably cropped up
in the Department, or better described as the "<u>Rumor Mill</u>", because the boys had
nothing better to talk about one day. Here the grist for the mill, seems to be
jealousy and the simple facts that Sawyer is movie star handsome and single.
Sawyer is a likeable guy who hitched his wagon to the wrong horses, (Hanafin
and Ferguson) in this battle. (Testimony, demeanor and exhibits)

57. George Cummings had been friends with the Appellant, Hanafin, Ferguson,
Sawyer, Skehan and other officers in the Department. Cummings was best
friends("like brothers") with Ferguson and had been best man at Ferguson's
wedding. They had attended parties at each other's home and otherwise
socialized, together, taking ski vacations with some of the officers. Cummings
had a swimming pool and some of the officers and their families were invited to
the pool. George Cummings offered credible Testimony indicating that
Cummings ran into Hanafin at the Dunkin Donuts in Burlington, sometime early
in this whole process. Hanafin expressed his anger at how the Appellant's formal
charge could lead to serious discipline against Sawyer, Hanafin's close friend.
Hanafin believed that Sawyer was going down over it. Hanafin said "He's trying
to get Harry Sawyer in trouble" over the indictment cartoon, which Hannifin
described. Hanafin expressed to Cummings, a plan and an intention in concert
with other officers, on the day shift, to get the Appellant. Hanafin acted upset and
said that "He's, (the Appellant) going to go down and we're going to make an
example of him, because of this." Hanafin had further plans that if the Town did
not discipline the Appellant, they would take the matter to the newspapers.
Cummings cautioned Hanafin and said "Rich, I don't understand. You guys are
friends. I don't understand what's going on, nor do I want to be involved."
Hanafin went on to describe a detailed plan in which the aligned officers would
give their testimony, when the Town would call every officer in the Department
over and take statements before a stenographer, as in a deposition. Cummings
asked Hanafin how he knew these details, since it was a private investigation and
it had not occurred yet. Hanafin stated he knew through his brother in law, Jack
Farren, who is very tight with the Town Administrator. Hanafin in particular was
instinctively and reflexively rough and crude in his language and content of his
conversations He got exuberant and overused the F-word in conversations. He
had to be routinely cautioned when women and children were present.
(Testimony and Demeanor).

29

Robert Downer V. Town of Burlington                                    D-01-1326

58. It is important to note that Sawyer's numerous friends, acquaintances, coworkers,
    and superiors in the Department, including Hanafin and Ferguson, had not
    bothered to inform him or report any of this allegedly offensive, improper and
    allegedly, long-standing behavior of the Appellant. They also failed to admit to
    Sawyer that they, ( Hanafin and Ferguson) had made worse comments, of a
    similar nature about him.  Sawyer had not been aware of the Appellant's
    comments and no one reported it, until it suddenly, at the instigation of Hanafin
    and Ferguson, materialized as the entire basis of this expansive investigation
    targeting the Appellant. (Exhibits, Demeanor and Testimony)

59. It is also noteworthy that the investigation that targeted the Appellant was
    expanded after it was initiated, to include then Lt. Hart and Officer Anderson as
    alleged victims of the Appellant's offending remarks. Yet neither of these two
    men were aware of any of the allegedly disparaging remarks made about them by
    the Appellant until they were informed of such through the investigative process.
    Again, no friends, acquaintances, coworkers, subordinates and superiors in the
    Department had bothered to inform them or report, any of this behavior. Ironically
    Anderson first heard about the Appellant's alleged offensive comments about
    him, from Sawyer, when Sawyer began his own investigation and witness
    recruitment. Sawyer denied being the first to inform Anderson of the Appellant's
    alleged comments about him.  Sawyer testified clearly that Anderson had
    previously heard those comments attributed to the Appellant; "through other
    people." Anderson, however, testified that he was first informed of the
    Appellant's alleged comments about him, from Sawyer. Sawyer, after receiving
    the allegation of comments attributed to the Appellant, from Hanafin began
    collecting information from officers in the Department. Sawyer spoke with at
    least 25 officer-witnesses, some more than once, in search of information to use
    against the Appellant. Sawyer was planning on filing a formal complaint in court
    or at the MCAD at that point. It was common knowledge in the Department, early
    on, that Sawyer would be filing a complaint against the Appellant and possibly
    the Town. This is even admitted by Sawyer. The entire Department was then

D-01-1326

divided over the Sawyer/Downer controversy. The Department was in "complete
turmoil" over it. It is not exactly clear at what date Sawyer consulted with an
attorney for this purpose. This extensive search, by Sawyer personally, for
witnesses and evidence to use against the Appellant, was not impeded, cautioned
or acknowledged in any way by the Town or the Department, in contrast to the
letter of caution, regarding witness tampering, sent to the Appellant. Sawyer knew
before he began his search and witness recruitment that he would not be
disciplined for the indictment cartoon and lying about it. Within 10 days of the
Appellant filing the formal charge with the Chief against Sawyer for that cartoon,
the Chief and Lt. Sciuto informed him that the complaint had "dried up and blown
away". From this point forward, Sawyer was completely free of fear of discipline
and could concentrate on getting the Appellant. These events are examples of the
bias of the Town and the Command Staff against the Appellant and in favor of
Sawyer. This is also an example of the pervasive and unrestrained influence that
Sawyer and Hanafin had on the investigation and the witnesses. This is also an
example of the ineptitude of the Town and the Command staff. If a management
problem develops, in which two employees are allowed to project their personal
differences into "complete turmoil" for the Department, ultimately the
administration and the Command Staff are to blame. An administrator, who
voluntarily gives up the leverage of discipline for a serious offense, (indictment
cartoon and lying) against only one of the two obstinate adversarial employees is
guilty of serious mismanagement and possibly misfeasance. The voluntary loss of
that counterweight between the two combatants is expectantly fatal to the
eventual agreeable and equitable resolution between them. (Testimony, demeanor,
Exhibits 7, 8 etc.)

60. Officer Hanafin precipitated this investigation when he recounted to Sawyer on
his own initiative that the Appellant had made comments concerning Sawyer's
sexual preference, on more than one occasion, calling him gay or "a fag". The
most recent of those comments that Hanafin claimed to recall, was in August of
1999. At one instance, the Appellant allegedly told Hanafin that a person he

31

Robert Downer V. Town of Burlington                                    D-01-1326

knew had seen homosexual pornography in Sawyer's apartment. This is not
believed because Hanafin has no credibility in this matter. However, if I did
believe Hanafin, that comments were made, on occasion, by the Appellant, the
statement would merely constitute normal conversation, police banter, an offhand
remark or the passing on of a rumor, rather than an attempt to convince Hanafin
of the truth of the matter asserted. Virtually every witness, including Sawyer,
have admitted that they have participated in type of conversation, gossip or rumor
mongering of this nature and that it has been common practice in the Department
for years. (Testimony).

61. Hanafin has been married for 14 years and has 3 children. He has been a close
    friend of Sawyer for 15 years and socialized with him outside of work. Hanafin
    testified clearly that his friendship with the Appellant broke up over an incident
    that occurred at a motorcycle event at Salem, New Hampshire, in September
    1999. Later, during cross-examination, he testified clearly that his friendship with
    the Appellant broke up due to the initial accusation by the Appellant that he, not
    Sawyer, had posted the offending "indicted" cartoon and the threat to take him to
    the Chief over it. When he was confronted with this contradiction he initially
    denied it and then tried to lie his way out by saying that they both contributed to
    the break up of the friendship. Hanafin is a liar and has no credibility. (Testimony
    and Demeanor)

62. Hanafin broke off his friendship with Officer Paul Glejzer in 1994 because
    Glejzer apparently made a comment about Hanafin's improper conduct that
    affected Hanafin's marital relationship. Apparently Hanafin's wife heard the
    comment. Hanafin reacted spontaneously and viscerally toward Glejzer for this
    perceived wrong. Hanafin, in his normal colloquial speech, called Glejzer "a
    fucking asshole, a rat and a piece of shit"and threatened to get even with him.
    Hanafin has not been a friend of Glejzer since then. However, Hanafin claimed
    that he did not threaten to get even with Glejzer for this perceived wrong. Much
    effort was expended to avoid describing Hanafin's improper conduct. There was a

32

Robert Downer V. Town of Burlington                                         D-01-1326

perceived belief of nearly everyone involved in this entire matter that the
Appellant and only the Appellant should suffer any discipline, loss or
embarrassment from this investigation. This is also a demonstration of Hanafin's
personality traits. He breaks a friendship quickly over some perceived wrong
without even considering his own blame in the matter. He is a liar. Hanafin is a
person who holds a grudge despite his assertions to the contrary. (Testimony and
Demeanor)

63. Hanafin has no credibility on matters relating to the Appellant because he was out
to get the Appellant. Hanafin was carrying on a conspiratorial war against the
Appellant, from the beginning, with Sawyer, Ferguson and others. Hanafin lied
when he testified that he had not ever made any disparaging sexual remarks about
Sawyer, Anderson, Hart or any other officers. He made such comments more
regularly than others. Hanafin admitted that he had a falling out of his friendship
with the Appellant over an incident at the Salem, New Hampshire motorcycle
rally but he did not describe the incident. At the time of his Testimony in this
hearing, Hanafin held a strong bias based or personal animus against the
Appellant. Hanafin's Testimony is not believable. (Exhibits, Demeanor,
Testimony)

64. Ferguson has very low credibility on matters relating to the Appellant because he
was also out to get the Appellant. Ferguson was carrying on a conspiratorial war
against the Appellant, with Hanafin, Sawyer and others. Ferguson admitted that
he had a falling out of his friendship with the Appellant over some personal
incident that he refused to clarify. Both Hanafin lied when they testified that they
had not made similar comments about Sawyer. (Exhibits, Testimony and
Demeanor)

65. Ferguson vacated the witness stand, in anger, without permission, during
examination. Ferguson obviously became upset, confrontational and
uncooperative due to the line of questioning. This occurred during an inquiry that

33

referenced a very sore personal subject matter. At the time of his testimony in this hearing, Ferguson held a strong bias based or personal animas against the Appellant. Ferguson's testimony is not believable. Ferguson's behavior in refusing to answer questions and vacating the witness stand is an example of the strong emotions generated in this case, which influenced behavior, memory and testimony. It is also an indication of the firm belief and attitude of every officer-witness here, that the Appellant and only the Appellant was the target of this investigation and only he could suffer any loss, discipline, or embarrassment. (Exhibits, Testimony and demeanor).

66. The Appellant's ego was bruised when he and his wife were out to dinner socializing with Ferguson and his wife. This incident cut the Appellant to the quick and is at least a contributing factor to the Appellant's change in attitude toward Sawyer. Ferguson recounted this incident where he, the Appellant and their wives were at a restaurant and the wives were asked whom they thought was the handsomest officer on the force. When the Appellant's wife claimed Sawyer was the most handsome, the Appellant spontaneously reacted by calling Sawyer "a flaming homo or faggot." Then Ferguson claims that he said to the Appellant No, it isn't true. I find the incident involving the Appellant's wife to be accurate, but not Ferguson's version of his own reaction to the Appellant's outburst. Ferguson also relayed that the Appellant had asked him on numerous other occasions whether he thought Sawyer was "a fag", to which Ferguson claims he always said no. These statements, attributed to the Appellant are not believable. Ferguson had actually told other people that Sawyer was gay in a crude way; "Yeah, he does it all the time. Yeah, he takes it up the ass." When one of the people exclaimed disbelief, Ferguson repeated the accusation, for emphasis and added the gesture of a limp wrist for added emphasis. (Testimony, demeanor and exhibits).

67. Ferguson, who was a union officer at the time, tried to engineer a strongly worded resolution by the Burlington Police Patrolman Association, ("BPPA"), against the

Robert Downer V. Town of Burlington                                    D-01-1326

Appellant after the Appellant had been demoted to Patrol Officer. The BPPA has between 45 and 50 Patrol Officers, as members. This is an example of Ferguson's vindictiveness and pettiness and yet another example of the virulent animosity and bias that Ferguson held against the Appellant for the benefit of Sawyer (Testimony and demeanor).

68. Officer Skehan claimed to have recalled that the Appellant told him on several occasions prior to the subsequent investigation that he knew that Sawyer was gay. The Appellant would make these statements while in the station and in front of other officers. Skehan never reported these alleged statements to anyone. Skehan was aligned emotionally, with Sawyer, Ferguson and Hanafin against the Appellant in this matter and his memory and testimony was influenced and tainted. His testimony is not believable.(Testimony, demeanor and exhibits).

69. I attribute very little weight or accuracy to Skehan's testimony on the issue of alleged statements made by the Appellant regarding Sawyer's sexual preference. His memory was weak and needed prompting and refreshing, despite having reviewed his prior Testimony with the Town's attorney. He was reviewing the transcript of his prior Testimony in the Commission's lobby prior to giving his Testimony here. His memory of the exact words used, persons present, the reactions of those present and other circumstances was hesitant and indefinite. Although Skehan had been friends with both the Appellant and Sawyer, he was much closer to Sawyer, some one he grew up with in the same neighborhood and continued their friendship through college and on to the police force. Given a choice, Skehan chose Sawyer over the Appellant. Skehan was biased in favor of Sawyer but also angry that he had been "put in the middle" between friends by virtue of being "dragged into this investigation" by his compelled Testimony in this matter. Skeehan and many of the other officers (eg. Michael McDade) also felt like "victims" of this investigation. Skehan commiserated with the Appellant who bewailed the loss of his two close friends, Hanifan and Ferguson, over this investigation. This is not a matter entirely of credibility. I believe that Skehan did

35

Robert Downer V. Town of Burlington                                    D-01-1326

an admirable job trying to navigate, under difficult circumstances, however his
memory and testimony was emotionally tainted and enhanced not refreshed, as
the investigation focused exclusively on the Appellant, with his close friend
Sawyer as the alleged victim. This forced Skeehan and the other officer-witnesses
to ultimately choose sides, sometimes between friends and sometimes against a
competitor or nemesis. I believe that the complex, emotion-laden, psychological
choice process was susceptible, over the length of time between the alleged event
and the testimony, to improper considerations rendering those recollections
unreliable. Those considerations for the most part were unconscious or
subconscious and as varied as human experience and personality. The affect on
memory and resulting testimony would be difficult to discern, both for the witness
and the finder of fact. In any event, none of the witnesses thought that any of the
Appellant's alleged statements were serious or important enough to report to the
referenced officer or a superior officer until much later, either precipitating the
investigation or after the investigation had begun and testimony compelled.
(Testimony, demeanor and exhibits)

70. None of the officer-witnesses in this case were emotionally neutral. The finding
above regarding Skeehan pertains to each other officer. Every testifying officer is
an experienced and professional witness, having been trained and having testified
in court on criminal and/or motor vehicle offenses. Each of them had some
relationship with Sawyer and the Appellant as coworker, superior, subordinate
acquaintance or friend. Each witness did have had his or her memory and
testimony subconsciously or unconsciously affected as described above. Also
each witness, depending on his or her relationships, could be consciously
motivated to protect or persecute the Appellant or protect Sawyer. It is unlikely
that any witness was motivated to persecute Sawyer as the Appellant was the sole
target of this investigation. This was obvious to all the witness-officers, right
from the beginning of the investigation. This investigation with compelled
participation and testimony was, by design, a vehicle for division and "taking
sides" in the Department. For some officer-witnesses, this was "get even time"

36

Robert Downer V. Town of Burlington                                    D-01-1326

against the Appellant for others it was "standing tall time" to protect him. Still others' memory and testimony could be affected to some degree by some real or imagined past act of kindness or of offense, without the witness even being aware of it. Because of the obvious circumscription-design of the investigation to target the Appellant, exclusively, each officer-witness was not encouraged nor allowed to make comments about other specific officers. Any officer-witness, who would venture outside these strict confines to specifically accuse another officer, would be viewed by the other officers, as a rat. Accordingly, any officer-witness who did not recall derogatory comments made by the Appellant might feel at some risk for discipline for lying under oath. In any event none of the witnesses who claimed to recall past offending statements thought that any of the Appellant's alleged past comments were serious or important enough to report the statements either to the referenced officer or a superior officer until after the investigation had begun and Testimony compelled. (Testimony, demeanor and exhibits)

71. Sawyer began to informally investigate the allegations of Ferguson, Hanafin and Skehan. Sawyer sought to compile any and all information to support Ferguson and Hanafin's assertions so that he could use it against the Appellant. (Testimony).

72. Officer Sawyer sought the consultation of attorney Harvey Schwartz at some point following his inquiries into the Appellant's behavior. On February 14, 2000, Schwartz sent a letter to Chief Soda requesting a formal investigation be initiated concerning the Appellant's statements about Sawyer (Exhibit 21).

73. On February 17, 2000, within only few days of receipt, Chief Soda informed the Appellant in writing that a formal investigation was to proceed against him. The listed charge was sexual harassment, in violation of Department policies and procedures. This response, by Chief Soda, was impulsive, spontaneous and done without full consideration of the over all well being of the Department. This

response was motivated by bias against the Appellant and in favor of Sawyer.
(Exhibit 22, Exhibits, testimony and demeanor).

74. The Town or Chief Soda had the discretion to react to Attorney Schwartz's letter
in a variety of ways. A better approach would have been sending a response letter
to Attorney Schwartz, saying something like, "Thank you for your letter; I have
appointed a committee to look into the circumstances cited in your letter. After we
have thoroughly assessed the situation and reviewed the committee's
recommendations, I will respond to you with my planned course of action."
Initiating a formal investigation was a rash and inappropriate reaction by Chief
Soda to Attorney Schwartz's letter. Chief Soda should have first tried the
longstanding practice of attempting to resolve the matter informally by the "in
house or in office" approach previously described, preferably by a neutral
superior officer respected by the men. If that approach was ineffective then a
more formal approach could have been pursued. There is no indication that Soda
was ever made aware of Devlin's attempts to informally settle the matter. It is
very difficult to deescalate from the formal and severe approach he took. The very
predictable results of division, animosity and recrimination between the Appellant
and Sawyer and his aligned witnesses should have been seriously considered. The
divisiveness and other negative consequences to his officers and to his
Department should have been considered by him before he launched this fiasco.
Hopefully those foreseeable results which did occur and remain, ("The
Department is in complete turmoil") will be dealt with effectively, in the future.
(Exhibits and Testimony).

75. The Town charged the Appellant with openly making offending statements at roll
call and elsewhere inside the station, or in private conversations in violation of the
rules and regulations of the Department. The Town, further, charged that those
offending statements were made with such purpose and intent as to be in violation
of the rules and regulations of the Department. The statements charged to the
Appellant are no different in nature, content and purpose from statements

38

Robert Downer V. Town of Burlington                                    D-01-1326

regularly made by numerous other officers, including superior officers, in the
Department over a period of many years, even decades, at roll call, throughout the
station, and in social situations. Therefore the Appellant was exclusively targeted
for past behavior that had occurred over a period of many years, without any
advance, fair notice that the behavior was prohibited and would be punished if
continued. This investigation and its resulting discipline is a clear act of disparate
treatment, retrospective or ex post facto enforcement and is an example of the
Town's and the Command Staff's strong bias against the Appellant. It is
especially indicative of bias considering the long-standing inertia and failure to
act in this area when faced with other more egregious, open and notorious
conduct, by other officers, such as that conducted against Papagno by Priest or
Horvass with anyone present. (Exhibits and Testimony)

76. Town Administrator Mercier assigned Assistant Town Administrator Larry
    Rittenberg and Wes Simons, Director of the Community Life Center to
    investigate the allegations of sexual harassment against the Appellant
    (Testimony).

77. Neither Rittenberg nor Simons had ever conducted an investigation such as this
    before. Both men were unfamiliar with the principals of progressive discipline,
    even though the Town subscribes to the principals of progressive discipline
    (Testimony).

78. For decades, the Town and the Department has tolerated and allowed these
    prevalent practices as previously described. It has allowed these to go unchecked
    and unpunished in the Department, practices which they have only now termed a
    problem, and then only as it relates to the Appellant's behavior. This long-term
    acquiescence has affirmed that long-standing prevalent practice as its own de
    facto policy in this area. (Exhibits and Testimony)

Robert Downer V. Town of Burlington                                          D-01-1326

79. The de facto Departmental policy or the policy as long practiced certainly had
    much more influence on the officers, as a guide to behavior than the personnel
    rules and regulations of the Town and the Department on harassment/sexual
    harassment. Those rules and regulations are vague, employing undefined terms
    and on which the officers received no instruction, direction or training. (Exhibit
    64 and Testimony)

80. Rittenberg testified that Town Manager Robert Mercier instructed him to
    investigate only allegations about the Appellant, not allegations about anyone
    else. He believed that he had no authority to expand the investigation to anyone
    else. However, the investigation was expanded beyond Mr. Sawyer's initial
    accusations to other allegations leveled at the Appellant. Rittenberg therefore did
    not investigate statements that were attributed to other officers or even suggest
    that they be investigated. He did not have the authority to consider the Appellant's
    prior performance. Rittenberg accepted every statement about the Appellant as
    true. The investigators' duty was to compile facts, not to make any
    determinations of motive, intent and other state of mind aspects. (Exhibits 1, 2, 3,
    4 & 5, and Testimony)

81. The Town's personnel rules and regulations have an anti-harassment and anti-
    sexual harassment policy. The Town's harassment/sexual harassment policy is
    contained in the "Blue Book" of personnel rules and regulations. This policy
    could not be reasonably used as a guide to determine in advance, what behavior
    was intended to be prohibited. This policy fails to define sexual harassment and
    merely dictates how such allegations are to be handled. This book of rules and
    policy was handed out to most officers, including the Appellant in 1997 but most
    officers were only generally familiar with the contents as they had not been
    trained or tested on the content. (Exhibit 64 and Testimony).

82. The Town and/or Department harassment/sexual harassment policy, although not
    exhaustive, gives some examples of conduct that may constitute sexual

40

harassment. These include "gossip regarding one's sex life", "comment about and individual's sexual activity", and "displaying sexually suggestive objects, pictures, cartoons". The Town and/or Department failed to give officers any definitive instruction, training, testing or orders in determining whether their behavior created a hostile work environment to their co-workers. Sawyer was not aware of any harm he may have suffered nor had he experienced a hostile work environment right up to the time he testified here. (Exhibit 64 and Testimony).

83. A factor in harassment of any kind is that the alleged victim is well aware of the offending conduct and the conduct is continual. The alleged victim is actually more than aware of the offending, continual conduct. The alleged victim of real harassment is offended and harassed. Here none of alleged victims; Sawyer, Hart and Anderson, were aware of the alleged conduct, until becoming informed through the investigation process. Hanafin informed Sawyer of the alleged offending comments. Hanafin is a liar, (see findings on credibility). Sawyer informed Anderson of the alleged offending comments, after the formal investigation had begun. This might be viewed as witness tampering. However neither Hanafin nor Sawyer were not investigated or charged for this act. Hart was somehow informed through this investigative process. This is an example of selective enforcement and overzealous pursuit of old, routine and accepted behavior; as if it was recent, highly unusual and complained about. If the investigators believed that the alleged victims, would be offended by knowledge of the alleged comments, why did they start the investigation, informing the alleged victims in the process. (Exhibit 64, demeanor and testimony)

84. Under the Town's harassment/sexual harassment policy, any employee has the right to make a formal complaint of sexual harassment. No formal complaints were filed here and no redress was sought. A letter was sent on behalf of Sawyer by a lawyer. When a complaint is filed, an investigation of some kind could be conducted by the Town. The Town then imposes what it considers to be the

Robert Downer V. Town of Burlington                                    D-01-1326

appropriate discipline, if any, for offenders, up to and including termination (Exhibit 64).

85. The Town's harassment/ sexual harassment policy applies to the Police Department (Testimony).

86. The Department had no training or instruction in the area of harassment or sexual harassment or even in the area of what remarks or behavior might be considered offensive. This void in policy and training left the Officers to follow their usual practices that had been in existence, undeterred for decades. (Exhibits and Testimony)

87. Rittenberg was given a copy of the Massachusetts Police Institute's ("MPI") policies and procedures regarding sexual harassment when he was assigned to investigate the Appellant. He and Simons considered this to be the Department's policy. The MPI policies and procedures are not the Department's policy (Testimony).

88. Under normal circumstances the longstanding practice in the Department was not to formally report, investigate or discipline the type of behavior for which the Appellant is charged here. This is born out by the fact that indeed the alleged behavior of the Appellant, or similar behavior by any other officer, had never been reported, investigated or disciplined until this draconian investigation with universal compelled Testimony of all offices, focusing exclusively on the Appellant, began. No witness could recall any prior investigation of anyone, for the same or similar charges. No witness could recall any prior investigation of any charges whatsoever, with the extensive magnitude and expenditure of resources of this investigation. This investigation was the most expansive, extensive and protracted ever conducted by the Town or the Department. (Exhibits and Testimony)

42

Robert Downer V. Town of Burlington                              D-01-1326

89. The Town squandered a valuable opportunity to conduct an extensive, generalized investigation to determine and asses the existence of any Departmental wide problems. The Town could have utilized that information to formulate or modify policy and to develop training programs to address any specific problem areas found. The Town and the Department needed knowledge of the prevailing general conduct within the Department as a backdrop against which to judge the specific conduct of an individual officer. (Exhibits and Testimony)

90. The Town and the Department were strictly obligated by its own rules and regulations to remain vigilant and "pro-active" to identify and eliminate any conduct, actions or behavior that it determined to be offensive. Considering the near void of vigilance and action, over a period of decades, it seems that the Town and the Department should be disciplined. However, instead only the Appellant was investigated and disciplined. This is another example of bias and selective enforcement. See Anti-Harassment Policy Rule 4.7A-2.(Exhibit 64, Exhibits and Testimony)

91. The Town and the Department utterly failed to fulfill its obligations to remain vigilant and pro-active. Since the Town and the Department found that the long term alleged actions and conduct for which the Appellant was charged, were harassment, they indicted themselves. The Appellant's alleged behavior is alleged to have occurred over many years. Similar and some more outrageous, open and notorious conduct and behavior was pervasive throughout the Department for at least three decades and well known by the Command Staff including the Chief at the time of it occurrence (Testimony).

92. Police officers generally have good instincts, especially survival instincts and aspirations for future career advancement. Detailed information and rumors circulated quickly around the Department regarding this extensive ongoing investigation. The general perception of the officers in the Department, including the officer-witnesses who testified, was that the investigation was designed to get

43

Robert Downer V. Town of Burlington                                    D-01-1326

the Appellant exclusively and that the Appellant would take the fall. This belief or perception affected the emotions, memory and/or the testimonial faculties of each witness to some varying degree. (Exhibits and Testimony).

93. The Town of Burlington prescribes to a doctrine of progressive discipline (Testimony).

94. The investigators were instructed to focus the scope of their investigation upon the complaints leveled against the Appellant in Attorney Schwartz's letter. The investigators' duty was to compile facts, not to make any determinations of motive, intent and other state of mind aspects. (Testimony).

95. The investigators began the process by creating what they described as a "standard" questionnaire to present to each witness concerning Sawyer's allegations against the Appellant. However this questionnaire was actually a microscope focused on the Appellant. (Exhibits 66 thru 73 & 88 thru 93, Testimony).

96. The investigators asked Sawyer to produce a list of officers who could corroborate Sawyer's allegations. Sawyer provided them with a list of all of the patrolmen in the Department. The investigators proceeded to interview all of the patrolmen, and, for the sake of being thorough, the commanders as well (Testimony).

97. The questionnaire initially asked the officers whether they had heard the Appellant make any comments concerning Sawyer's sexual preference (Testimony).

98. Some officers corroborated Sawyer's allegations. All of the officers whom Sawyer had indicated would corroborate the allegations did so. Other officers claimed the allegations were not true (Testimony).

44

Robert Downer V. Town of Burlington                                    D-01-1326

99. In the beginning of the investigative process, Rittenberg and Simons became
    aware of the Cartoon. It also came to their attention that the Appellant might have
    made similar comments about other officers as he did about Sawyer (Testimony).

100.    The officers' statements led the investigators to add additional questions to
    their questionnaire. The questionnaire now asked officers to mention the Cartoon,
    mention any other officer whom the Appellant had made similar comments about,
    and allowed the officers to provide any additional comments related to this
    investigation, focusing on the Appellant. (Testimony).

101.    Several officers, including Ferguson and Patuto, mentioned that the
    Appellant had repeatedly called then-Lieutenant Hart a "fag" and a cross-dresser.
    In one instance, the Appellant supposedly asserted that Hart went to a salon for
    manicures and wore a dress. However, this or some other version, was a
    persistent rumor throughout the department for years. There is no evidence the
    Appellant started this rumor. Ferguson's credibility has been previously dealt
    with.. Lt. Patuto had an unfriendly relationship with the Appellant and it would be
    highly unlikely, that such a statement would have been made to him by the
    Appellant. (Testimony and demeanor).

102.    Hart had been appointed to Lieutenant over the Appellant based upon his
    higher score on the promotional exam, taken together. Hart and the Appellant
    were known to each other and the entire Department, as being in competition with
    each other for advancement. (Testimony and demeanor).

103. The Appellant was also accused by Hanafin and Brown of making comments
    concerning Lt. Anderson, calling him a pedophile and a "diddler" (Testimony).

104. Sawyer contacted Anderson during the course of the investigation and told him
    what the Appellant allegedly said about him. This was the first time that

45

Anderson had ever heard any of these allegations before. Although Anderson had already given his statement before hearing this information, he testified before the Commission that he subsequently felt that Rittenberg's written transcript of his statement did not accurately reflect his statement. (Testimony)

105. Anderson was in charge of the DARE program, which received a considerable amount of grant money to operate. The Appellant was not fond of this program, and felt that the grants could be used on more worthwhile programs, including a universal hiring program. The Appellant did not like Anderson's approach of wearing funny hats and acting clownish with the students. Anderson did not like the Appellant. Mutual antipathy existed between them. Anderson thought that the Appellant was not a competent officer. This view is decidedly at variance with the department wide opinion that the Appellant was bright, competent, and professional. Many of the subordinate officers on the Appellant's shift thought the Appellant was the best Sergeant on the force. (Testimony, demeanor and exhibits).

106. Other officers had made comments about Anderson in the past. These comments had insinuated that Anderson was a pedophile. Specifically, officers in the Department spoke of Anderson driving the "magic bus", a reference to the magic room, referred to in the Fells Acres child molestation case. Anderson was referred to by officers as "Tookie" Anderson, another reference to the Fells Acres case. These types of comments were not uncommon in the Department. There is no evidence that the Appellant started these comments or rumors about Anderson (Testimony and demeanor).

107. Anderson drove a large painted school bus as part of the DARE program. At one point during the Eighties, he painted the phrase "magic bus" on the vehicle, in reference to a children's book, not to Fells Acres. This phrase remained on the bus for several months before Captain Mills ordered it removed, probably due to the connotation created by association with Fells acres. (Testimony).

46

---

108. Anderson owned a motorcycle with the words "crotch rocket" emblazoned on the gas tank. He often rode this motorcycle throughout town and commuting to and from the station for duty. (Testimony).

109. Anderson showed monumental misjudgment by driving his motorcycle around town with "crotch rocket" emblazoned on the gas tank. Although "magic bus" was quickly removed by Capt. Mills, Anderson was never admonished or disciplined for the "crotch rocket", by his superiors. Anderson was the DARE officer in town for many years, instructing young students up through grade 12. Students are generally impressionable and become aware of sex sometime in the age bracket that Anderson instructs. Anderson is familiar to all of those many students and ex-students, he has instructed over the years, but not necessarily to their parents. Anytime Anderson is seen by a student riding the "crotch rocket" around town or anywhere for that matter; he might be viewed by the student as an adult in a position of authority who supports the demonstration sexual symbolism or any corollary sexual idea that might enter an impressionable young mind, piqued by thoughts of concupiscence. If, I were the parent of a child in the DARE program, being taught by Anderson and I found that he was riding around town on the "crotch rocket, I would be down at the station within fifteen minutes, reading the Chief, the riot act. There is no evidence that the Department or the Town was aware of this possibly ignorant yet offensive conduct. This is another example of the Town and the Department's failure to observe its obligation of vigilance and pro-activity. (Testimony, exhibits and demeanor)

110. After completing the interviews, the investigators sent written copies of each officer's statements to the individual officers to verify by signature (Testimony).

111. The investigators compiled a list of what they determined were "sexual comments" in the context of the investigation. This list consisted of comments

Robert Downer V. Town of Burlington                                 D-01-1326

that certain officers alleged that the Appellant had made (Exhibit 66 and
testimony).

112. After the statements were compiled from the officers, Mercier attempted to
     reconcile the situation between the Appellant and Sawyer by means of mediation
     by a third party. After a mediation session, the parties could not be reconciled.
     The fact that this attempt was so belated, occurring after the parties and the
     witnesses had become deeply entrenched, is an indication that the Town was not
     sincere in this mediation attempt. This mediation should have been sincerely
     attempted before, not in the middle of the investigation. The bullheadedness of
     Sawyer and the Appellant certainly is the main cause for the failure of this
     attempt. This stubbornness is certainly the most serious offense that I have found
     here. Two men willing to sacrifice anything and anybody in order to prevail over
     the other is a disgrace and a travesty. However this does not appear to be against
     the Town or Departmental policy. If I had a choice, I would not want to reward
     either man for their selfish behavior in this matter.(Testimony, demeanor and
     exhibits).

113. Larry Rittenberg, Assistant Town Manager, working with Town counsel in this
     case, created a new definition for words of alleged sexual harassment, based upon
     officers' recollections of comments made by the Appellant regarding Sawyer,
     Hart, or Anderson. There was no basis in any town policy or practice for this
     definition, nor is there any other recognized source for this definition. While some
     of the terms on the list may be suggestive of harassment, many are not. Others
     have multiple meanings. Rittenberg acknowledged that terms on his list might
     have meanings that were not sexual, including fag and homo. He did not consider
     the context of the statements before determining that they were sexual
     (Testimony).

114. On May 5, 2000, the Appellant was interviewed at the Town Hall. Before the
     interview began, he was handed copies of the sexual harassment policies of the

Robert Downer V. Town of Burlington                                    D-01-1326

Town, the MPI, the list of sexual comments prepared by the investigator, and the Department's rules concerning truthfulness. The Appellant was assured that the proceeding was to be confidential. He was warned that any attempt to coerce or persuade a witness to change their Testimony would be met with disciplinary action. He was the only person, so warned (Testimony and Exhibits 7, 8 ).

115. The Appellant testified before the investigators that he might have once called Sawyer a "fag" out of anger for his role in the cartoon incident, but if he did, that was the only instance in which he made such a sexual comment. He testified that he might have called the DARE program "faggy", but he never made such a comment about Anderson himself. The Appellant denied making any type of sexual comment about Hart (Testimony).

116. On September 14, 2000, a written copy of the Appellant's statement to the investigators was compiled by Rittenberg and Simons and sent to the Appellant to sign under the pains and penalties of perjury. The Appellant refused to sign the document, claiming that it was not an accurate reflection of what he said (Exhibit 68, Testimony).

117. On September 12, 2000, the Department received a call from an unidentified individual stating that a uniformed officer was lying on the ground, behind and outside the Raytheon plant. Shortly thereafter, the Appellant, working a detail, radioed in from the plant, indicating that he was down on one knee tying his shoe (Exhibit 24).

118. Sawyer, from a police cruiser, called into the station on his police-band radio to report that he saw the Appellant lying down on the grass, in the shade behind the Raytheon plant. He spoke with Ferguson, who was working the desk and then asked to be transferred to Lt. Sciuto to discuss the incident. The two men discussed the matter in a joking manner. During the conversation, Sciuto told Sawyer that he should have checked to see if there was a sixteen-year old girl

49

Robert Downer V. Town of Burlington                                    D-01-1326

underneath the Appellant. The participants here, Sciuto and Sawyer, talked and acted like college fraternity-brothers gleefully planning some prank against an unsuspecting adversary. Officer Sawyer identifies himself as "Junior" and addresses Lt. Sciuto as "Big Al". Lt. Sciuto or "Big Al" directs Sawyer to log a report on the matter in an effort to create some evidence to support a charge against the Appellant. Sawyer complies and does file a typed report on the matter. However Sawyer states in the report that he is filing the report at the directive of Lt. "Big Al" Sciuto. Sawyer also conveniently fails to mention in his report, that his own gleeful and conspiratorial radio call to Lt. "Big Al" Sciuto, initiated the reporting of this matter. Lt. "Big Al" Sciuto referred to others in the Department; "Gary and Billy" as being sympathetic to their anti-Appellant attitude. "Big Al" also tried to arrange a meeting between "Billy-boy" and Sawyer presumably to discuss this or a related matter. The statement by "Big Al" or Sawyer regarding the possibility of a sixteen-year-old girl being underneath the Appellant alarmed Sawyer since they might be talking on a recorded line. Sawyer, Sciuto and Ferguson did not anticipate that the Appellant would become aware of the content of this radio conversation. However the Appellant later obtained a copy of the audiotape of this call. It is inferred that there were many other such conversations among these colluding fraternity brothers. (Exhibits 24, 25, 26, 79, 80 and Testimony).

119. Sciuto was the officer in charge of the Department's Internal Affairs division (Testimony).

120. The September 12, 2000 radio conversation is a good example of the conspiratorial atmosphere and bias existing in the Department, against the Appellant, at least among; Sawyer, Sciuto, Ferguson and possibly "Billy and Gary". It is also an example of the eagerness of Sawyer and Sciuto to frame, embellish and exploit a trivial matter against the Appellant. It is not as if the Appellant were asleep in the shade since Sawyer made eye contact with him as he drove by and the Appellant got up then. I assume Officers do have breaks while

Robert Downer V. Town of Burlington                                          D-01-1326

working details and this did occur in a relatively, out of the way location. It is also a good example of Sawyer's sneaky, indirect approach to situations. He tried to shift the onus of the reporting over to Sciuto. He tried to hide the fact that he initially reported the situation to Sciuto. What type of person would attempt to construct a charge against a fellow Officer over such an insignificant situation? A sneaky, petty, vindictive and immature person. (Exhibits 24, 25, 26, 79, 80 and Testimony).

121. The radio conversation between Sawyer and Sciuto was made on the station's radio band, monitored by members of the public, which is automatically recorded and saved for a period of time. The Appellant made a copy of the conversation while he was on duty. He then submitted this tape to his attorney (Exhibit 102).

122. On October 16, 2000, Lt. Sciuto received a written reprimand from Chief Soda for engaging in disparaging remarks about the Appellant during his conversation with Sawyer over the police band radio. This was a violation of the Departmental Rules & Regulations 6.4.3.1. The police-band radio is routinely monitored by some local people, by means of police-band radio receivers. Potentially members of the public heard the conversation between Sawyer and Sciuto and if so, it poorly reflected on the individual Officers and/or the Department. (Exhibit 86).

123. That same day, the Appellant received a one (1) day suspension from Chief Soda for insubordination. This was for making a copy of the recording of the conversation without first obtaining permission from the Chief to do so. The Appellant was ordered specifically by Chief Soda on February 4, 2000 not to make such recordings without his prior permission, in the aftermath of the Sciuto/Soda tape of December 1999. This disparate punishment in relation to the punishment given to Sciuto for a more serious violation is an example of the bias held by Chief Soda against the Appellant. (Exhibit 102, testimony and demeanor).

51

Robert Downer V. Town of Burlington                     D-01-1326

124. If the Appellant had not already copied the radio call, it is highly unlikely that he
     would have received permission from Chief Soda to do so and without the copied
     radio call charges would not have been proffered against Sciuto. (Testimony,
     demeanor and exhibits).

125. Town Administrator Mercier later amended this suspension into a written
     reprimand and ordered the Appellant's back pay reinstated. This is not an
     example of leniency toward the Appellant but an admission that the Appellant had
     received disparate discipline. (Testimony, demeanor and exhibits).

126. On November 7, 2000, Hart issued a directive to all officers prohibiting the
     dissemination of sexually explicit or offensive messages between officers
     specifically via email. The directive ordered such action to cease immediately
     (Exhibit 39).

127. During that time, the computers in the Department were suffering from a glitch
     whereby an individual would open what they thought was his own email inbox,
     only to find that it was someone else's. This would occur even if the user had not
     logged on as the individual whose inbox was opened. (Testimony)..

128. On November 30, 2000 an e-mail with attachment was sent from Sgt. O'Meara's
     e-mail box. The email was addressed to a Jim Sorenson, whom O'Meara did not
     know. The email included a short video clip of a monkey urinating into its mouth
     and is identified here as "the monkey business e-mail" (Testimony).

129. O'Meara found an identical message to Sorenson in his "Sent Items" folder. The
     date that email was sent was November 28, 2000 at 7:22 AM (Exhibit 54).

130. The email in question contained a history of all senders and recipients. On April
     5, 1999, Hanafin had sent the email to the Appellant with the caption: "Bobby D.

when he's in a slump with his woman (sic) friends. Or is it Buck Savage in the
Closet" (Exhibit 54).

131. O'Meara, immediately reported the incident to Lt. Hart, who requested that he file
a written report. O'Meara did this, implicating the Appellant by name (Exhibit 55
and testimony).

132. O'Meara submitted an amendment to his previous report, indicating that the
Appellant asked Filep "is it OK to send this", to which Filep responded yes.
(Exhibit 121).

133. On December 24, 2000, Hanafin submitted a report to Chief Solomon regarding
the ""monkey business"" email. Hanafin denied ever sending the email to the
Appellant. He accused the Appellant and Filep of tampering with the computer
system, attaching his name to the email, and sending it to Sorenson. Hanafin also
accused the Appellant of filing a false complaint with the MCAD against him
regarding this incident, and for threatening himself and Ferguson through George
Cummings. (Exhibit 121 and testimony)

134. Lt. Hart and Chief Soda attempted to create additional e-mail charges against the
Appellant by pressuring and threatening Officer Filep to testify against the
Appellant. Officer Filep was called at home on December 21, 2000, and asked to
come to the station to speak with Chief Solomon. When he arrived at the Chief's
office he found Lt. Hart also present. They began by accusing him of helping the
Appellant break into O'Meara's account so as to send e-mail to Sorenson. Filep
was shocked and fearful at this serious, surprise accusation and denied the
accusation. Filep believed that his job was at stake because Hart and Soda told
him he could be terminated because of it. Filep was kept there for at least 45
minutes while Lt. Hart and Chief Soda tried to badger him into an admission that
he instructed the Appellant on how to break into O'Meara's e-mail. There was no
evidence to support the accusation against Filep, especially considering the e-mail

53

Robert Downer V. Town of Burlington                                    D-01-1326

problems being experienced at that time, in the Department. That e-mail problem
was the sporadic receiving and sending of e-mails from the wrong e-mail station
or address without explanation. Filep did not instruct or assist the Appellant to
break into or use O'Meara's or anyone else's e-mail box. The Appellant did not
The Appellant did not break into or use O'Meara's or anyone else's e-mail box.
This pressure and unfounded threats by Chief Soda and Lt. Hart on Filep in order
to generate evidence against the Appellant is an example of strong bias of Hart
and Soda against the Appellant and their firm commitment to get the Appellant at
all cost. (Testimony, Exhibit 121)

135. O'Meara never learned how the video entered his email account in the first place,
     other than the e-mail snafu that existed at the time. He testified that he had never
     received the forwarded email in the year or so that it had been circulating through
     the Department (Testimony).

136. At some point during the course of the investigation (Summer, 2000), the
     Appellant approached Officer Skehan as he was leaving for home. The Appellant
     conveyed how he felt hurt and betrayed by some of the other officers. In
     particular, the Appellant pointed out Hanafin and Ferguson; his previous good
     friends, saying, "If they were dying on the side of the road, they wouldn't get a
     helping hand from me" (Testimony).

137. Skehan told the Appellant that he himself had had been ordered to testify, and that
     he had made statements that may have hurt the Appellant. The Appellant replied
     by saying that he didn't believe that Skehan had done so maliciously, but that he
     had still hurt him (Testimony).

138. Several days later, Skehan told Hanafin and Ferguson what the Appellant had told
     him. He told them this because he felt that since they knew the Appellant better
     than he did, he decided to let them interpret the statements as they saw fit.
     (Testimony).

Robert Downer V. Town of Burlington

D-01-1326

139. The statement by the Appellant to Skehan regarding Hanafin and Ferguson was not viewed as a threat by Skehan and not intended as a threat by the Appellant. It was an expression by analogy to emphasize his disappointment and hurt felt over the loss of friendship with Hanafin and Ferguson and now the animosity that existed. (Testimony and demeanor).

140. Officer Ferguson later contacted Rittenberg to inform him of the comments that Skehan had relayed the Appellant made about Ferguson and Hanafin. This is an example of the nearly spontaneous reaction of Hanafin and Ferguson in attempting to seize any situation to their advantage against the Appellant. (Testimony and demeanor).

141. Sometime in the summer of 2000, the Appellant approached Officer Kirchner while they were both assigned to a detail. Kirchner could not exactly recall what the Appellant said to him, but he did remember something to the effect that he would be with the Department for another twenty (20) years and at some point, those that testified against him would have to answer for what they said (Testimony).

142. Officer Kirchner later spoke to Hanafin about the incident. Hanafin testified at this hearing that Kirchner told him that the Appellant said that he would get even with those that testified against him. This is a lie by Hanafin. (Testimony).

143. Officer Tsingos testified that he recalled being approached by the Appellant at a detail. Tsingos could not recall what the Appellant exactly said, but he testified that the Appellant made some sort of remark that Tsingos recalled as a threat to get even with those that testified against him. Tsingos has a poor reputation for truth and veracity in the Department. His testimony was unsure and hesitant. Tsingos did not have a friendly relationship with the Appellant and it is highly

55

unlikely that such a statement would have been made to him, by the Appellant. (Testimony and demeanor).

144. The investigators completed their report and delivered it to Mercier in October 2000 (Exhibit 1).

145. Chief Hart should not have been involved to any degree, in this investigation and related matters. He and the Appellant were competitors with each other and had been before this. They were not friends and Hart is designated as a victim of some of the Appellant's comments. It was generally known throughout the Department that Hart and the Appellant were rising stars in the Department and each would likely be Lieutenants if not Chief in the Department, some day. Indeed Hart was promoted to Chief during the pendancy of this matter. Hart was biased against the Appellant and in favor of his co-victim, Sawyer. This was also generally felt in the Department. Since all officers are concerned about their future job security and career advancement, it is highly likely that they were concerned about Hart's opinion of them. It was obvious to everyone that the Appellant was slated to take a fall here and Chief Hart was a designated victim of the Appellant's comments. It also was known by many in the Department, that these two were not friendly toward one another. Hart's involvement, even in his supervisory role as Chief had a chilling effect on those officers who were inclined to testify on the Appellant's behalf and had an encouraging and rallying effect on other witnesses. This investigation and related matters should have been overseen by someone outside of the Department. This is one of the taints and flaws of this investigation.(Exhibits, testimony and demeanor)

146. On or about October 11, 2000, Sawyer filed a complaint with the MCAD, naming the Appellant and the Town as defendants. The basis of the complaint was that the Appellant had made derogatory comments regarding Sawyer's sexuality as early as October 1999 (Exhibit 84 and testimony).

56

Robert Downer V. Town of Burlington                                    D-01-1326

147. On October 31, 2000, the Appellant was notified that he was to appear at a
     disciplinary hearing on November 14, 2000. The listed charges consisted of,

   - Disparaging comments about the sexual orientations of Sawyer, Hart and
     Anderson (separate charge for each)

   - Threatening/attempting to threaten a witness

   - Failing to tell the truth in an investigation

   - Distributing obscene materials through the Department's email system

   - Seeking to use Cummings to influence officers' Testimony

   The hearing was postponed (Exhibit 2).

148. On or about December 11, 2000, the Appellant filed a complaint with the MCAD
     regarding the phone conversation between Sawyer and Sciuto and the email sent
     to him by Hanafin (Exhibit 49).

149. On January 31, 2001, the Appellant received an amended set of charges. This
     contained all of the charges in the previous notice, with the additional charge of
     making false statements in a sworn statement sent to the MCAD. At this time, the
     Appellant was placed on paid administrative leave (Exhibit 3).

150. Hearings were held before Mercier, beginning on February 9, 2001 and
     continuing until August 8, 2001. (Exhibit 1).

151. On August 16, 2001, Officers Hanafin and Ferguson met with acting Chief Barry
     Solomon to express their concerns with working together with the Appellant.
     Chief Solomon assured the men that he would see to it that they would not be
     forced to work in the same sector as the Appellant (Exhibits 77, 78).

152. In September, 2001, The BPPA passed a resolution deploring the Town's decision
     to retain the Appellant in the Department (Exhibit 40).

57

Robert Downer V. Town of Burlington                                    D-01-1326

153. The incidents that started this unnecessary, expansive, ill-designed and
     misdirected investigative process, the personality of the Appellant and the
     ineffectiveness of the town officials and police command staff in addressing this
     type of situation, either prior to or after Attorney Schwartz's letter, is accurately
     described by Officer Michael Joyce, in his comments during the interview
     process. I find that his comments are accurate and reasonably reflect the general
     view of many of the officers in the police Department. Those comments are;

     "Sgt. Downer is cocky and aggressive. Sgt. Downer wanted something
     done about it (cartoon). I couldn't believe it, given all the stuff that has
     been put up about other people that is worse. It should not have gotten
     this far, but not surprised because a lot of the time issues just don't get
     dealt with. Most people up there [Command Staff] are just trying to
     avoid confrontation and keep an even Keel; too many guys are on cruise
     control. This place needs to be tightened up." (Exhibit 70, testimony and
     demeanor)

                                  **CONCLUSION**

This was one of the longest and most involved cases in the history of the Commission.
From the voluminous evidence presented before me, I can infer that this matter has been
exhausting, emotional and consequential for all parties involved. Serious divisions in the
Burlington Police Department were exposed and exacerbated, if not caused, as a result of
the investigation and subsequent discipline of the Appellant. Both sides have made
colossal expenditures of time and money. The Appellant was ultimately demoted and
suspended for five (5) separate charges: sexual harassment, threatening/intimidating
witnesses, distributing obscene materials through the Department's email, lying before
the investigation board, and filing a false statement with THE MCAD.

                                      58

Robert Downer V. Town of Burlington                                D-01-1326

A US Supreme Court Justice once in regards to the definition of pornography that he
might not be able to define it but he would be able to recognize it when he saw it. Here
the Town and the Police Department could do neither, regarding harassment..

Police work is stressful as officers realize that dangerous and unusual events can occur
without warning. The Town and the Department allowed a pervasive, decades-long
practice to go unchecked, in which officers seemed to relieve the tensions and stress of
the job through crude humor. Mark Twain's dictum comes to mind "Under certain
circumstances, profanity provides a relief denied even to prayer."

It is a fundamental purpose of the civil service law to protect employees from arbitrary
and capricious actions. M.G.L. c. 31 § 1. Callanan v. Personnel Admin. For Comm. 400
Mass. 597, 600 (1987).    To further this purpose, the Civil Service Commission seeks to
determine "whether the appointing authority has sustained its burden of proving that there
was reasonable justification for the action taken by the appointing authority." City of
Cambridge v. Civil Service Commission. 43 Mass. App. Ct. 300, 304 (1997). The issue
to determine in this case is whether the Respondent, at the time of the hearing, had
reasonable justification for demoting the Appellant and suspending him without pay for
thirty days. See Town of Watertown v. Arria. 16 Mass. App. Ct. 331 (1983). McIsaac v.
Civil Service Commission. 38 Mass. App. Ct. 473, 477 (1995). Police Department of
Boston v. Collins. 48 Mass. App. Ct. 411 (2000). City of Leominster v. Stratton. 58
Mass. App. Ct. 726, 728 (2003). "Justified" is defined as "done upon adequate reasons
sufficiently supported by credible evidence, when weighed by an unprejudiced mind;
guided by common sense and by correct rules of law." City of Cambridge, 43 Mass.
App. Ct. at 304, quoting Selectmen of Wakefield v. Judge of First Dist. Ct. of E.
Middlesex, 262 Mass. 477, 482 (1928). Commissioners of Civil Service v. Municipal Ct.
of the City of Boston, 359 Mass. 211, 214 (1971).

The Commission has the statutory authority to modify any penalty issued by an
appointing authority. M.G.L. c. 31 §43. When the Commission modifies an action taken
by the appointing authority, it must remember that the power to modify penalties is

Robert Downer V. Town of Burlington                                    D-01-1326

granted to ensure that employees are treated in a uniform and equitable manner, in accordance with the need to protect employees from partisan political control. The Commission's power does not extend to modifying lawful exercises of discretion by the appointing authority merely because the Commission would have exercised that discretion differently. Police Commissioner of Boston v. Civil Service Commission. 39 Mass. App. Ct. 594, 600 (1996). Town of Falmouth v. Civil Service Commission. 61 Mass. App. Ct. 796, 801 (2000). The appointing authority's exercise of discretion must be with good cause, and not in bad faith. Cambridge Housing Authority v. Civil Service Commission, 7 Mass. App. Ct. 586, 589 (1979) (proffered reason for discharge was "mere pretext" and thus not justified exercise of discretion).

It is the opinion of the Commission that the Appellant probably did make some of the comments for which he was charged. These include making comments regarding Sawyer's sexuality, and disseminating sexually explicit emails through the Department's computer system. The Appellant's own testimony substantiates these charges. However, the Town has not substantiated the remaining charges. The actions the Appellant did commit were no different than those committed by other officers who received far less punishment. In addition, the procedure by which the Appellant was investigated, charged and ultimately punished was flawed to the extent that the Appellant was the subject of arbitrary or capricious action. It is not fair or reasonable for the Town to reach back in time, into a department with a decades-long practice of allowing this pervasive behavior and select only one person for selective and retrospective prosecution. Hanafin said some of the comments were made as far back as 16 years and 9 months ago. Apparently there is no statute of limitation on offensive comments. The Town produced a paucity of credible evidence, considering the length and breadth of its investigation, focused on the Appellant. This is an arbitrary and capricious action. For these reasons, the Commission is ordering that the discipline be modified.

## I. The Appellant did not file false statements with the MCAD

The facts on the record do not support the Town's finding that the Appellant filed a false sworn statement with the MCAD. A close examination of the MCAD complaint requires the Commission to give the Appellant's explanations about errors in the statement greater credibility than the Town did. The Town cites the fact that the complaint mentions Officer Hanafin as one of the officers that made disparaging comments about the Appellant in the phone conversation of September 12, 2000. They also emphasize the fact that the Appellant admitted that Hanafin was not a party to that conversation. The Appellant's original complaint mentions Hanafin's involvement in the conversation only once, in the introduction. All other mentions of Hanafin in the complaint involve the "monkey business" email sent to the Appellant. This is concurred by Hanafin's own Testimony regarding his receipt of the Appellant's MCAD complaint (Transcript III pg. 71). Hanafin is not mentioned in any other allegations concerning the phone conversations, which refer only to Sciuto and Sawyer's comments. It appears that the mention of Hanafin's name in regards to the phone conversation was in fact a drafting error by the Appellant' attorney rather than an act of retaliation against him.

The language of the Appellant's MCAD complaint suggests that no false statements of fact were made in regards to Sawyer. It is important to note that the allegation of the complaint against Sawyer was that he aided and abetted the Town of Burlington in sexually harassing the Appellant in violation of M.G.L. c. 151B § 4(5). Sawyer's language in the transcript of the phone call suggests that he told Sciuto about what he observed the Appellant doing with the intention of engaging in some sort of disparaging conversation about the Appellant, knowing that Sciuto did not like the Appellant. It seems as though this charge did actually have some factual basis. The record contains two different transcripts of the conversation; each transcript identifies either Sciuto or Sawyer as making the "sixteen-year-old girl" comment (Exhibits 24 & 26). At the time that the Appellant filed his complaint he did not necessarily know that the Department determined that Sciuto had made the comment. The Town's allegations that the Appellant knowingly filed false reports for retaliatory purposes are not supported by the facts in the record.

Robert Downer V. Town of Burlington                                    D-01-1326

## II. The Appellant did not Threaten Fellow Officers

It is the function of the hearing officer to determine what credibility should be given to a witness' Testimony. School Committee of Wellesley v. Labor Relations Commission. 376 Mass. 112, 120 (1978). Doherty v. Retirement Board of Medicine. 425 Mass. 130, 141 (1997). As it is the hearing officer's duty to assign credibility, the hearing officer must provide an analysis as to how credibility was proportioned. Herridge v. Board of Registration in Medicine. 420 Mass. 154, 165 (1995).

It is noteworthy that the Appellant was warned by the investigators (and his attorney received a letter) not to speak with witnesses in an attempt to influence their Testimony or otherwise interfere with the investigation. Virtually every officer in the Department, over fifty individuals in all, gave statements to the investigators. Every conversation the Appellant had with one of his coworkers during the course of the investigation was subject to scrutiny. Additionally, there existed the possibility that such conversations, no matter how neutral or inane, could be twisted to an individual's personal advantage.

The allegation that the Appellant attempted to threaten officers that testified against him is threefold. In the first instance, the Appellant allegedly told Officer Skehan that if he saw Hanafin and Ferguson dying in the road he would not come to their aid. Skeehan testified that he couldn't tell if the Appellant meant that as a threat. Skehan waited several days to inform his friends Hanafin and Ferguson of what the Appellant had said. He never reported the incident to any of his superiors, nor to the investigating committee. Officer Ferguson testified that he spoke with Chief Solomon after speaking with Skehan. However, there is no indication on the record as to how Solomon reacted or how he addressed the matter. Hanafin and Ferguson are biased against the Appellant, their old friend turned adversary, and Skehan is more aligned with these men and Sawyer than he is with the Appellant. They were out to get the Appellant by creating, enhancing, or miscasting incidents to use against him or provide to Sawyer for that purpose. Hanafin and Ferguson's Testimony does not convince me that either man was ever concerned

62

Robert Downer V. Town of Burlington                                          D-01-1326

about the Appellant's comments. Ferguson himself testified that he has never been fearful of the Appellant. If he did express his concern over the Appellant's statements to Solomon, there doesn't appear to have been any follow up on Ferguson's part to see that his concerns were addressed until after the Town handed down its decision in August 2001, a year after the comments were made. It appears from the record that the Appellant's statements were an expression of disappointment and disgust with Hanafin and Ferguson rather than any attempt to threaten retaliation, and all of the officers involved believed the same thing.

Officer Kirchner testified that the Appellant told him that those who falsely testified against him would someday have to answer for what they'd done. Mercier stated in his decision that Kirchner later reported to other officers that the Appellant would get even with those that had lied about him. As with Skehan, Kirchner did not testify that he believed that the Appellant's statement constituted a specific threat to himself or anyone else. Kirchner testified that he told other officers the gist of what the Appellant had said. Although he didn't remember exactly what he said, he was certain that he didn't tell anyone that the Appellant had made any threat. This is in contradiction with Hanafin's Testimony that Kirchner told him that the Appellant threatened to get even with those that had wronged him. Hanafin's Testimony appears to be a deliberate misstatement of what the Appellant's true declaration was, and that is the only way in which an indication of a threat could be gleamed from whatever was actually said between Kirchner and the Appellant. Neither Hanafin nor Ferguson reported Kirchner's statements to a superior.

Officer Tsingos testified inconsistently that the Appellant told him while on a detail that he was entitled to get the officers' Testimony, and that he would get even with those that had testified against him. However, Tsingos' recollection of this conversation was hazy. Tsingos has failed to offer clear and convincing evidence regarding what the Appellant actually said at the detail. Tsingos does not have the best reputation for truth and veracity within the Department. Further, Tsingos testified that he did not feel threatened by the Appellant. The Appellant made his statement to Tsingos after Tsingos told him that he had made statements to the investigators that would harm the Appellant. Yet

Robert Downer V. Town of Burlington                                    D-01-1326

Tsingos never brought the incident to his superiors' attention. This would suggest that whatever the Appellant said could not be viewed as a threat. Tsingos was not friendly with the Appellant and apt to slant any circumstances against the Appellant. As with all of the witness officers, they were instinctively influenced in Testimony by the curious design of the investigation focusing exclusively on the Appellant. All of the myriad of factors that influenced, reformulated and enhanced the testimony are covered above, in the findings.

The Testimony of Officers Skehan, Kirchner and Tsingos do not credibly demonstrate that the Appellant made any threats to his fellow officers. The Appellant simply made several off hand remarks. The biased, investigatory process transformed these remarks into threats to the safety of other officers.

## III. The Town did not properly consider the context in which the Appellant made his comments

The Commission has in the past examined the context in which an Appellant has made an inappropriate comment about a co-worker to see if any circumstances existed that might mitigate or explain the Appellant's comments. Ward v. Town of Billerica. 16 MCSR 7 (2003). (Profanity was used in the locker room, where third parties were not intended to hear it). O'Brien v. City of Lynn. 8 MCSR 106 (1995). (Comments were made in a private discussion between officers to express anger with the actions of a third officer). In the matter at hand, the Appellant made similar derogatory comments towards Sawyer as other officers in the Department made towards each other. Many of the alleged comments were made in private conversations or retelling or passing on of gossip and rumors.

The overwhelming evidence on the record indicates that the Department, perhaps as a result of the tensions inherent in the duties of a police officer, had a culture of put downs and ridicule amongst its officers. This ridicule was often of questionable taste and crossed into the obscene. In contrast to the Town's determination, this practice was not always good-natured, and was sometimes carried out behind certain officers' backs. Hurtful rumors were spread throughout the Department concerning the behavior of

64

Robert Downer V. Town of Burlington                                                      D-01-1326

certain officers that, if taken as true, would call into question those officers' capacities to
serve as an officer of the law. The evidence demonstrates that superior officers were
aware that such behavior was occurring. Rude remarks were made at roll call in the
presence of members of the Command Staff. Offensive emails were brought to the
attention of Lt. Hart and Chief Soda. There is also indication that superior officers
engaged in the same sort of behavior. For example, Capt. Devlin and Sgt. Sheppard were
notorious in the Department for their exchanges. There is nothing in the record to
indicate that any action was ever taken by the chief or any superior officers to investigate
the culture of derogatory comments made between officers, or to put a stop to such
actions by formally punishing an individual. This was in spite of the Department and the
Town's obligation under Anti-Harassment Policy Rule 4.7A-2 to take a pro-active stance
in identifying and eliminating harassment in the workplace. There is no indication that
any officer ever made a formal complaint regarding such behavior before the Appellant
did in the autumn of 1999. It is apparent from the record that the officers handled jokes
and comments that crossed the line in an informal fashion, without seeking any sort of
formal investigation. Numerous officers (including Tsingos, Walthall and Rogers)
testified that they never felt the need to report any of the Appellant's comments to their
superior officers. There was an insufficient factual inquiry as to what was acceptable
behavior (or at least behavior that had gone unpunished for years) when the Town
initiated an investigation focused solely on the Appellant. Because of this, the
investigation proceeded with a very restrained field of vision. Witnesses who might have
engaged in the same conduct themselves were asked about the Appellant and the
Appellant only. These witnesses were also called upon to recall specific circumstances in
which the Appellant behaved similarly as many of the officers did most of the time, for
years. An investigation such as this calls into question the accuracy of the compiled
facts, because the suggestibility posed by the questions and the culpability of many
witnesses for what had suddenly become a punishable offense. The Appellant became a
scapegoat for the actions that everyone participated in.

The Town has the right to limit inappropriate behavior if it feels that it is impairing the
efficiency of the police Department. However, in a situation such as this, where the

65

Robert Downer V. Town of Burlington                                                    D-01-1326

Command Staff at least knew that this sort of conduct was conducted throughout the entire Department, the Town should have addressed the problem as it existed in the Department as a whole. Sawyer did have a right to file a formal complaint with the Town, and if he did, a general investigation should have occurred. However, the Town should not have conducted an investigation focusing exclusively on the Appellant. Yet if it did investigate only the Appellant, went beyond what was alleged in the attorney's letter, particularly when the investigatory process was initiated by an outside attorney with no knowledge of the prevailing Departmental culture.

Many of these men grew up together or have had long-term friendships with fellow members of the Department. Many of these officers have traveled and socialized together. Human experience teaches us that that close friends who mix their professional and personal lives will on occasion have friction leading to a possible rupture of their friendship. Some of the close friendships in the Department ruptured and resulted in realigned friendships against prior friends. That did occur here in obvious and described instances above. However some hurt feelings and friction between officers remained hidden from other officers. An investigation with forced or compelled Testimony toward a sole and exclusive target invited the release of pent up emotions and veiled attempt to even scores, under the guise of "I was forced to testify". A common sense appraisal of this investigation is that it would predictably have the net effect of creating division, animosity, embarrassment and recrimination throughout the Department.

## IV. The investigatory procedures were flawed

In McDonough v. MBTA Police Dep. 13 MCSR 140, 143 (2000), the appellant's comments were made to another officer's face following her insubordinate response to his directions. When the comments were taken in the context of a pattern of conduct by the insubordinate officer, they "raised serious questions as to how the policy (regarding inappropriate comments) is implemented and who is responsible for the implementation." See Lawler v. Boston Police Department. 10 MCSR 161 (1997) (officer could not be punished for using vulgarities when there was never any express order forbidding such use, and officer was known around the station as a man with a foul mouth). Mercier

testified that the Department was bound to the Town's policy regarding sexual harassment. Mr. Rittenberg testified that the Town gave him and Simons the Municipal Police Institute (MPI) rules, and that they believed that these governed the Department. This was an erroneous assumption. The investigators created their own definitions of sexual harassment and sexual comments and presented them to the officers as the basis for their questioning. Rittenberg and Mercier testified that it was not the duty of the investigators to reach any sort of conclusion concerning whether sexual harassment had occurred, only to generate facts to present to the hearing officer. Despite this limited role, the investigators were allowed to create their own definition of what constituted sexual harassment and sexual comments, rather than operate in accordance with one policy or another's definition of such conduct. If the Appellant and the witnesses were only asked to recount every time he ever made any of those comments, there could be no differentiation between what comments the alleged victims found offensive, and those that they considered the normal shop talk in the Department. This is not indicative of a purely investigative body. Nor is it indicative of the use of a uniform, well defined policy in the course of the investigation.

If, for the sake of argument, the investigation did in fact follow one uniform set of procedures, the Town failed to ensure that these procedures were not carried out selectively once the investigation into the Appellant began. When an appointing authority adopts an internal procedure, it must follow those procedures as set forth. Butler v. Stoneham Public Schools. 12 MCSR 138, 144 (1999). An appointing authority cannot engage in selective enforcement of its rules. Donovan v. Boston Police Department. 9 MCSR 136 (1996). Colonies v. Town of Shrewsbury. 9 MCSR 174 (1996). The Appellant was initially investigated regarding Sawyer's sexual harassment complaint. Sawyer, the complainant, participated in a disparaging phone conversation with Sciuto about the Appellant that might have been defined as sexual harassment for the same reasons as the Appellant's comments about Sawyer were. Rittenberg testified that he was aware that several officers, including Sawyer and Sciuto had made derogatory comments or drawings involving the Appellant, yet he and Simons refused to expand the scope of their investigation beyond what they were ordered to investigate: whether the

67

Appellant made certain comments about Sawyer. Lt. Sciuto later received a written reprimand for what was effectively the same sort of conduct that the Appellant was being investigated and later demoted for (Sciuto's conduct was arguably more grievous because the public could access the radio line while he made his comment). That was a disparate treatment of two officers who effectively committed the same misconduct. See Boston Police Department v. Collins. 48 Mass. App. Ct. 408, 412 (2000). Police Commissioner of Boston v. Civil Service Commission. 39 Mass. App. Ct. 594, 601 (1996). Dunn v. Department of Correction. 10 MCSR 200 (1997). Kelleher v. Braintree Police Department. 10 MCSR 198 (1997). Had an investigation proceeded into the incident, a finding could be made that Sciuto did in fact sexually harass the Appellant. It might be argued that the Appellant never filed a formal complaint against Sawyer and Sciuto, and was thus the two men were never investigated. However, when it came to the investigators' attention that the Appellant might have made comments regarding Hart and Anderson, they expanded the scope of their investigation to address these matters, although Hart and Anderson never filed formal charges against the Appellant. This appears to be an inconsistent application of the Town's procedures handling harassment of any kind. If the Town's procedures required the filing of a formal complaint to initiate an investigation, the scope of the investigation concerning the Appellant should not have been expanded to his comments regarding Hart and Anderson. The Town followed its obligation to remain vigilant and proactive only in regards to the Appellant's actions. The Town was clearly selective in its decision to order and subsequently expand an investigation of the Appellant that led to his demotion, while refusing to do so in the case of Sciuto and Sawyer.

## V. Conclusion

What the Commission finds troubling in this case is that the Town's decision to punish the Appellant as it did was not an effective means of addressing the problems of which the Appellant's actions were a symptom. There was no attempt to place the Appellant on notice that his comments about Sawyer or any other officer would no longer be tolerated. Nor was there ever any attempt to formally address the conduct of officers towards other officers that was similar or far more grievous, e.g. that taken against Papagno, prior to the

Town's decision to demote the Appellant. Although it is not within the authority of the
Commission to overturn an appointing authority's implementation of its own policy
solely on the basis that it would have implemented that policy differently, the
Commission is aware that this situation could have been handled in a matter that
wouldn't have led to the Appellant's demotion, while still preventing such conduct from
reoccurring. This indicates that the Town either sought to make an example out of the
Appellant or that it refused to accept just how prevalent the problem was within the
Department.

The Appellant is hardly free from blame in this matter. He did violate Lieutenant Hart's
email directive. The Appellant attributes this to a desperate attempt to preserve evidence
for his own defense, since he was unable to print directly from the computer.
Additionally, some of the Appellant's statements to the investigatory board may not have
been entirely truthful, but in the context of the designed dilemma he was in, mitigation
ameliorates any untruthfulness. In consideration of all the findings above, it is clear that
he and he alone was under siege by a concerted and coordinated effort of the Town, the
Department's Command Staff and numerous officers in the Department. The paucity of
credible evidence produced by this draconian investigative process is a testament to its
initial folly of purpose. Imagine if Hanafin were the target of a similar investigation, the
results would be expectedly heavier. Taking these facts in mitigation and considering his
strained state of mind, the appropriate discipline for this offense, for the violation of the
November7, 2000 e-mail directive, is a written reprimand being placed in his personnel
file, to be removed in six months if there are no subsequent disciplinary offenses. This
discipline is similar to the discipline imposed upon Sgt. Mills for disseminating an
offensive email involving Glejzer and Soda.

It was an error of judgment for the Appellant to have filed a formal, written complaint
with the Chief, against Sawyer, for posting the "indicted" caricature or cartoon, given that
the Appellant had been a regular and willing participant in verbal and written high jinx of
his own. Despite the serious overstepping in the use of the word "indicted" by Sawyer,
the Appellant should have let the matter be resolved informally, by the "face to face" or

the mediated "in house" method or some other informal method, before filing a formal written complaint with the Chief. It is noted that Downer tried the "face to face" approach after filing a formal charge, but Sawyer denied the accusation. Still, the Appellant should have realized that he was opening Pandora's box when he pressed for a formal investigation of behavior him and nearly everybody else on the force practiced regularly.

Despite the Appellant's actions, his conduct did not justify the actions taken by the Town or the Department. To single the Appellant out as the subject of an investigation for conduct that was part of the normal course of officer relations and to subsequently pile on additional charges, some unsubstantiated, without a clear regard for procedural integrity, did not sufficiently justify the action taken by the Town.

The expansive investigation was seriously flawed because it focused exclusively on the Appellant for behavior and comments that were common place in the Department for decades. The relevant policy or rules and regulations of the Department were so vague and undefined as to be nonexistent. The long-term practice by acquiescence replaced the formal rules and regulations. The vague and undefined terms and offenses were never clearly explained throughout this hearing. The confusion or even absence of policy and procedure applicable to the Department, the creation of new terms, e.g. "sexual comments", suggest that an ex post facto determination was made that the Appellant's behavior and only the Appellant's behavior, subsequently constituted a punishable offense.

The investigation was political in nature, motivated by personal animus and vindictiveness, highly suggestible and influential to compelled witnesses, and arbitrary and capricious in its design, enforcement and conclusions. Hanafin and Ferguson, the instigators, aligned with Sawyer early on to reformulate and manufacture Testimony and evidence against the Appellant.

It was a serious mistake for Sawyer to use language on an open posting, that created the inference or impression that the Appellant had done or was inclined to do something

Robert Downer V. Town of Burlington                                    D-01-1326

criminal, a felony no less. Police officers are well aware of the definition of the term
indictment or indicted. It was also wrong for Sawyer to joke, over the publicly monitored
radio, about a 16 year old girl,(a possible crime) being under the Appellant. Rumors
could spread and the Appellant's reputation might be affected. Rumors did regularly
circulate quickly, around the Police Department. The Department could be accurately
described as a rumor mill. These rumors pertained to almost any subject including an
officer's; girlfriends, use of pornography, drug use, sexual preference, sexual fetishes and
work related activities etc. It is also noted that Sawyer's reaction to the accusation was to
lie. Sawyer suffered no reproach or discipline for his offense because he was a favored
and popular member of the Department.

What started out as hurt feelings and a power struggle between two obstinate, egotistical,
inconsiderate and immature men was allowed to fester and spread throughout the
Department. The Town and the Department allowed the investigation to create division,
contention and suspicion throughout the Department. The Town and the Department
failed to properly assess the situation initially and nip it in the bud by effectively
employing its usual informal "in house" method. Instead the Town launched an
unprecedented investigation targeting only the Appellant. The Town and the Department,
in the process, choose to ignore the pervasive if not systemic practices and problems
contributing to this situation. Those practices and problems had existed in the Department
for decades. The Town and the Department also chose to ignore other more egregious
conduct committed by other officers in its dogged pursuit of the Appellant. The Town
officials and the Department Command Staff had to be willfully ignorant to be unaware
of the decades old practices and conduct throughout the Department. Additional charges
incurred as a byproduct of the investigation were unsubstantiated by the facts. The design
of the investigation encouraged, if not forced the officer-witnesses who held a grudge
against the Appellant to line up and take a shot at him The overwhelmingly clear fact is
that the decision makers who designed and implemented this pervasive investigation and
many of the Appellant's adversarial witnesses were biased against the Appellant and
were out to get him at all costs. The entire process of investigating, charging and

Robert Downer V. Town of Burlington                                    D-01-1326

disciplining the Appellant was fatally tainted or flawed as it was very selective and
politically or personally motivated.

It is recommended that the Town and the Department quickly call these two men together
and resolve this personal matter in a mature adult manner. Then the Town and
Department can begin to address the departmental problems that may have come to their
attention.

The Appeal is *allowed* and the decision of the Town is to be modified to a written
reprimand for the violation of the November 7, 2000 e-mail directive. The written
reprimand is to remain in his personal file for the period of six months. Thereafter the
written reprimand is to be removed from the personal file, if there is no further discipline.
The Appellant is to be returned to his prior rank of Sergeant without any loss of
compensation or other benefits.

Civil Service Commission

Daniel M. Henderson, Esq.
Commissioner

By vote of the Civil Service Commission (Goldblatt; Chairman, Henderson, Taylor,
Guerin and Marquis; Commissioners) on May 19, 2005.

A True Record. Attest:

Commissioner

Either party may file a motion for reconsideration within ten days of the receipt of a Commission order or
decision. A motion for reconsideration shall be deemed a motion for rehearing in accordance with MGL
ch. 30A sec. 14(1) for the purpose of tolling the time of appeal. Pursuant to MGL ch. 31 sec. 44, any party
aggrieved by a final decision or order of the Commonwealth may initiate proceedings for judicial review

Robert Downer V. Town of Burlington                    D-01-1326

decision. Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of the Commission's order or decision.

Notice To:
        Brian Rogal, Esq.
        Leo J. Peloquin, Esq.

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Robert Downer and Nancy Downer

## DEFENDANTS
Town of Burlington, Robert Mercier individually and in his capacity as Town Manager, Francis Hart, individually and in his capacity as Chief of Police, and Harry Sawyer

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  __Middlesex__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  __Middlesex__
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Brian Rogal
Law Offices of Timothy M. Burke
160 Gould Street, Suite 111
Needham, MA  02494-2300

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☒ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7509 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
42USC Section 1983.  Violation of First Amendment Rights.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ YES  ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE  8/24/05

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) Downer

2.  CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LIST
    ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1))

    ___        I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT
    _X_        II.   195, 368, 400, 440, 441-444, 540, 550, 625, 710, 720,730,
                     740, 790, 791, 820, 830, 840, 850, 890, 892-894, 895, 950.
    ___        III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
                     315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
                     380, 385, 450, 891.
    ___        IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
                     690, 810, 861-865, 870, 871, 875, 900.
    ___        V.    150, 152, 153.

3.  TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E))
    None.

4.  HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN
    FILED IN THIS COURT? No.

5.  DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS
    AFFECTING THE PUBLIC INTEREST? No.
    IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY? (SEE 28 USC 2403)

6.  IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES
    PURSUANT TO TITLE 28 USC 2284? No.

7.  DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF
    MASSACHUSETTS (WORCESTER COUNTY)? (SEE LOCAL RULE 40.1(C)) YES ___ OR IN THE WESTERN
    SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)? (SEE LOCAL RULE 40.1(D))
    YES ___

8.  DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN
    SECTIONS OF THE DISTRICT? YES
    (a)  IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?

9.  IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE? Middlesex

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY
    GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE
    IN THE CENTRAL SECTION_____ OR WESTERN SECTION No.

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Brian Rogal

ADDRESS Law Offices of Timothy M. Burke, 160 Gould Street, Suite 111, Needham, MA 02494-2300

TELEPHONE NO. (781) 455-0707