UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT DOWNER and<br>NANCY DOWNER<br>　　　　　Plaintiff,<br><br>V.<br><br>TOWN OF BURLINGTON,<br>ROBERT MERCIER individually and in<br>his capacity as Town Manager,<br>FRANCIS HART, individually and in his<br>capacity as Chief of Police, and<br>HARRY SAWYER,<br>　　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CIVIL ACTION NO. 05-11761-RCL

PLAINTIFFS' OPPOSITION
TO MOTION TO DISMISS

STANDARD OF REVIEW

The standard of review on a motion to dismiss is well known. As Judge Young

described it in Carvalho v. Town of Westport, 140 F.Supp.2d 95 (Mass. 2001):

> Dismissal is appropriate "only if 'it appears beyond doubt that the plaintiff can
> prove no set of facts in support of his claim which would entitle him to relief.' "
> _Roeder v. Alpha Indus., Inc.,_ 814 F.2d 22, 25 (1st Cir.1987) (quoting _Conley v.
> Gibson,_ 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957] ). In making this
> determination, the Court should "take the allegations in the complaint as true and
> grant all reasonable inferences in favor of the plaintiff." Monahan v. Dorchester
> Counseling Ctr., Inc., 961 F.2d 987, 988 (1st Cir.1992) (citing Dartmouth Review
> v. Dartmouth Coll., 889 F.2d 13 [1st Cir.1989] ).

Here, plaintiffs have filed a detailed complaint and attached and incorporated the

lengthy decision of the Massachusetts Civil Service Commission. To the extent that this

motion turns on facts, these facts cannot be determined on a motion to dismiss. When

plaintiffs are allowed the reasonable inferences that flow from the facts alleged, including

the findings of the Civil Service Commission, a claim has been stated.  To the extent that

there is any dispute as to whether sufficient facts are alleged, or to the extent that

plaintiffs may be viewed to rely on factual allegations deemed to be outside their

complaint, then the appropriate remedy is to allow them to amend their complaint.

DEPRIVATION OF CONSTITUIONAL RIGHTS

Defendants argue that Mr. Downer's statements involved matters of purely

private concern, and therefore cannot form the basis for a denial of his First Amendment

rights.  To prevail on a § 1983 claim based on a violation of his First Amendment rights,

a public employee must show that his speech involved matters of public concern rather

than speaking "as an employee upon matters only of personal interest." Connick v.

Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).   Resolution of this

question often requires the courts to consider "the content, form, and context of a given

statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. 1684.  However, the

First Circuit has recently stated that:

> Not every First Amendment inquiry requires a full *Connick* inquiry into form and
> context, however. There are some situations where public interest will be apparent
> from the content of speech alone:
> Where a public employee speaks out on a topic which is clearly a legitimate
> matter of *inherent* concern to the electorate, the court may eschew further inquiry
> into the employee's motives as revealed by the "form and context" of the
> expression.

Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225 (1st Cir. 2005), citing O'Connor v.

Steeves, 994 F.2d 905, 913-14 (1st Cir.1993).

> In some instances, the subject matter of the speech, alone, may resolve the "public
> concern" question, as when the employee "expresses himself on a subject that is
> 'clearly a legitimate matter of inherent concern to the electorate,' "

Jordan v. Carter, 428 F.3d 67 (1st Cir 2005) quoting Fabiano v. Hopkins, 352 F.3d 447, 454 (1st Cir. 2003) and O'Connor v. Steeves, supra at 913-914.

In Baron the First Circuit affirmed a District Court finding that complaints about the internal workings of a sheriff department were matters that were inherently of public concern. Analyzing Connick, the Baron court also noted that a question on an internal survey of a District Attorney's office which asked about the effect of political pressure on District Attorneys raised a matter of inherent concern to the public. Baron v. Suffolk County Sheriff's Dept., supra at 234.

In Jordan v. Carter, 428 F.3d 67, 73 (1st Cir 2005) a motion to dismiss was denied because criticism of a police chief and management could inherently be matters of public concern. The court stated that an analysis as to whether the statements might instead be "performance critiques (which) concerned only matters of internal working conditions" could not be resolved on motion to dismiss. Moreover, the "fact that statements are made in private conversations and not disseminated to the public at large does not necessarily weigh against them." Id., at 74, citing O'Connor v. Steeves, supra. "[t]he First Amendment protects employee speech about matters of public concern even if the employee does not seek to make that speech to an audience outside the workplace. Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 13 (fn 10) (1st Cir. 2003) (citations omitted). The fact that the plaintiff had a personal stake in subject of the speech alleged to be protected by the First Amendment also does not matter if the speech also had a public dimension. Fabiano v. Hopkins, supra, at 454.

In Cignetti v. Healy, 967 F.Supp 10 (D. Mass. 1997) a firefighter alleged that he was disciplined in retaliation for statements made about the fire department. The Court

3

found that statements which were related to the development of property sites and to the

provision of benefits to gay and lesbian couples were statements on matters of public

concern, and therefore protected free speech.  The court cited the following cases and

examples of protected speech:

> Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135
> L.Ed.2d 843 (1996) (garbage collector's criticisms of County, Board of
> Commissioners deemed matter of "public concern"); Rankin v. McPherson, 483
> U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (public employee's private
> political remark while on duty matter of "public concern"); see, e.g., Pickering v.
> Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)
> (teacher's speech on need for extra school funding a matter of "public concern").

Here, plaintiffs allege that Mr. Downer suffered retaliation[1] for comments that he

made about the Burlington Police Department.  The safe and effective operation of any

police department would obviously be a matter of concern to the residents of that

community.  In particular, Mr. Downer suffered retaliation designed to prevent him from

becoming promoted up to and including becoming Chief of Police.  Defendants suggest

that this is purely a personal matter.  The response is simply to consider whether the

public has an interest in who the police chief is.  Appointment of a police chief is always

reported in the local media.  Appointment is made by the selectmen, in open meeting,

after discussion and public input.  A police chief sets the tone and priority of a police

department, and makes numerous decisions affecting public safety.  A police chief is

often the spokes person for the department, and the person who will ultimately handle

complaints and concerns of the public.  A police chief proposes the budget for the

department, including priorities as to how the money will be spent, what programs should

be cut, and what programs should be instituted.  A police chief will be held accountable if

---

[1] Defendants do not appear to be arguing for dismissal based upon a lack of causal connection.  To the
extent they may be, causation is adequately pled, and factual issues cannot be determined on this motion to
dismiss.

there are public safety issues, witness the dismissal and appointment of a new police chief in Boston after the Patriots victory riot approximately two years ago.

Consider as well whether the public would be concerned over a conspiratorial attempt by town officials to block a candidate from becoming chief of police.  In fact, there have been numerous stories in the local media about the discipline imposed on Mr. Downer and the decision of the Civil Service Commission.  These stories were often front page headline stories.  They occurred as charges were initially pressed against Mr. Downer, during the course of Civil Service proceedings, and on numerous instances after the Civil Service Decision in 2005.

In expressing his intent and desire to be Chief, and consequentially his view that he would be the best qualified candidate, Mr. Downer is speaking on a matter of public concern.  His statements and comments were well known within and outside the police department.  Under the case law cited above, the fact that he may have had a personal stake in the speech or that it may have occurred in private conversations is not determinative.  However, to the extent that the exact context of his statements, the place where they were made, who they were made to, or other specifics of the statements are relevant, those facts cannot be decided on a motion to dismiss.

Mr. Downer also repeated criticized the DARE program[2].  He called it a waste of money and stated views that it was not being properly run.  He criticized the way the officer assigned ran the program.  Mr. Downer's subsequent discipline alleged significantly that he the DARE officer was one of the people that Mr. Downer made offensive comments regarding, and it was part of the basis for his discipline.  The DARE

---

[2] DARE is a program to have police officers teach drug abstinence to grammar school children.  Funding is through federal grants.

officer and his assistant were among Mr. Downer's chief accusers, and testified against him at Civil Service.  A drug education program, which uses federal grant money, and sends a police officer into schools to have contact with and teach young children is certainly a matter of public concern.

Therefore, under the relevant case law, plaintiffs have pled sufficient facts which if proved would allow a jury to find that he spoke on matters of public concern and was disciplined for doing so.

STATUTE OF LIMITATIONS

Defendants argue that plaintiffs' claims are barred by the statute of limitations. Plaintiffs have pled that a conspiracy existed among the parties to have Mr. Downer disciplined and/or to have his employment terminated.  One of the objects of the conspiracy was to prevent Mr. Downer from being promoted to a position where he could become Chief of Police.  Other objects were to prevent him from instituting discipline against defendant Sawyer, a Burlington police officer, and in retaliation for his criticism of the DARE program and officer.  Mr. Downer was told not to take a civil service examination, and then stripped of several positions when he did take the examination.  He complained about the way the Burlington police department was run, and particularly about the existence, misuse of funds by, and improper leadership of the DARE program. Mr. Downer alleges that the conspirators brought charges against him in retaliation for his statements and in an effort to achieve its objectives.  There has been further retaliation against him as a result of his exercising his rights of appeal to civil service and then as a result of his favorable civil service decision.   The conspirators have made his life

miserable as a policeman in Burlington, and have done so with the intent of making it so miserable that he would quit.

Unlike the typical case where the allegations of conspiracy may be conclusory and speculative, plaintiffs have attached the decision of the Civil Service Commission. Based upon twelve days of hearing and the testimony of over thirty witnesses, the Commission finds that there was a conspiracy.[3]  The Commission decision documents numerous incidents of actions taken against Mr. Downer, of false charges, and of conspiracy to manufacture evidence.

The difficulty with this case is the time.  Plaintiffs allege that the conspiracy began with the allegations of defendant Sawyer that Mr. Downer had made statements that constituted sexual harassment.  Those allegations occurred in early 2000.  The Town instituted and investigation, but did not impose discipline until August 2001.  Mr. Downer appealed to the Civil Service Commission within the ten day time limit for an appeal.  The Commission did not issue its decision until May, 2005.  Suit was filed reasonably soon thereafter, in August 2005.  Plaintiffs allege that actions taken in furtherance of this conspiracy have occurred throughout this period, and continue to the present.  They include numerous acts of retaliation since the Civil Service Commission issued its decision.

A review of some of the actions alleged to have been taken in furtherance of the objectives of the conspiracy is necessary to understand its scope.  Those actions include:

1. Letters sent by Mr. Sawyer's lawyer to the Town complaining of alleged sexual harassment by Mr. Downer.

---

[3] Since only the Town was a party to the Commission proceedings, its findings will only be binding upon the Town.  However, since the Commission heard testimony from the other defendants and their agents, it findings certainly provide concrete evidence of the existence of the conspiracy between all of them.

2. Design and instigation of an investigation into Mr. Downer which was "political in nature", "motivated by personal animus and vindictiveness" towards Downer, and "arbitrary and capricious in "design, enforcement and conclusions." Decision of the Civil Service Commission (hereinafter "Decision"), Pg. 70.

3. Directing that the investigation focus solely on Mr. Downer and not be expanded to include anyone else.

4. Compelling all police officers to take sides and give statements.

5. Disciplining Mr. Downer for practices that were commonplace in the police department, well known and even practiced by its ranking officers, which the Police Department had made no attempt to stop or change, and for which other officers had not been disciplined. Decision, Pg. 20, 39, 43.

6. Pressure and threats used by the former police chief and defendant Hart, then a lieutenant, against a patrol officer to force him too testify against Mr. Downer, including the use of a threat to fire the officer if he did not testify. Decision, Pg. 53.

7. Coordination, by a former police chief and defendant Hart, of an attempt to "manufacture testimony and evidence" against Mr. Downer. Decision, Pg. 70, 14.

8. Compelling officers to testify at Civil Service proceedings.

9. Falsely stating that Mr. Downer had made racist remarks about another officer, and getting that officer to make a complaint in August 2001.

10. Investigating, getting officers to testify and disciplining Mr. Downer for the alleged racist remarks. Town disciplinary decision issued in March 2003 after hearings in late 2002.

11. Inducing defendant Sawyer's mother to make a false complaint against Mr. Downer, and then concealing the source of the complaint. Her identity was revealed in or about December 2002.

12. Advising the District Attorney that Mr. Downer had been disciplined and providing them with a copy of the disciplinary decision, all with the intent of embarrassing Mr. Downer and making it difficult for him to work as a police officer. Refusing then to send a copy of the Civil Service Commission exonerating Mr. Downer to the District Attorney after it was issued in 2005, and despite having been requested to do so.

13. Refusing to reinstate Mr. Downer despite the decision of the Civil Service Commission.

14. Subjecting Mr. Downer to harassment after the Civil Service decision was received, including imposing and attempting to impose discipline on him without cause. These events have occurred in 2005.

15. Repeated, regular meetings in the Police Chief's office since the decision between defendant Chief Hart and defendant Sawyer, a patrol officer. The length and regularity of the meetings between a patrol officer and a police chief demonstrate that they have no legitimate police reason.

16. Refusal of Chief Hart to select or recommend Mr. Downer for any award, citation or position, despite his having been the best qualified person on numerous occasions. These events have happened on a routine basis, including numerous times this year.

17. Since the Civil Service decision Chief Hart has threatened Mr. Downer and has conducted personal investigations regarding Mr. Downer. Police Chiefs, including Chief Hart, do not normally conduct personal investigations into patrol officers.

18. The attempt of defendant Sawyer and others to intervene in the appeal of the Civil Service decision for the purpose of overturning that decision. As individuals, there is no precedent for their intervention, and that motion was denied.

19. In or about October 2005 Chief Hart denied Mr. Downer the right to exercise his seniority in the selection of assignments. No other officer is denied that right.

In addition to these specifics, plaintiffs note that the civil service hearing commenced on July 24, 2002 and then reconvened on eleven additional days ending on March 13, 2003. Nine of these dates occurred within three years prior to filing this action in August 2005. Defendant Sawyer testified on September 23, 2002, within the three year period. Assistant Town Administrator Larry Rittenberg, who had been designated by the Town to lead the investigation into Mr. Downer, testified on October 25, 2002. Defendant Town Administrator Mercer testified on the same day. Defendant Chief Hart testified on November 4, 2002.

The Civil Service Commission found that there was a conspiracy to "get" Mr. Downer, that evidence was manufactured and that witnesses were coerced or intimidated. It is fair to infer that witnesses did not testify at the Civil Service Commission without being interviewed, prepared and coaxed, if not outright coerced. In fact counsel wrote to the Town in August 2002 to complain that witnesses were being ordered to talk to Town Counsel. Thus it is reasonable to infer that there were numerous conversations about that testimony, in addition to the testimony itself, all of which occurred during the three years prior to filing the complaint. It is fair to infer that there were regular meetings between Town Counsel, the Town Administrator and/or selectmen regarding the progress of the case and the strategy to be used.

From the above recital it is clear that the conspiracy continues to exist, and that numerous acts were taken in furtherance of the conspiracy within the three years prior to the time that suit was filed.  Defendants do not contest that suit regarding such actions is timely.  Even under an argument that a cause of action accrues with each specific act, a plaintiff cannot be barred from suit over actions that occurred within three years prior to filing suit.  Defendants' motion is, at most, to limit this action to events occurring on or after August 24, 2002.

ACTS IN FURTHERANCE OF THE CONSPIRACY THAT OCCURRED PRIOR TO AUGUST 24, 2002 ARE NOT BARRED

In a criminal conspiracy case, the statute of limitations runs from the date of the last overt act in furtherance of the conspiracy.  U.S. v. Nazzaro, 889 F.2d 1158 (1st Cir. 1989); citing Grunewald v. United States, 353 U.S. 391, 396-97, 77 S.Ct. 963, 969-70, 1 L.Ed.2d 931 (1957).  In determining whether an act is an overt act in furtherance, the courts examine the object of the conspiracy. Id.  The conspirators' motives, designs, and objectives can make an otherwise innocent act into an action in furtherance of a conspiracy for purposes of the statute of limitations.  Id.  The crucial question for determination as to whether a conspiracy continued to exist and whether an action was taken in furtherance of the conspiracy is the scope or object of the conspiracy.  If there is an overt act within the limitation period that furthers the object of the conspiracy, and not just passive acquiescence or silence, then the prosecution on the entire conspiracy is timely.

Defendants argue that the limitations period runs from each discreet act, relying heavily on Nieves v. McSweeney, 241 F.3d 46 (1st Cir. 2001) to support their argument.  There, Nieves alleged he had been subjected to a false arrest and the use of excessive

force during the course of the arrest.  He filed suit more than three years after the arrest and excessive force, but less than three years after the conclusion of the criminal trial. Nieves also alleged a conspiracy to cover up by giving false testimony.  The Court held that an alleged conspiratorial cover up was separate from the initial, discrete acts of the false arrest and use of excessive force.  In essence, those acts were complete, and known to Nieves, when they occurred.  Thus the limitations period as to the arrest and use of force ran from the date they occurred.

Here, the conspiracy does not start or end with one complete act.  The scope of the conspiracy could not have been known when discipline was initially imposed.  Only as the prosecution of Mr. Downer played out through the civil service hearings, as various witnesses appeared and were compelled to testify, and as other charges were brought against him does the scope of the conspiracy and the actions of the participants become known.  In fact, cross examination at the Civil Service Commission hearings produced significant evidence of the scope of the conspiracy.

Moreover, it would have been very difficult to bring suit during the pendency of the Civil Service proceedings.  Had Civil Service ruled against Mr. Downer he would have been estopped from relitigating its findings.  At a minimum, he would be precluded from arguing that his demotion was without cause.  This would have limited or precluded many of his claims, including specifically the majority of his damages.  The reality is that had Mr. Downer not won at Civil Service he would likely not have filed suit.  Had Mr. Downer filed suit before the Civil Service decision defendants would have argued that he had to exhaust his administrative remedies, or at least that this litigation should be stayed

until the Civil Service Commission had issued its decision.[4]  Plaintiffs would have

concurred.  In fact Massachusetts requires plaintiffs to exhaust grievance procedures

contained in either collective bargaining agreements or in personnel manuals before they

can resort to the courts.  <u>O'Brien v. New England Tel. & Tel. Co.</u>, 422 Mass. 686, 664

N.E.2d 843 (1996).  The rule should not be different where the employee chooses to a

civil service appeal rather than an appeal to an arbitrator.[5]  Plainly the best use of judicial

resources, as well as the resources of the litigants is to await the findings of the Civil

Service Commission before filing suit.  Moreover, for reasons similar to those why a

federal court will abstain when a criminal case is pending in a state court, a decision on

this action while the appeal was pending before the Civil Service Commission would bar

or call into question the validity of any subsequent decision by that agency.

A conspiracy to cover up excessive force or false arrest is different than the initial act
itself.  <u>Gonsalves v. City of New Bedford</u>, 939 F.Supp. 921, 927 (D.Mass. 1996) citing

The problem here is the length of time that the Town took to investigate and impose

discipline, followed by the approximately four years that Civil Service took to render its

decision.  No one would have anticipated that delay at the outset.  Had the decision been

reached within even two years of the time that the Civil Service appeal was filed this

action would have been filed at a time that would have obviated any statute of limitations

argument.

A conspiracy to cover up excessive force or false arrest is different than the initial act

itself.  <u>Gonsalves v. City of New Bedford</u>, 939 F.Supp. 921, 927 (D.Mass. 1996) citing

<u>Karim-Panahi v. Los Angeles Police Department</u>, 839 F.2d 621, 625 (9th Cir.1988).  In

<u>Gonsalves</u> a jury awarded damages for the cover up that far exceeded the damages

---

[4] If a criminal case were pending the court would be obligated to stay the sec. 1983 action pending the outcome of the criminal trial.  Landrigan v. City of Warwick  628 F.2d 736 (1st Cir. 1980)
[5] Mr. Downer was a member of the sergeant's union and had a contractual right to grieve and arbitrate his demotion.  Alternatively, he had the right of appeal to civil service.  He could only pursue one avenue of appeal and chose civil service.

awarded for the initial use of excessive force. In <u>Landrigan v. City of Warwick</u>, 628 F.2d 736 (1st Cir. 1980), the court allowed a claim for a conspiratorial cover up to proceed despite the fact that the claim for the initial use of excessive force was barred by res judicata. Thus, while a conspiracy claim would not extend the limitations period related to use of excessive force or false arrest in <u>Nieves</u>, a subsequent conspiracy to cover up facts may well extend past the initial incident as in <u>Gonsalves</u> and <u>Landrigan</u>.

The conspiracy here is much more akin to the conspiracy to cover up. It is not based upon a single, discrete incident. Defendants are alleged to have taken numerous actions over time to further their goals of preventing Mr. Downer from achieving higher rank and from ultimately becoming Chief of Police, and/or to force him out of the police department by discharge or making conditions so intolerable that he would resign. It is anomalous to suggest that some of those actions are time barred because this is a civil conspiracy, when they would not be if it were a criminal conspiracy. Moreover, the court should toll any limitations as to the earlier actions since they are part of the same conspiracy, and since any other ruling would force plaintiffs to file suit before their appeal was adjudicated at the Civil Service Commission. For reasons set forth above, such a suit would waste judicial resources and expose the court to rendering decisions that were inconsistent with, or which supplant the jurisdiction of an important state agency.

<u>INTRACORPORATE IMMUNITY</u>

Defendants allege that the doctrine of intracorporate immunity should bar this action. The doctrine, which arises largely in anti-trust cases, states that a corporation cannot conspire with its own employees to the extent that they are acting for the

corporation.  However, the doctrine has been held to have limited, if any, application to civil rights cases.  Stathos v. Bowden, 728 F.2d 15, 20-21 (1st Cir.1984) (we do not see why [intracorporate immunity] should extend--if at all--beyond the ministerial acts of several executives needed to carry out a single discretionary decision.); Broderick v. Roache, 1992 WL 512164 (D.Mass. 1992)(Doctrine does not apply to 42 USC Sec. 1985(3) conspiracy).  Thus in Limone v. U.S., 336 F.Supp.2d 18 (D.Mass. 2004) intracorporate immunity did not bar conspiracy allegations against several FBI agents.

Thus, intracorporate immunity should not apply to this case.  The actions of defendants, if proved, would not be in furtherance of any legitimate action of the Town of Burlington.  The actions of the individual defendants are not ministerial acts.  Rather they are alleged to have formulated and actively participated in the plan to discipline and harass Mr. Downer.

MASSACHUSETTS CIVIL RIGHTS ACT

Defendants' motion to dismiss the Massachusetts Civil Rights Act (MCRA) claim is primarily based on the same grounds as its challenge to the Section 1983 claims.  The above argument as to protected First Amendment speech and matters within the statute of limitations applies.

This court has found that allegations of a conspiracy to discipline a civil service employee in retaliation for First Amendment speech were sufficient to state a MCRA claim.  Cignetti v. Healy, 967 F.Supp 10 (D. Mass. 1997).  In that case a threat to discipline the employee was sufficient to satisfy the MCRA's requirement of threats, intimidation or coercion.  Moreover, placing the employee on sick leave, doctoring evidence, and preferring charges were sufficient to constitute overt acts in furtherance of

a conspiracy.  See <u>Murphy v. Cruz,</u> 52 Mass.App.Ct. 314, 753 N.E.2d 150 (2001)

(Transfer of prisoner allegedly in retaliation for filing suit was sufficient to satisfy

intimidation or coercion requirement.  Dismissal reversed.); <u>Murphy v. Cruz,</u> 52

Mass.App.Ct. 314, 753 N.E.2d 150 (2001) ("Adverse administrative action which is part

of a scheme of harassment may amount to the required threats, intimidation or coercion

for purposes of the MCRA."  Case involved institution of false disciplinary charges

against prisoner to force him to withdraw complaint.)(Citations omitted).

Plaintiffs allege that a number of acts were taken to intimidate and coerce him from

continuing to take promotional examinations.  They also allege, and Civil Service found,

that witnesses were pressured and intimidated.  Moreover, defendant Hart has threatened

Mr. Downer with new discipline repeatedly since the Civil Service Commission in

retaliation for his exercising his right to pursue enforcement of that decision and in

retaliation for filing this action.

<u>MASSACHUSETTS COMMON LAW CONSPIRACY</u>

Massachusetts recognizes a common law cause of action for conspiracy, including a

conspiracy which has purpose of depriving another of the benefits of a contract.

<u>Comerford v. Meier</u>, 30 Mass. 398, 404 (1939); <u>Garst v. Charles</u>, 187 Mass. 144, 149

(1905).  A conspiracy is actionable on a theory of "concerted action".   The plaintiff need

only "demonstrate that a combination of persons acted pursuant to an agreement to injure

the plaintiff." <u>Gutierrez v. Mass. Bay</u>, 437 Mass. 396, 415 (2002).  "Under this theory, a

defendant may be held liable for actions done by others pursuant to a common design or

with the defendant's substantial assistance or encouragement." <u>Mass. Laborers' Health &</u>

<u>Welfare Fund v. Philip Morris,</u> 62 F.Supp.2d at 244 (citations omitted). "Key to this

cause of action is a defendant's substantial assistance, with the knowledge that such assistance is contributing to a common tortious plan." Kurker v. Hill, 44 Mass.App.Ct. at 189, 689 N.E.2d at 837.  A plaintiff must establish "a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.' "Id. (quoting Stock v. Fife, 13 Mass.App.Ct. 75, 82 n. 10, 430 N.E.2d 845, 849 n. 10 (1982)).

To sustain an action for interference with contractual relations, the plaintiff must show that he had a contract with a third party, the defendant knowingly induced the third party to breach the contract, the defendant's interference was *improper in motive or means*, and the plaintiff was harmed by the defendant's action. Wright v. Shriners Hospital for Crippled Children, 412 Mass. 469, 476 (1992).  Massachusetts similarly recognizes a tort for wrongful interference with employment.  Falcon v. Leger, 62 Mass.App.Ct. 352, 816 N.E.2d 1010 (2004); O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 664 N.E.2d 843 (1996).

Here, Mr. Downer's employment with the Town of Burlington is a form of contract. See O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 664 N.E.2d 843 (1996)(discussing whether the terms of a personnel manual were part of that contract) All defendants were aware of that contract, and Mr. Downer clearly suffered damages as a result of this breach, including his demotion.  For reasons set forth above, the plaintiffs have adequately pled a common law conspiracy to interfere with Mr. Downer's contractual relations and/or employment.

MUNICIPAL LIABILITY

Defendants argue that there can be neither municipal nor official capacity liability under §1983 based upon a theory of *respondeat superior*.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Further, they contend that such liability must rest on proof that harm was caused by a policy or custom of the municipality.  In a recent iteration the First Circuit stated:

> …"it is when execution of a government's policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established. Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). But "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." Britton v. Maloney, 901 F.Supp. 444, 450 (D.Mass.1995), aff'd in part and rev'd in part on other grounds, 196 F.3d 24 (1st Cir.1999). In a §1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.1989). This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Id.; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). If a custom is attributable to the municipality, we must also inquire whether it was "the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro, 871 F.2d at 1156.

Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225, 236-237 (1st Cir. 2005).

Here we allege that the ultimate decision maker was defendant Mercier, who acted for the Town of Burlington as its Town Administrator.  Defendant Mercier made the decision to investigate Mr. Downer, made the decision to seek discipline, acted as the Town's hearing officer and therefore heard the testimony for and against Mr. Downer, made the decision to impose the suspension, and has made or been consulted in each decision to pursue that discipline, to impose subsequent discipline and to deny Mr. Downer the right to take civil service examinations.  The investigation into Mr. Downer

was conducted by Assistant Town Administrator Rittenberg, who was assigned the task by defendant Mercier. Town counsel, who we can infer reports to the Town Administrator and the Board of Selectmen, has participated in every phase of this matter. The Civil Service Decision points to conspiratorial actions, including the attempt to coerce witnesses and manufacture evidence, by past and present Burlington police chiefs and ranking officers. The current police chief continues to retaliate against Mr. Downer on a regular basis, despite letters sent by Mr. Downer's counsel to counsel for the town and grievances sent to and heard by defendant Mercier.

Based on these facts the actions against Mr. Downer are being taken by the Town through its top administrators. The Town has actual knowledge of what is being done. The Town is acting pursuant to "policy" set by its Town Administrator in consultation with the past and present police chiefs and town counsel. Note that among the Civil Service findings are findings that the entire investigation of Mr. Downer was designed from its inception to "get" him, and was improper in form and motivation. See <u>Putnam v. Town of Saugus, Mass.</u>, 365 F.Supp.2d 151 (D.Mass. 2005)(Discussion of municipal liability by Judge Young finding that intentional deprivation of rights by authorized policy and decision maker was sufficient to impose municipal liability)

<u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

Plaintiffs agree that the Massachusetts Tort Claims Act bars suits against the municipality and official capacity suits for common law intentional torts including intentional infliction of emotional distress. It does not bar individual capacity actions. However, defendants argue that the exclusive remedy provisions of the Massachusetts

Workers Compensation statute bars such a claim against a co-employee, and therefore that this claim is subject to dismissal against the individual defendants.

Initially, the problem with this argument is that police officers are not covered by the Workers' Compensation act. As defendants concede, police officers receive payment if injured on the job pursuant to M.G.L. c. 41, sec. 111F. That statute contains no such exclusive remedy provision. Defendants cite no case holding that sec. 111F bars a suit against a co-employee for individual torts, let alone a case that states that suits for intentional infliction of emotional distress are barred. Moreover, even the Workers Compensation statute does not bar suits against co-employees who are not sufficiently acting within the scope of their employment. Grant v. John Hancock Mut. Life Ins. Co., 183 F.Supp.2d 344 (D.Mass. 2002).

There can be no argument that defendant Sawyer was acting within the scope of his employment. As to defendants Mercier or Hart, they have not argued that they were acting within the scope of their employment. Were they to do so those arguments would certainly turn on findings of fact that cannot be made in a motion to dismiss.

DEFAMATION

Defendants seek to dismiss the count for defamation as to the individual defendants because the complaint does not set forth specific defamatory statements by each of them. Given the limited requirements of notice pleading plaintiffs' initial response is that they have sufficiently put defendants on notice of their claim, and the specific instances should be fleshed out as part of the discovery process.

Given the findings of conspiracy and the series of actions in this matter, plaintiffs are also entitled to use the discovery process to establish exactly who made specific

statements.  For example the patrol officers union has publicly decried the Civil Service

Decision, calling it false and misleading.  They have challenged the decision and tried to

have it overturned.  Their statements, under the case law below, are susceptible of an

interpretation that the charges against Mr. Downer were correct.  Those charges certainly

have damaged his reputation.   Defendant Sawyer is a union officer, as are a number of

the other officers found by Civil Service to have falsely testified against Mr. Downer.  He

is entitled to use the discovery process to determine defendant Sawyer's exact role in

making those statements.

> "Words may be libelous unless they cannot be reasonably understood in a
> defamatory sense, or, to express it in another way, unless they are incapable of a
> defamatory meaning…"

King v. Globe Newspaper Co, 400 Mass. 705, 717-718 (1987).  Unless a statement is

unambiguous, the ultimate question of whether it is defamatory is for the jury.   Yovino

v. Fish, 27 Mass.App.Ct. 442, 447 (1989).  Where a statement was "susceptible of being

read by a reasonable person as fact or opinion… the final determination was for a jury…"

Id.  Where a communication is susceptible of both a defamatory and nondefamatory

meaning, a question of fact exists for the jury. Dreghetti v. Chmielewski, 416 Mass. 808,

811(1994); citing Jones v. Taibbi, 400 Mass. 786, 792 (1987).

> If a publication is susceptible of both defamatory and harmless meanings, it
> presents a question for the trier of fact and cannot be ruled non-libelous as matter
> of law.  Sharratt v. Housing Innovations, Inc., 365 Mass. 141, 143, 310 N.E.2d
> 343 (1974); Mabardi v. Boston Herald-Traveler Corp., 347 Mass. 411, 413, 414,
> 198 N.E.2d 304 (1964).  Inferences which might be drawn by a considerable and
> respectable segment of the community can make a publication actionable.  Id. at
> 414, 198 N.E.2d 304; Poland v. Post Publishing Co., 330 Mass. 701, 704, 116
> N.E.2d 860 (1953); Thayer v. Worcester Post Co., 384 Mass. 160, 162, 187 N.E.
> 292 (1933); Cf. Colby Haberdashers, Inc. v. Bradstreet Co., 267 Mass. 166, 170-
> 171, 166 N.E. 550 (1929).  Words may be actionable even if they do not tend to
> damage a plaintiff's reputation or hold him up to ridicule in the community at
> large or among all reasonable people; it is enough to do so among a considerable

and respectable class of people.  <u>Sharratt v. Housing Innovations, Inc</u>., supra, 365 Mass. at 145, 310 N.E.2d 343.

<u>Smith v. Suburban Restaurants, Inc</u>., 374 Mass. 528 (1978).  In <u>Smith</u> the plaintiff was sent a letter stating that she was not allowed back at the restaurant because of unspecified bad conduct in the past.  The court held that this was susceptible of a defamatory meaning and reversed a grant of summary judgment.  In <u>Skelley v Trustees of Fessenden School</u>, 1994 WL 928172, at 6 (Mass Super. Ct. 1994), letters which suggested that the plaintiffs made unfounded accusations and that they may have been distant parents, and statements that the family was dysfunctional and psychiatrically unsound, presented jury questions.

Attached hereto is a letter sent by defendant Hart, copied to and with the consent of defendant Mercier, to District Attorney Martha Coakley on July 25, 2005.  Mr. Downer had asked Chief Hart to notify District Attorney Coakley of the Civil Service Decision exonerating him, since the Town's disciplinary decision had been sent to her.  The Town's decision was then released to numerous defense attorneys, and severely damaged Mr. Downer's reputation within that community.  Defendant Hart refused to send the Civil Service Decision.  Instead he sent the attached letter which states that the Civil Service Decision is incorrect.  In so doing, defendant Hart again asserts that Mr. Downer has testified untruthfully, a clearly libelous remark for a police officer.   Since the letter is susceptible of a defamatory meaning, the question as to whether it is defamatory is for the jury.  The letter is attributable both to defendant Hart and to defendant Mercier, since he condoned and reviewed it, if not authorized it.

Defendants argue that they have a qualified privilege as to such letters.  However, a qualified privilege will not protect an action done in bad faith.  Resolution of whether

defendants acted within the scope of any qualified privilege will also turn upon questions of fact which cannot be resolved here.

To the extent that the Court may conclude that the complaint does not sufficiently allege defamation, then the plaintiffs move that they be allowed leave to amend their complaint.

LOSS OF CONSORTIUM

Plaintiff Nancy Downer's claim for loss of consortium is viable and cannot be dismissed as to each of the common law torts in this case that are not subject to dismissal.

CONCLUSION

For reasons set forth above defendants' Motion to Dismiss should be denied.  To the extent that the Court may find that facts have not been sufficiently pled, or that this opposition relies on facts outside of the complaint and attached Civil Service Decision that are material to the Court's decision, Plaintiffs move that they be allowed leave to amend their complaint to incorporate those factual allegations.

Respectfully Submitted
By Plaintiffs' attorney,

January 6, 2006                                        /S/ Brian Rogal_____
                                                      Brian Rogal, Esq., BBO #424920
                                                      LAW OFFICES OF TIMOTHY M. BURKE
                                                      160 Gould Street, Suite 111
                                                      Needham, MA 02494-2300
                                                      (781) 455-0707



**BURLINGTON POLICE DEPARTMENT**

Francis J. Hart
CHIEF OF POLICE

July 20, 2005

Martha Coakley
Middlesex District Attorney
40 Thorndike Street
Cambridge, MA 02141

Dear District Attorney Coakley:

At the request of Burlington Patrol Officer Robert Downer (see attached e-mail), I am writing to inform you of the findings of the Civil Service Commission and its decision to overturn the Town Administrator's decision in August 2001 to demote him from sergeant to patrol officer.

Previously, at your request, the Town had submitted a letter advising you of the demotion and the underlying Rules and Regulations violations.

The Town strongly disagrees with the Civil Service Commission decision and the rationale for it. The Town has appealed.

The Commission endorsed the decision of Commissioner Daniel Henderson, who heard the case.

Officer Downer's view is that he has been found "innocent" of the charges. The Town does not agree. The grounds for its appeal include the following:

- While the Commissioner found that Officer Downer had made false statements about the sexual orientation and activities of three officers behind their backs, he determined that other officers had engaged in similar misconduct with impunity. The Town strongly disagrees with the proposition that other officers did what Officer Downer did;

- While the Commissioner found that Officer Downer had failed to tell the truth in the Town's investigation of his conduct, he determined that it was excusable because the investigation unfairly targeted Officer Downer. The Town strongly disagrees with the Commissioner's determination that a police officer can be excused for being untruthful;

- While the Commissioner found that Officer Downer had made comments about those who had testified

45 Center Street
Burlington, MA 01803

Tel: (781) 270-1914
FAX: (781) 270-1920

against him (including stating about two officers, "If either of them were dying on the side of the road, they wouldn't get a helping hand from me."), he determined that Officer Downer's comments were not threats but an expression of disappointment in the officers;

- The Commissioner's findings on many fronts are not supported by substantial evidence on the record, which includes a stenographic transcript of the testimony.

If you have any questions, please contact me.

Chief Francis Hart
Burlington Police Department

Cc:    Robert Mercier, Town Administrator
       Officer Robert Downer
       Brian Rogal, Esq. (for Officer Downer)

BURLINGTON POLICE DEPARTMENT