UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT DOWNER and | ) | |
| NANCY DOWNER | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | |
| | ) | |
| TOWN OF BURLINGTON, | ) | CIVIL ACTION NO. 05-11761RCL |
| ROBERT MERCIER individually and in | ) | |
| his capacity as Town Manager, | ) | |
| FRANCIS HART, individually and in his | ) | |
| capacity as Chief of Police, and | ) | |
| HARRY SAWYER, | ) | |
| Defendants | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

1. Plaintiff Robert Downer is a resident of the Town of Burlington and has been employed as a police officer for the Town of Burlington for approximately twenty years.

2. Plaintiff Nancy Downer is the wife of Robert Downer and is a resident of Burlington.

3. Defendant Town of Burlington is a municipal corporation.

4. Defendant Robert Mercier is the Town Manager of the Town of Burlington. He is sued individually and in his official capacity.

5. Defendant Francis Hart is the Chief of Police of the Town of Burlington. He is sued individually and in his official capacity.

6. Defendant Harry Sawyer is a Burlington Police Officer and a resident of the Town of Burlington.

7. Mr. Downer was hired as a police officer in 1985. In March 1996 he was promoted to the rank of sergeant.

8. Mr. Downer had an exemplary career as a police officer. His annual evaluations consistently included rankings of excellent and outstanding, the highest possible ranks. He received numerous awards, certificates and letters of commendation, from both civilians and superior officers, during his career. Mr. Downer also obtained several grants for the police department, including grants for the bicycle unit and a community policing plan. He had no record of any discipline of any significance.

9. Hiring and promotion within the Burlington Police Department are governed by Massachusetts Civil Service Laws which include promotional examinations. Mr. Downer regularly scored at the top of civil service promotional examinations.

10. Defendants conspired amongst themselves and with other individuals and Burlington police officers to bring false charges against Mr. Downer, to have him disciplined if not fired, to deprive him of his civil service rights and job and to prevent him from being promoted to lieutenant and chief of police.

## ALLEGATIONS RELATED TO FIRST AMENDMENT SPEECH

11. Sgt. Downer spoke to numerous people about his desire for promotion including to become Chief of Police, his vision for changes within the Burlington Police Department and specific practices within the Department that he did not like and would change. He told many of the people that he spoke to that if promoted to Chief of Police he would make changes to the Department.

12. Among the specific programs that Sgt. Downer spoke about was a frequent criticism of the DARE program and the officers that ran the program. DARE is a

federally funded program which has police officers teach elementary school children about the dangers of drug usage. The DARE program in Burlington also ran trips and camps for children and had a bus it used to take children on outings.

13. Sgt. Downer believed that the DARE program was ineffective and a waste of money. He believed that the program should be replaced with a program focused on older students, eighth and ninth graders, and providing more real world and honest education about drug use, including using former drug users to educate children.

14. Sgt. Downer criticized the DARE program as a whole and the activities that were run by the Burlington Police DARE officer. He criticized its tactics of handing out balloons and mugs as being ineffective. Sgt. Downer's criticisms of the program found expression in a statement that he frequently made: "Blowing up balloons and giving out coffee mugs in the fifth grade is not going to help kids in the tenth grade making decisions in the woods."

15. Sgt. Downer criticized DARE officer Anderson for the way he acted with and around children including wearing a rubber duck mask, having children sit on his lap and having the words "crotch rocket" and a graphic picture painted on his motor cycle.

16. Burlington Officer Fournier, who was an assistant DARE officer and later a DARE officer, testified that Sgt. Downer criticized the DARE program and the way in which Officer Anderson ran the program. Officer Fournier also testified that Downer said he would change the program if he made Chief.

17. Another frequent target of criticism by Sgt. Downer was the work output of the Burlington Police Department Detectives and Drug Officers. Downer expressed his

opinion that the detectives were unproductive and useless and that they made few arrests and no drug arrests.

18. Sgt. Downer made the biggest drug arrest in the history of the Burlington Police Department.  Instead of receiving praise he was told by Police Chief Soda that he was not the drug officer and that he should mind his own business and *"shut his mouth"*.  Chief Soda had heard and was well aware of Sgt. Downer's criticism of the drug officers and detectives.

19. Sgt. Downer also stated that he would put a substation in the Burlington Mall. The Mall is statistically the highest area of crime and police calls in Burlington. Calls range from shoplifting, to car thefts and break ins, to truancy, to teenage disruptions, to medical calls.  Sgt. Downer actually proposed establishing the substation at a command staff meeting which included Chief Soda.  Chief Soda quashed the idea stating that he would decide where to station officers.

20. Sgt. Downer was assigned, as a sergeant, to work the midnight shift.  He often criticized the work ethic of some of the officers assigned to that shift.  He found that some of the officers made few or no arrests and did little or no traffic enforcement.  Sgt. Downer would ask for more productivity out of those officers, would complain to the Chief and others about the work ethic of those officers, and would write poor evaluations for those officers who showed little work.  He received no help in trying to change those behaviors.

21. Sgt. Downer spoke about his desire to be Chief to almost anyone on the Department, to numerous other family members, many of whom are residents of Burlington, friends and Town officials.  Some of these conversations occurred around the

fact that Sgt. Downer achieved the top grade on every examination that he took. This was achieved by spending months studying for the examinations, including using all of his time off to study. The amount of time he took to study was widely known, as was the perception that he would top tests because he would continue to spend that time.

22. Two specific incidents demonstrate both how widely his desire to become Chief was known and the fact that he would make changes if he became Chief.

23. First, Chief Soda told Sgt. Downer to stop studying for promotional examinations because he had older officers that he wanted to promote. Chief Soda told Sgt. Downer to stop studying for promotional examinations for ten years, and that he would promote Downer before he retired. Downer refused, subsequently taking and receiving the best score on the written portions of the lieutenant and captain's examinations.

24. The following week, in retaliation for Downer's refusal, Chief Soda stripped Downer of his responsibilities as head of the bicycle unit, as head of the community policing program and for handling grant writing. When Downer asked why he had been removed from these positions, Chief Soda said that he did not want to hear from Downer, that Downer should not be telling people that he was going to study hard, and that he was helping Downer by taking all of his responsibilities away since that would leave Downer plenty of time to study.

25. Second is the caricature that Defendant Sawyer posted about Sgt. Downer. That caricature was accompanied by hand written statement, "If they don't indict me first I'll be the next Chief." The fact that Downer's ambition to become Chief was the subject of a caricature, posted in the police station, and recognized by everyone as referring to Downer demonstrates how widely his ambition to become Chief was known.

26. Within the Department Downer spoke to Captain Devlin, Lt. Duffy and Sgt. Kirchner about his desire to become Chief and his ideas to change the Department.  They told him they believed that he would become Chief and that he could make his changes then.

27. Among the people that Downer spoke to about becoming Chief outside of the Police Department was Joseph Impemba, a selectman for the Town of Burlington, and Brian Downer, Sgt. Downer's brother and the campaign manager for Mr. Impemba. Brian Downer was also campaign manager for State Representative Charles Murphy, and also spoke to him about Sgt. Downer being promoted.  There were numerous conversations between and among Sgt. Downer, Brian Downer and Selectman Impemba about the Burlington police department, changes in the Department that Sgt. Downer wanted to make, his desire for promotion and the fact that he was being passed over for promotion.

28. Sgt. Downer had numerous conversations in which he complained to Selectman Impemba about the way in which the Burlington Police Department operated and changes he would make if he became Chief of Police.

29. Discussions with Selectman Impemba included the opposition within the Selectmen to the promotion of Sgt. Downer and the preference for Hart as Chief of Police.  Selectman Impemba confirmed that the majority of the Board of Selectmen wanted to promote Hart to Chief and to prevent Sgt. Downer from becoming Chief. Selectman Impemba supported Sgt. Downer for promotion, but became isolated within the Selectmen for that position.  In those conversation Selectman Impemba made it clear that Downer, his concerns over the Department and the opposition to him were discussed

amongst the Selectmen. Selectman Impemba acknowledged that the opposition against Sgt. Downer being promoted was because he had complained about the police department, making enemies both in the Town and on the Department.

30. Another public official that Sgt. Downer spoke with about need for changes in the Burlington Police Department, and becoming chief of that department, was Michael Austin, a member of the Burlington Ways and Means Committee. Mr. Austin would talk about needing Sgt. Downer as chief.

31. Sgt. Downer's statements about the way in which the Burlington Police Department operated and his criticism of the Department and its programs are matters of public concern protected by the First Amendment. Sgt. Downer's desire to become Police Chief also concerned his stated desire to change the Police Department, which is again a matter of public concern protected by the First Amendment.

## FACTUAL ALLEGATIONS RELATED TO THE CONSPIRACY AGAINST MR. DOWNER

32. Mr. Downer's primary competition for promotion to the rank of Chief was from Defendant Hart. Mr. Hart also did very well on promotional examinations, but had been on the police force longer than Sgt. Downer. Hart at one point stated that he would leave the Department of Downer became Chief. This is an indication of both the rivalry and his knowledge that Downer sought to become Chief and would make changes if he did so.

33. In 1999 Sgt. Downer had the highest score on the civil service list for promotion to lieutenant in the Burlington Police Department. At the time Mr. Hart already held the rank of lieutenant.

34. Sgt. Downer subsequently took the promotional examination for Captain, again achieving the highest score on the examination. Hart, who also took that exam, tried to prevent Downer from taking it.

35. In or about September 1999 Burlington Police Officer Harry Sawyer posted an offensive caricature in the police station which referred to Sgt. Downer. When questioned Officer Sawyer lied and stated that he did not do it. As a result, Sgt. Downer referred the matter up the ranks for an investigation and discipline.

36. In an attempt to head off discipline Officer Sawyer made a false complaint about Sgt. Downer and enlisted others in the Department to support his complaint.

37. The complaint about Downer was for the alleged use of language and terms that were in fact common throughout the Burlington Police Department. Despite being aware of their usage, neither the Police Department nor the Town of Burlington had ever made any attempt to curtail the use of any such terms or to discipline any officer for their use.

38. The Town of Burlington, acting through its police chief and Town Administrator, launched an investigation against Sgt. Downer that was unprecedented in magnitude and in subject matter. Town Administrator Mercier designated Assistant Town Administrator Rittenberg to conduct the investigation. Rittenberg had no experience in investigations generally or in the subject matter of the investigation. The Town also retained Attorney Leo Pelloquin to help design the investigation.

39. Messrs. Pelloquin and Rittenberg created new definitions of terms, never previously used by the Town of Burlington, to create a case against Sgt. Downer. They and the Burlington police chief forced every officer in the Burlington Police Department to give statements regarding Sgt. Downer.

40. Forcing every officer to give a statement in an investigation is unprecedented.

41. It was made clear to all Burlington police officers that the investigation was focused on Sgt. Downer, that he would be disciplined, and that only he would be disciplined.  Mr. Rittenberg was told that he could only investigate Sgt. Downer, and told the police officers he questioned that he was only interested in Sgt. Downer.  Messrs. Rittenberg and Pelloquin ignored any response that indicated that the statements being attributed to Downer were commonplace within the Department, or had been made by others.

42. Despite the fact that Officer Sawyer had lied to a superior officer he was told that he would not be subject to any discipline or investigation.

43. Civil Service laws provide that Sgt. Downer could only be disciplined for just cause.  Just cause does not exist where an employed is disciplined for political motives, where rules are selectively enforced, or where an employee is disciplined for alleged conduct that is widely tolerated amongst other employees.  Defendants ignored these principles.

44. Established principles require that towns adhere to policies of progressive discipline in which they make their policies known to employees, start with simple warnings to curb violations of those policies, and then progress to more severe discipline only if the conduct is undeterred.  The Civil Service laws and principles were well known to Burlington's labor counsel, Mr. Pelloquin, to Mr. Mercier, its town administrator, and to the Chief of Police.   All of these principles were ignored during the investigation and discipline of Downer.

45. On or about October 31, 2000 Mr. Mercier gave notice to Sgt. Downer that the Town of Burlington proposed to discipline him, and that the discipline could include demotion or discharge. Mr. Mercier made the decision to propose discipline and also acted as the hearing officer during nine days of hearing. The length and scope of that hearing is unprecedented in Burlington.

46. The case against Mr. Downer was prosecuted by labor counsel Pelloquin, who designed and participated in the investigation and continued to act as counsel to the Town of Burlington and Mr. Mercier about the proceedings. On information and belief Mr. Pelloquin drafted the ultimate decision and consulted and advised Mr. Mercier about that decision.

47. During the hearings police officers were pressured to testify against Sgt. Downer. Pressure came from the Town, its counsel, Officer Sawyer and other officers who had aligned with Officer Sawyer.

48. During the hearings virtually every police officer admitted to the use language that was the same or worse than that for which Downer was being disciplined. The Burlington Police Department had never made any attempt to curtail the use of any derogatory terms nor had it ever imposed any significant discipline for their use. As hearing officer, Town Administrator Mercier heard all this testimony.

49. Sgt. Downer was also accused of spreading rumors. Numerous officers testified to hearing these and similar rumors spread around the police department by officers other than Sgt. Downer. The witnesses testified that rumors and gossip about officers were common in the department, that no effort was made to stop them, and that no one else was disciplined. As hearing officer, Mr. Mercier heard all of this testimony.

50. The Town added supplemental charges against Sgt. Downer, including allegations of making false statements.  It took no action against Officer Sawyer for lying to Sgt. Downer, and took no action regarding false testimony against Sgt. Downer at the Town Hearings or subsequently at the Civil Service hearings.

51. In August 2001 the Town of Burlington demoted Mr. Downer to the rank of patrol officer and precluded him from retaking the sergeant's examination for two years.

52. The decision of the Town was motivated by a desire to keep Sgt. Downer from being promoted so that he could not become Chief of Police.  Preventing Downer from being demoted cleared the way for the promotion of defendant Hart to Chief.  Defendant Sawyer and other officers knew that if Downer became Chief he would change the Police Department and would require them to do more work.  Sawyer knew that he could be disciplined for having lied to Downer.  The Selectmen wanted Hart promoted and Downer stopped.  All were opposed to the changes that he would make in the police department.

53. Mr. Downer appealed his demotion to the Civil Service Commission.  The Commission ultimately had 12 days of hearing on the appeal, hearing approximately 33 witnesses.  Briefs were submitted, and the Commission eventually issued a 73 page decision ("Decision").  (Copy attached to original complaint as Exhibit A and incorporated herein by reference)

54. The Decision states that it is "one of the longest and most involved cases in the history of the Commission."  (Decision, Pg. 58). The 73 page decision is certainly one of the longest in its history.  *Fifty-Seven* of those pages are devoted to Findings of Fact.

55. The Civil Service Commission found that other police officers and town officials had conspired to demote Mr. Downer. The Civil Service Commission ordered that Mr. Downer be reinstated to the rank of sergeant without loss of pay.

56. The Commission's decision is striking not just for its length, but for the strength of its findings. Civil Service Commissioner Daniel Henderson found that the investigation into Sgt. Downer was "political in nature", "motivated by personal animus and vindictiveness" towards Downer, and "arbitrary and capricious in "design, enforcement and conclusions." Decision, Pg. 70. Among the specific findings of the Commission were the following:

--Top ranking police officials, including current Police Chief Hart, set out "to get" Sgt. Downer. Pg. 14.

--The officers instigating and those investigating the allegations were biased against Sgt. Downer.

--Commissioner Henderson found that the Town and the Department designed the investigation solely to focus on Sgt. Downer. Pg. 33, 43-44, 70

--Sgt. Downer was disciplined for practices that were commonplace in the police department, well known and even practiced by its ranking officers, which the Police Department had made no attempt to stop or change, and for which other officers had not been disciplined. Pg. 20, 39, 43.

--Sgt. Downer's principal accusers were found to "manufacture testimony and evidence" against Sgt. Downer. Pg. 70. The Commissioner termed one of Downer's chief accusers, a "dangerous liar". Pg. 17.

--"…outrageous, open and notorious conduct and behavior was pervasive throughout the Department…and was well known to the (police) Command Staff including the (police) Chief…" Pg. 43.

--"…the Town and the (Police) Department…tolerated and allowed these prevalent practices….to go unchecked and unpunished in the Department, practices which they have only now termed a problem, and then *only as it relates to (Sgt. Downer's) behavior."* Pg. 39.

--The Burlington Police Department launched an investigation which Commissioner Henderson found to be "focused exclusively on (Sergeant Downer) for behavior and comments that were common place in the Department for decades." Pg. 70.

--The Civil Service found that the Town, the Police Department Command Staff including the former and current police chiefs had a strong bias against Sgt. Downer. Pg. 19, 34, 39, 54., and that the Chiefs exhibited a strong bias against Sgt. Downer, they demonstrated a firm commitment to get him "at all cost." Pg. 54

36. The Commission also found great fault with the way in which the investigation

was conducted. The Commission found that:

--The Police Department quickly made it clear that only Sgt. Downer would be disciplined. Pg. 33

--There was a general perception that the process was designed to get Sgt. Downer and get him exclusively. This belief affected the testimony of many witnesses. Pg. 43-44

--Burlington Police Officers were allowed a pervasive and unrestrained right to influence the investigation and witnesses. Pg. 31

--Officer Sawyer lied to his superiors at the start of the investigation, but was quickly told that he would not face any discipline. Pg. 31

--The Town assigned officers to conduct the investigation who had no experience in conducting investigations and who were unfamiliar with basic labor principals. Pg. 39.

37. The Civil Service Commission makes numerous references to a conspiracy

among Burlington Police officers and officials:

--Lt. O'Meara and current Police Chief Hart were "out to get" Downer. Pg. 14.

--The Town, (former police chief) Solomon, Hart, O'Meara and another police officer coordinated an attempt to manufacture serious charges against Downer. Pg. 14

--In another incident during the course of the investigation (former police chief) Soda and (then) Lt. Hart attempted to create additional charges against Sgt. Downer. They did so by pressuring and threatening another officer to testify against Sgt. Downer. The threats included a threat to fire the officer if he did not testify. Pg. 53

--Lt. Sciuto and (former police chief) Soda engaged in a conspiratorial conversation regarding Downer. Pg. 19. At the time Lt. Sciuto was in charge of the police

department's internal affairs division: i.e. the person who is charged with investigating allegations of police misconduct.  Pg. 19

--Lt. Sciuto and Officer Sawyer attempted to embellish a trivial matter and exploit it to make another claim against Sgt. Downer.

--Police officers organized an effort to *create* information to be used against Downer. Pg. 23. They organized a "concerted effort *with other officers* to create charges against… (Downer) and planned to take him down; get him fired."  Pg.  27

--A police officer threatened that Downer was going to "go down".  That officer knew details of how the investigation was to be conducted before those details were disclosed.  Pg. 29.

38.  On or about August 19, 2001 Mr. Downer was allowed to return to work as a patrol officer.  The following day Officer Sawyer went to Burlington Police Officer Robert Preston and told him that Mr. Downer had made racist remarks about Officer Robert Preston.  Officer Preston is African-American.  Officer Sawyer's purpose was to attempt to get Mr. Downer fired by having Officer Preston make a complaint against him.   Officer Preston did make that complaint.

39. The remarks referred to by Officer Sawyer had allegedly occurred years before.  No complaints were made at the time.  Only when Officer Sawyer learned that Mr. Downer would come back to work did he fabricate these new allegations.

40. Despite a lack of any credible supporting evidence that Mr. Downer had made any racist remark, Mr. Mercier notified Mr. Downer that it was planning to impose discipline for alleged racial bias.  Another hearing was conducted, this one lasting several days.  Mr. Mercier again made both the decision to seek discipline and acted as the hearing officer.  Attorney Pelloquin again acted as both prosecutor and legal consultant to Mr. Mercier.

41. Officer Preston testified that Mr. Downer had never made any racist remarks in his presence, that he considered Mr. Downer a friend, that he had been to social gatherings at Mr. Downer's house, and that he did not believe that Mr. Downer was racially biased.  Numerous other witnesses testified that Mr. Downer was not biased.

42. The officers testifying in support of the allegations could not give dates when the statements had been made, other than years earlier.  The officers did not report the statements at the time.

43. Again the investigation focused solely on Mr. Downer.  The Town chose to ignore racial statements made by a former Chief, and to ignore clearly false statements from one of the officers.

44. Mr. Mercier imposed an additional discipline of a fifteen day suspension and a further bar from taking the sergeant's examination for another two years.

45. Mr. Downer appealed that decision to Civil Service, which has not yet heard the appeal.

46. During these proceedings defendant Hart was promoted to Chief of Police.  The Town of Burlington also blocked Mr. Downer from being considered for promotion to the open lieutenant position, despite the fact that he had the highest civil service score at the time.

47. The Town of Burlington, Mr. Mercier and Chief Hart continued the prosecution of Mr. Downer through the lengthy Civil Service process.  Witnesses were forced to testify against Mr. Downer.  They created an atmosphere where officers were forced to choose sides for or against Mr. Downer, with a clear understanding of which side the Town was taking.

**ACTIONS OF DEFENDANTS OCCURING AFTER AUGUST 24, 2002**

48. The Town investigated a complaint that Downer had used racial remarks, a complaint which it knew to be false and to have been filed only because Downer was not fired as a result of the Sawyer investigation.   The investigation was directed Chief Hart and Town Administrator Mercier.  Mercier acted as hearing officer and made the ultimate decision to impose discipline. Mercier issued the disciplinary decision in March 2003 after hearings in late 2002.

49. Defendant Sawyer induced his mother to make a false complaint against Mr. Downer, and then concealing the source of the complaint.  Her identity was revealed in or about December 2002.

50. Chief Hart advised the District Attorney that Mr. Downer had been disciplined and provided the District Attorney with a copy of the disciplinary decision, all with the intent of embarrassing Mr. Downer and making it difficult for him to work as a police officer.  No other disciplinary decision had ever been sent to the District Attorney by the Town of Burlington, and nor had the District Attorney been advised of any discipline. In 2005, after the Civil Service Commission issued its decision clearing Downer he asked that Chief Hart send it to the District Attorney with a letter explaining that the discipline had been reversed.  Chief Hart not only refused to do so, but he sent the District Attorney a letter to the effect that the Civil Service decision was wrong, and that Downer's integrity was still at issue.  When Downer questioned Hart about the letter, Hart stated that it was written by Burlington's Town Counsel, Leo Pelloquin.  Lest there be any question that the defendants were motivated out of a desire to harm Downer, it must be noted that although Civil Service found that other Burlington Police officers

had lied under oath and had conspired against Downer to have him demoted and/or fired, the defendants have not investigated any of the officers named in the decision nor have they notified the District attorney that there is an opinion of the civil service commission stating that officers lied under oath.

51. The Town of Burlington has refused to reinstate Downer to the rank of sergeant despite the decision of the Civil Service Commission.  That decision was affirmed by the Superior Court on May 30, 2006.

52. Chief Hart has refused to select or recommend Mr. Downer for any award, citation or position, despite his having been the best qualified person on numerous occasions.  For example, Downer was instrumental in the seizure of $70,000.00 in drugs, one of the highest seizures in Burlington history.  Downer received a federal commendation for his work, but Chief Hart refused to give him any commendation, although commendations are commonly given in the Department.  In or about 2004 and 2005 Downer was recommended on several occasions for selection as Officer of the Month.  Despite the recommendations and generally outstanding work Hart would never select Downer.

53. More importantly Chief Hart has refused to appoint Downer for positions as Drug Officer, Computer Crime Officer or Detective, although he had far more experience and seniority than those appointed.  He has been passed over a number of times since August of 2002, including in 2005.  When Downer asked if it was a waste of time to apply for these positions Chief Hart stated "you will never get me to admit that".

54. In retaliation for their testimony in support of Downer, Officers Kirchner and Ferguson have been passed over for appointment to any position for which they have applied.

55. The Civil Service decision became public at the beginning of June 2005. A number of articles appeared in the local newspapers describing the findings of the Civil Service Commission and copies of the decision were widely distributed to Town Meeting members.

56. After the Civil Service decision became public Chief Hart stopped being cordial to Downer and often would not even acknowledge his presence.

57. Since the decision there have been repeated, regular meetings in the Police Chief's office between defendant Chief Hart and defendant Sawyer, a patrol officer. It is unusual for a police chief to meet privately with a patrol officer for almost any reason. The length and regularity of the meetings between Officer Sawyer and a Police Chief Hart demonstrate that they have no legitimate police reason.

58. On June 11 and 12, 2005 Downer took off two days on sick leave to seek some relief from the particularly stressful environment that existed after the decision became public. The sick leave had been approved by both a lieutenant and a captain. After Downer returned to work Chief Hart personally conducted an investigation into whether he had inappropriately taken sick leave. Such investigations are never conducted by the Chief of Police. During that investigation Chief Hart called a Burlington resident that Downer had spoken to. Chief Hart wanted to know not only what conversations he had with Downer, but whether Downer mentioned the Civil Service decision or made any negative comments about those mentioned in the decision. Chief Hart also wanted to

know who Downer had been with.  Although Chief Hart was told that the use of sick

leave had been approved, and despite the fact that use of sick time for stress was a long

standing practice in the department and two other officers and a dispatcher had recently

taken similar leave, he threatened to discipline Downer for his use of sick leave, Chief

Hart relented only after counsel sent the town a letter advising them that Chief Hart's

actions were retaliatory.

59. On June 30, 2005 Downer was late for court due to a mistake in scheduling.  He

learned of his mistake and arrived in court long before the case was called.  Other

officers had missed court altogether without incurring any discipline.  Chief Hart, again

investigating on his own, stated that he would give Downer a letter of reprimand.

60. On July 1, 2005 Downer attempted to speak to Chief Hart about being late to

Court.  Chief Hart lashed out at Downer, stating that he did not give a damn about

anyone else.  You don't have any rules, do you?  You can do whatever you want.  You

have no policy or procedures, all you have to do is call your lawyers and they will send

a letter to town hall and I'm then a conspirator."  Chief Hart was clearly irate.  He

pointed his finger in Downer's face, yelled at him and told him to "shut up" about any

complaint.

61. On June 30, 2005 George Cummings, a civilian who had testified for Downer,

was confronted by Burlington Police officer Charles Ferguson.  Ferguson had

previously refused to arrest two individuals who intruded into Cummings' home.  The

individuals were subsequently charged.  On June 30th, during a court appearance on the

case, Cummings observed officer Ferguson speaking with the defense attorneys.  When

Cummings questioned whether they were discussing the case Officer Ferguson became

enraged and screamed at Cummings, particularly berating him for not being neutral in the Downer case. Although Cummings filed a letter of complaint with Mercer, and despite the fact that Officer Ferguson's comments were unprofessional and in violation of department rules, no action was taken against Ferguson.

62. In or about October 2005 Chief Hart denied Mr. Downer the right to exercise his seniority in the selection of assignments. No other officer is denied that right.

63. After the Civil Service Commission decision was issued Chief Hart decided that Downer should not back up Officers Ferguson or Hanifin, two of his principal accusers. The decision is based on an allegation that Downer had threatened retaliation against Hanifin and Ferguson. Civil Service rejected this contention. On October 17, 2005 Downer was told that he could not work the same sector as Hanifin. On January 14, 2006, Downer was told not to back up Ferguson during a possible break in despite the fact that Downer was the closest officer. The radioed instruction not to back Ferguson was overheard by at least one civilian. This action is part of an on-going attempt to embarrass and humiliate Downer out of his job as a police officer.

64. Since the Civil Service decision Downer has been the subject of numerous small acts of harassment, including leaving his assigned cruiser with no gas and leaving trash in the cruiser. These acts violate departmental policy and would normally be addressed by superior officers. Although Downer has filed complaints about the practices Chief Hart has failed to address any of those complaints or to take any action to stop the harassment.

65. Downer filed a grievance related to the harassment and refusal to honor seniority. Inspector Nardone represented him at the grievance meeting. In retaliation

coffee was thrown over Nardone's vehicle in the police parking lot. That lot is watched by a recorded surveillance camera. No investigation has been made into that incident despite the fact that it must have been caught on tape. The incident is a clear signal that anyone assisting Downer will be harassed, and that Chief Hart and the Town of Burlington will do nothing about it.

66. The civil service hearing on the Sawyer allegations commenced on July 24, 2002 and then reconvened on eleven additional days ending on March 13, 2003. Nine of these dates occurred within three years prior to filing this action in August 2005. Defendant Sawyer testified on September 23, 2002, within the three year period. Assistant Town Administrator Larry Rittenberg, who had been designated by the Town to lead the investigation into Mr. Downer, testified on October 25, 2002. Defendant Town Administrator Mercer testified on the same day. Defendant Chief Hart testified on November 4, 2002.

67. The Civil Service Commission found that there was a conspiracy to "get" Mr. Downer, that evidence was manufactured and that witnesses were coerced or intimidated. Witnesses called by the Town to testify at the Civil Service Commission were interviewed, prepared and coaxed, and intimidated to testify against Downer and not to testify for him. In fact counsel wrote to the Town in August 2002 to complain that witnesses were being ordered to talk to Town Counsel. The Town was represented in that hearing by its regular labor counsel, Leo Pelloquin. Mr. Pelloquin was consulted by the Town at every step of the process applied against Mr. Downer. Mr. Pelloquin designed and participated in the initial investigation, reviewed and prepared the charges against Downer, prosecuted the case for the Town, on information and belief helped

prepare the decision, pressured witnesses, and prosecuted the case at the Civil Service

Commission. Mr. Pelloquin continues to represent the Town in the Civil Service bypass

case and in the pending appeal on the racial discrimination discipline. It is fair to infer

that there were regular meetings between Town Counsel, the Town Administrator

and/or selectmen regarding the progress of the case and the strategy to be used.

## ALLEGATIONS RELATED TO MUNICIPAL LIABILITY

68. Defendant Mercier, Town Administrator for Burlington, made the decision to

investigate Mr. Downer in both disciplinary actions, made the decision to seek

discipline, acted as the Town's hearing officer and therefore heard the testimony for and

against Mr. Downer, made the decision to impose the suspension, and has made or been

consulted in each decision to pursue that discipline, to impose subsequent discipline and

to deny Mr. Downer the right to take civil service examinations. The initial

investigation into Mr. Downer was conducted by Assistant Town Administrator

Rittenberg, who was assigned the task by defendant Mercier. Town labor counsel Leo

Pelloquin, who reports to the Town Administrator and the Board of Selectmen, has

participated in every phase of the investigations into and discipline of Mr. Downer.

69. Mercier reports to the Board of Selectmen for the Town of Burlington. They

have approved the expenditures to investigate and pursue discipline against Mr.

Downer. Those expenditures exceed $100,000.00. The Selectmen approved further

expenditures to appeal the Civil Service decision.

70. Statements made by Selectmen Impemba show that the majority of the Board of

Selectmen opposed the promotion of Downer and favored the promotion of Hart, and

that the opposition to promoting Downer stemmed from comments he had made about the operation of the police department and changing that department.

71. The Civil Service Decision points to conspiratorial actions, including the attempt to coerce witnesses and manufacture evidence, by past and present Burlington police chiefs and ranking officers.

72. The current police chief continues to retaliate against Mr. Downer on a regular basis. Letters sent by Mr. Downer's counsel to Labor Counsel Pelloquin and grievances sent to and heard by Town Administrator Mercier have ensured that he is well aware of the continued acts of retaliation. Mercier has done nothing to stop the retaliation.

73. Chief Hart has consulted Town Labor Counsel Pelloquin for assistance including specifically in sending the second letter to the District Attorney about Downer. Chief Hart could not consult labor counsel without the knowledge and consent of the Town Administrator.

74. The top policy makers of the Town of Burlington are its Town Administrator and Selectmen. Town Administrator Mercier has actual knowledge of the conspiracy against Mr. Downer, and has been an active participant using his powers as Town Administrator to shape the investigation, and to propose and implement discipline.

75. The Selectmen have actual and/or constructive knowledge of the actions taken against Downer, and have been motivated by a desire to prevent his demotion and to quiet his complaints.

76. The Town's attempts to discipline Downer have been the subject of public debate and the topic of numerous newspaper articles, including many articles after the Civil Service decision. The Town and its Selectmen have taken no steps to stop the

retaliation and harassment of Mr. Downer despite their knowledge of what was being done.

77. The decisions of the Town Administrator and Board of Selectmen to continue to pursue and continue to pursue discipline against Mr. Downer constitute policies and customs of the municipality.

## ALLEGATIONS RELATED TO DAMAGES

78. As a consequence of the actions of the defendants Mr. Downer has incurred legal fees and costs in excess of $100,000.00.

79. Mr. Downer is a life time resident of Burlington. His parents are residents of Burlington. He has been subjected to persecution that has now lasted approximately six years. There have been many newspaper stories in Burlington regarding this case, including many stories reporting the charges against him and his demotion. The demotion was extremely humiliating. The numerous stories and accusations have caused extreme damage to his reputation in many segments of the community.

80. As a result of the stress Mr. Downer has been forced to seek counseling. He has suffered a number of physical ailments which he did not have before the stress of these accusations. The physical, financial and emotional stress has severely affected his relationships with his wife and daughters.

81. When Mr. Downer was placed on administrative leave he lost income that he would normally have received from details, overtime, and court time. Like most police officers, his family depended on that extra income.

82. Mrs. Downer has stood by her husband during this entire time, but has seen their relationship greatly affected by the stress placed on him. She has suffered extreme stress herself and has had to seek counseling.

FIRST CAUSE OF ACTION

83. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

84. Defendants individually and as part of a conspiracy have, by threats, intimidation and harassment, retaliated against and attempted to terminate Mr. Downer's employment and demote him in violation of his rights under the Civil Service laws of Massachusetts as a result of his exercise of his First Amendment rights of free speech, all in violation of the Massachusetts Civil Rights Act, M.G.L. c.12, §11I.

85. The actions of Burlington's Town Administrator and Police Chief, taken with the knowledge and consent of the majority of its Board of Selectmen, constitute actions of key policy and decision makers for the Defendant Town of Burlington. As such, they represent an official policy of the Town. The Defendant Town of Burlington is liable for the deprivation of rights caused by its official policies and customs.

SECOND CAUSE OF ACTION

86. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

87. Defendants individually and as part of a conspiracy have, under color of law, retaliated against and attempted to terminate Mr. Downer's employment and demote him as a result of his exercise of his First Amendment rights of free speech, all in violation of the 42 U.S.C. §1983.

88. The actions of Burlington's Town Administrator and Police Chief, taken with the knowledge and consent of the majority of its Board of Selectmen, constitute actions of key policy and decision makers for the Defendant Town of Burlington.  As such, they represent an official policy of the Town.  The Defendant Town of Burlington is liable for the deprivation of rights caused by its official policies and customs.

THIRD CAUSE OF ACTION

89. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

90. Defendants have individually and as part of a conspiracy intentionally interfered with Plaintiff Robert Downer's contract of employment and his contractual rights.

FOURTH CAUSE OF ACTION

91. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

92. Plaintiffs have been held up to ridicule in the community where they live and where Mr. Downer works, and have suffered severe emotional distress as a result of the actions of the Defendants.

93. Defendants Hart, Sawyer and Mercier have individually and as part of a conspiracy intentionally inflicted emotional distress upon the Plaintiffs.

FIFTH CAUSE OF ACTION

94. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

95. Defendants Hart, Sawyer and Mercier have individually and as part of a conspiracy slandered and libeled the Plaintiffs and have knowingly caused those statements to be published and republished throughout the community.

## SIXTH CAUSE OF ACTION

96. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

97. Defendants Hart, Mercier and Sawyer have individually and as part of a conspiracy conspired together for the purpose of interfering with Plaintiff Robert Downer's constitutional, statutory and rights of employment and therefore are jointly and severally responsible under the doctrine of common law conspiracy.

## SEVENTH CAUSE OF ACTION

98. Plaintiffs reallege and incorporate herein the factual allegations of the preceding paragraphs in this complaint.

99. Defendants' actions have individually and as part of a conspiracy caused the Plaintiff Nancy Downer a loss of consortium.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues.

Wherefore Plaintiffs pray judgment against the Defendants as follows:

1. For fair and reasonable compensation for their emotional distress.

2. For fair and reasonable compensation for damage to Plaintiffs' reputation and standing in the community.

3. For compensation for Plaintiffs' consequential damages.

4. For Plaintiff Nancy Downer's loss of consortium.

5.  For punitive damages for violation of Plaintiff Robert Downer's rights under the

    Massachusetts Civil Rights Act and 42 U.S.C. §1983.

6.  For their reasonable attorneys fees.

7.  For such other and further relief as this court may deem just and proper.

For the Plaintiffs
By their attorney,

June 5, 2006                              /s/ Brian Rogal
                                         Brian Rogal, Esq., BBO #424920
                                         LAW OFFICES OF TIMOTHY M. BURKE
                                         160 Gould Street, Suite 111
                                         Needham, MA 02494-2300
                                         (781) 455-0707