UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT DOWNER and ) <br> NANCY DOWNER ) <br>     Plaintiff, ) <br> ) <br> V. ) <br> ) <br> TOWN OF BURLINGTON, ) <br> ROBERT MERCIER individually and in ) <br> his capacity as Town Manager, ) <br> FRANCIS HART, individually and in his ) <br> capacity as Chief of Police, and ) <br> HARRY SAWYER, ) <br>     Defendants ) <br> ) | CIVIL ACTION NO. 05-11761-RCL |

PLAINTIFFS' OPPOSITION TO MOTION
TO DISMISS FIRST AMENDED COMPLAINT

This matter is before the Court on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. The initial complaint was dismissed by the Court with leave to file an amended complaint. An amended complaint was filed and this motion followed.

STANDARD OF REVIEW

The standard of review on a motion to dismiss is well known. As Judge Young described it in Carvalho v. Town of Westport, 140 F.Supp.2d 95 (Mass. 2001):

> Dismissal is appropriate "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir.1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 [1957] ). In making this determination, the Court should "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 988 (1st Cir.1992) (citing Dartmouth Review v. Dartmouth Coll., 889 F.2d 13 [1st Cir.1989] ).

Plaintiffs rely on their detailed amended complaint and the lengthy decision of the Massachusetts Civil Service Commission which was attached to and incorporated in the initial complaint.  To the extent that this motion turns on facts, these facts cannot be determined on a motion to dismiss.  When plaintiffs are allowed the reasonable inferences that flow from the facts alleged, including the findings of the Civil Service Commission, a claim has been stated.

DEPRIVATION OF CONSTITUIONAL RIGHTS

Defendants argue that Mr. Downer's statements involved matters of purely private concern, and therefore cannot form the basis for a denial of his First Amendment rights.  To prevail on a § 1983 claim based on a violation of his First Amendment rights, a public employee must show that his speech involved matters of public concern rather than speaking "as an employee upon matters only of personal interest." Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).  Resolution of this question often requires the courts to consider "the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48, 103 S.Ct. 1684.  However, the First Circuit has recently stated that:

> In some instances, the subject matter of the speech, alone, may resolve the "public concern" question, as when the employee "expresses himself on a subject that is 'clearly a legitimate matter of inherent concern to the electorate,' "

Jordan v. Carter, 428 F.3d 67 (1st Cir 2005) quoting Fabiano v. Hopkins, 352 F.3d 447, 454 (1st Cir. 2003) and O'Connor v. Steeves, supra at 913-914; accord Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225 (1st Cir. 2005).

The amended complaint provides specifics of matters that Mr. Downer spoke about that are matters of public concern.  Mr. Downer spoke to numerous people about

specific problems within the Burlington Police Department, and about his proposals for changes in the way the department operated. He told many people he would make these changes if he became Chief of Police. (Par. 11)[1]   As with all allegations in the complaint they must be taken as true for the purposes of this motion.

Specifically, Mr. Downer criticized the DARE program, a federally funded program to teach elementary school children about drug and alcohol use. (Par. 12-16) He called it ineffective and a waste of money, (Par. 13) and criticized its activities and the way the officer in charge of the DARE program conducted himself around children. (Par. 14-16). Mr. Downer also proposed a very different system of drug education in the schools, including lectures from former drug users. (Par. 13)

Mr. Downer also criticized the effectiveness of Burlington police detectives and drug officers, stating that they had been ineffective and had made few arrests. (Par. 17-18) Mr. Downer called for a greater police presence at the Burlington Mall, including a substation. (Par. 19)  The Mall is statistically a high crime center. Mr. Downer complained about the lack of productivity and police work on the midnight shift, including the fact that few arrests were made and little traffic enforcement was done. (Par. 20).

Regardless of whether he became chief, Mr. Downer's criticism of the Burlington Police Department and his proposal's for changes in its practices constituted speech on matters of public concern. The DARE program involves the expenditure of substantial public funds with the stated goal of preventing children from using drugs. What could be of greater public concern on a local level than criticism that the DARE program was ineffective, a waste of money and run inappropriately?  The proposal to bring former

---

[1] All "Par." References are to the Amended Complaint.

drug users into the school would certainly be the topic of debate. The same is true for statements that detectives, drug officers and the third shift are not productive. Moreover, these criticisms, made outside the department, are both a current call for correction of the problems, and a declaration that Mr. Downer would change the way the department operated if he became Chief of Police. Mr. Downer's discussion of the need to put a police substation at the Burlington Mall involves the expenditure of public funds, the allocation of police resources, and a proposal to address crime at one of the most public places in Burlington. These are all matters that would concern any Burlington resident and would certainly be the subject of public debate if any of Mr. Downer's proposed changes were enacted.

Defendants contend that this is not public speech, but speech about a wholly private matter since Mr. Downer is merely talking about his desire to become Chief of Police. Mr. Downer did seek promotion to lieutenant and eventually Chief. He did state that he would make changes if he was promoted. In fact, the problem is that Mr. Downer's promotion would have resulted in change in the way in which the department operated. (Par. 31) That is a matter of public concern as is the selection of any Police Chief.

Second, the complaint alleges that Mr. Downer spoke about the issues to numerous people, including speaking at length and repeatedly to Joseph Impembra, a Burlington Selectman. (Par. 11, 21, 26-30) The complaint states:

> Selectman Impembra made it clear that Downer, his concerns over the Department and the opposition to him were discussed amongst the Selectmen. Selectman Impembra acknowledged that the opposition against Sgt. Downer being promoted was because he had complained about the police department, making enemies both in the Town and on the Department. (Par. 29)

Mr. Downer also spoke to his brother, who was campaign manager for Selectman Impembra and for State Representative Charles Murphy, and to Michael Austin, a member of the Burlington Ways and Means Committee. (Par. 27-29) These allegations demonstrate that the speech was not merely private, not solely within the police department, not solely within the course of Mr. Downer's official duties, and made in a way that entered the public forum.

Third, in complaining to a selectman and to a member of the ways and means committee, Mr. Downer was raising complaints about the way the police department operated; not about his desire to be Chief of Police. These issues were discussed and could have been addressed regardless of who was Chief of Police. Since Downer never was promoted above sergeant, his possible ascendancy to Chief was hardly imminent. Yet, he raised numerous issues about the way in which the police department was run, and his views were raised to and discussed by town officials who had the ultimate control over the department.

Mr. Downer did express his desire to be promoted and to ultimately become Chief. As Chief he could have implemented changes, and he promised he would do so. The complaint sufficiently alleges that the selectmen were opposed to his promotion because of his criticisms of the department and that the defendants sought to prevent his promotion, discipline him and have him discharged or driven from the department in retaliation and in order to prevent him from becoming Chief of Police.

Mr. Downer's speech on these matters falls well within matters that have been found to be of public concern in other cases. In Baron v. Suffolk County Sheriff's Dept., supra, the First Circuit affirmed a District Court finding that complaints about the internal

5

workings of a sheriff department were matters that were inherently of public concern. Analyzing Connick, the Baron court also noted that a question on an internal survey of a District Attorney's office which asked about the effect of political pressure on District Attorneys raised a matter of inherent concern to the public.   Baron v. Suffolk County Sheriff's Dept., supra at 234.

In Jordan v. Carter, 428 F.3d 67, 73 (1st Cir 2005) a motion to dismiss was denied because criticism *of a police chief and management* could inherently be matters of public concern.  The court stated that an analysis as to whether the statements might instead be "performance critiques (which) concerned only matters of internal working conditions" could not be resolved on motion to dismiss.  In Cignetti v. Healy, 967 F.Supp 10 (D. Mass. 1997) a firefighter alleged that he was disciplined in retaliation for statements made about the fire department.  The Court found that statements which were related to the development of property sites and to the provision of benefits to gay and lesbian couples were statements on matters of public concern, and therefore protected free speech.  The court cited the following cases and examples of protected speech:

> Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (garbage collector's criticisms of County, Board of Commissioners deemed matter of "public concern"); Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (public employee's private political remark while on duty matter of "public concern"); see, e.g., Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (teacher's speech on need for extra school funding a matter of "public concern").

In Branton v Dallas, 272 F. 3d 730 (5th Cir. 2001) retaliation against police officer for reporting a belief that another officer was lying was actionable as protected First Amended speech.  The Court summarized other cases within the Fifth Circuit:

> …speech "complain[ing] of misconduct within the police department . . . [is] speech addressing a matter of public concern." Thompson v. City of Starkville,

6

<span style="text-decoration:underline">Mississippi</span>, 901 F.2d 456, 463 (5th Cir. 1990); <span style="text-decoration:underline">Wallace v. Texas Tech. Univ.</span>, 80 F.3d 1042, 1051 (5th Cir. 1992).  "Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials . . . concerns matter of public import." <span style="text-decoration:underline">Thompson</span>, 901 F.2d at 463 (quoting <span style="text-decoration:underline">Conaway v. Smith</span>, 853 F.2d 789, 796 (10th Cir. 1998) (per curiam))…. Exposure of official misconduct, especially within the police department, is generally of great consequence to the public.  <span style="text-decoration:underline">Brawner v. City of Richardson</span>, 855 F.2d 187, 191-92 (5th Cir. 1988).

The Seventh Circuit has stated that police departments are matters of public concern and that statements involving police protection and safety will generally be matters of public concern.  <span style="text-decoration:underline">Miller *v.* Jones</span>, 444 F. 3d 929, 936 (7th Cir. 2006).  There a retaliatory transfer of a police officer for protected speech was actionable.  The Court also found that the police chief was not entitled to qualified immunity, citing an earlier case in which a police officer's speech criticizing the management of a community-oriented policing program was found to be speech about a matter of public concern. <span style="text-decoration:underline">Campbell v. Touse,</span> 99 F.3d 820 (7th Cir. 1996).

Defendants argue that the May 30, 2006 decision in <span style="text-decoration:underline">Garcetti v. Ceballos</span>, __ U.S. __ requires dismissal.  There the Court reviewed the need to balance a public employee's First Amendment right, as a citizen, to speak on matters of public concern against the government's right, when acting as an employer, to promote the efficiency of the services it provides through its employees.   The holding of <span style="text-decoration:underline">Garcetti</span> is significant in that it sets the following bright line test:

> …when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

That holding has no application here.  There can be no suggestion that Mr. Downer's speech was part of his official duties with respect to the DARE program, the detectives and drug officers, the substation or the overall running of the police

department. He had no control over those matters and did not evaluate them in the course of his duties as a sergeant. As for the third shift, Mr. Downer was a first line supervisor, but his suggestions and criticisms were ignored, and when he spoke to Selectmen Impembra and others about that issue it was well outside of the scope of his assigned duties. Ironically, Mr. Downer's expressed desire to be Chief would give him the power to make changes in all of these areas, and thus might make his speech, if he were Police Chief, within the ambit of Garcetti.

Moreover Garcetti reaffirms that a public employee "must face only those restrictions necessary for their employers to operate efficiently and effectively" when speaking about matters of public concern. The Court noted that public employees may be amongst those most informed on public issues related to their employment, for example teachers speaking about how school funds should be spent. Citing Pickering v. Board of Education, 391 U.S. 563, 88 (1968) and San Diego v. Roe, 543 U.S. 77, 82 (2004).

Moreover, the "fact that statements are made in private conversations and not disseminated to the public at large does not necessarily weigh against them." Id., at 74, citing O'Connor v. Steeves, supra. "[t]he First Amendment protects employee speech about matters of public concern even if the employee does not seek to make that speech to an audience outside the workplace. Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 13 (fn 10) (1st Cir. 2003) (citations omitted). This principle was confirmed in Garcetti v. Ceballos, supra, where the Court stated,

> That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work…The First Amendment protects some expressions related to the speaker's job. (citations omitted)

The fact that the plaintiff had a personal stake in subject of the speech alleged to be protected by the First Amendment also does not matter if the speech also had a public dimension. Fabiano v. Hopkins, supra, at 454; Miller v. Jones, supra, citing Kokkinis v. Ivkovich, 185 F.3d 840, 844 (7th Cir. 1999).

Here, plaintiffs allege that Mr. Downer suffered retaliation[2] for the statements that he made about the Burlington Police Department. The safe and effective operation of any police department would obviously be a matter of concern to the residents of that community. While there is a personal aspect to statements that he made in connection to statements about his desire for promotion and to become Police Chief, the personal aspect is not a bar. Mr. Downer's criticisms of the Department, made outside of the Department, are protected First Amendment speech. They do not lose that protection when coupled with statements that he would make changes if he became Chief.

Moreover, the issue of who will be police chief is inherently a matter of public concern. The public has an interest in who will be appointed police chief. Appointment of a police chief is always reported in the local media. Appointment is made by the selectmen, in open meeting, after discussion and public input. A police chief sets the tone and priority of a police department, and makes numerous decisions affecting public safety. A police chief is often the spokesperson for the department, and the person who will ultimately handle complaints and concerns of the public. A police chief proposes the budget for the department, including priorities as to how the money will be spent, what programs should be cut, and what programs should be instituted. A police chief will be held accountable if there are public safety issues, witness the dismissal and appointment

---

[2] Defendants do not appear to be arguing for dismissal based upon a lack of causal connection. To the extent they may be, causation is adequately pled, and factual issues cannot be determined on this motion to dismiss.

9

of a new police chief in Boston after the Patriots victory riot approximately two years ago. Thus expressing a desire to be chief of police of Burlington is itself public speech, which should not be the basis for a series of retaliatory actions designed to prevent that from happening.

Therefore, under the relevant case law, plaintiffs have pled sufficient facts which if proved would allow a jury to find that he spoke on matters of public concern and was disciplined and retaliated against for doing so.

## STATUTE OF LIMITATIONS

Defendants argue that plaintiffs' claims are barred by the statute of limitations. Plaintiffs have pled a conspiracy existed among the parties to have Mr. Downer disciplined, to have his employment terminated, and to prevent him from being promoted. Plaintiffs allege that Mr. Downer was subjected to numerous discrete acts of retaliation for his criticisms of the police department.

The complaint was filed on August 24, 2005. Plaintiffs stand on their prior brief with regard to the timeliness of specific incidents occurring prior to August 24, 2002. The Amended Complaint provides further specification of the numerous acts of retaliation which occurred after that date. (Par. 48-67). There can be no question that actions occurring after August 24, 2002 fall within the statute of limitations period, and are not subject to a motion to dismiss.

One of the most serious incidents was that Mr. Downer was disciplined in March 2003 for allegedly making racist remarks.[3] The discipline was based on hearings held by

---

[3] The matter is now on appeal at Civil Service where two days of hearing have been held. Mr. Downer denies the allegations, and his defense has included testimony by Burlington's only Black Officer that he considers Mr. Downer a personal friend and does not believe Downer would ever make a racist remark. (Par. 41)

10

Town Administrator Mercier in late 2002. Mr. Mercier, acting for the Town, suspended Mr. Downer for fifteen days and prohibited him from seeking reappointment to sergeant for two years. (Par. 44) This was a significant discipline that precluded him from attempting to regain his position as sergeant or to seek further promotion. It falsely stigmatizes Mr. Downer. It would make it difficult for him to seek any transfer or other public position. It was a separate and distinct act of retaliation for which the limitation period would not begin to run until the decision was issued.

Among the other actions that the defendants have taken against Mr. Downer after August 24, 2002 are:

1. Defendant Sawyer had his mother make a false complaint against Mr. Downer. The Town and Chief Hart then concealed the source of the complaint. Her identity was revealed in or about December 2002. (Par. 49)

2. Chief Hart advised the District Attorney that Mr. Downer had been disciplined and provided the District Attorney with a copy of the disciplinary decision. This has never been done before or since, and was done for the sole purpose of embarrassing Mr. Downer and making it difficult for him to work as a police officer. Chief Hart then refused to send the District Attorney a copy of the Civil Service Commission exonerating Mr. Downer, and despite having been requested to do so. (Par. 50)

3. The Town has refusing to reinstate Mr. Downer despite the decision of the Civil Service Commission, the affirmation of that decision by the Superior Court and the issuance of an order by the Superior Court enforcing the judgment. (Par. 51)

11

4. Chief Hart has subjected Mr. Downer to harassment after the Civil Service decision was received, including imposing and attempting to impose discipline on him without cause. These events have occurred in 2005. (Par. 58-60)

5. Chief Hart has refused to select or recommend Mr. Downer for any award, citation or position, despite the fact that Mr. Downer was the best qualified person. This includes refusal to appoint him as Drug Officer, Computer Crime Officer or Detective. These events have happened numerous times including during 2005. (Par. 52-53)

6. Since the Civil Service decision Chief Hart has threatened Mr. Downer and has conducted personal investigations regarding Mr. Downer. Police Chiefs, including Chief Hart, do not normally conduct personal investigations into patrol officers. (Par. 58-60)

7. Defendant Sawyer and other patrol officers attempted to intervene in the appeal of the Civil Service decision for the purpose of overturning that decision. As individuals, there is no precedent for their intervention, and that motion was denied.

8. In or about October 2005 Chief Hart denied Mr. Downer the right to exercise his seniority in the selection of assignments. No other officer is denied that right. (Par. 62)

9. In October 2005 and January 2006 Mr. Downer was told that he could not back up Officers Ferguson or Hanifin, two of his principal accusers. No other officer is subjected to such a restriction. (Par. 63)

10. The civil service hearing on the Sawyer allegations commenced on July 24, 2002 and then reconvened on eleven additional days ending on March 13, 2003. Nine of these dates occurred within three years prior to filing this action in August 2005. Defendant Sawyer testified on September 23, 2002, within the three year period. Assistant Town Administrator Larry Rittenberg, who had been designated by the Town to lead the investigation into Mr. Downer, testified on October 25, 2002. Defendant Town Administrator Mercer testified on the same day. Defendant Chief Hart testified on November 4, 2002. The Civil Service Commission found that there was a conspiracy to "get" Mr. Downer, that evidence was manufactured and that witnesses were coerced or intimidated. Witnesses called by the Town to testify at the Civil Service Commission were interviewed, prepared, coaxed, and intimidated to testify against Downer and not to testify for him. (Par. 66-67)

The actions taken against Mr. Downer since August 24, 2002 are more fully detailed in the complaint. The impact is significant. Again, there was the fifteen day suspension and loss of pay. There was the preclusion from taking the sergeant's examination for a further two years, which causes a further loss of pay and promotional opportunity. There is a stigma attached to that decision. There have been significant and continuing legal expenses in fighting that appeal, and in the continued appeals of the Sawyer discipline. There has been the refusal to appoint Mr. Downer to any position within the Department, the refusal to recognize any accomplishment, the petty investigations and disciplinary threats, the actual threats and belittlement by Chief Hart and the attempt to have him

13

discredited within the court system. These acts work a tremendous emotional toll which results from actions occurring within the statute of limitations.

## MUNICIPAL LIABILITY

Defendants argue that there can be neither municipal nor official capacity liability under §1983 based upon a theory of *respondeat superior*. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Further, they contend that such liability must rest on proof that harm was caused by a policy or custom of the municipality. In a recent iteration the First Circuit stated:

> …"it is when execution of a government's policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established. Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). But "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." Britton v. Maloney, 901 F.Supp. 444, 450 (D.Mass.1995), aff'd in part and rev'd in part on other grounds, 196 F.3d 24 (1st Cir.1999). In a §1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir.1989). This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." Id.; see also City of St. Louis v. Praprotnik, 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). If a custom is attributable to the municipality, we must also inquire whether it was "the cause of and the moving force behind the deprivation of constitutional rights." Bordanaro, 871 F.2d at 1156.

Baron v. Suffolk County Sheriff's Dept., 402 F.3d 225, 236-237 (1st Cir. 2005).

Here Plaintiffs allege that Mr. Downer's complaints about the police department were discussed by the selectmen for the Town, and that the selectmen opposed his promotion because of his criticism of the department. (Par. 29, 70) The selectmen are

the policy makers for the Town of Burlington, and their decisions are attributable to the Town as policy.

The selectmen designate defendant Mercier, its Town Administrator as appointing authority. As appointing authority Mercier is the decision maker on matters of discipline and promotion. Defendant Mercier made the decision to investigate Mr. Downer, made the decision to seek discipline, acted as the Town's hearing officer and therefore heard the testimony for and against Mr. Downer, and made the decision to impose the demotion and suspension. Mr. Mercier made or was consulted in each decision to pursue discipline, to impose subsequent discipline, to deny Mr. Downer the right to take civil service examinations and to pursue various appeals. The investigation into Mr. Downer was conducted by Assistant Town Administrator Rittenberg, who was assigned the task by defendant Mercier, and who reported to Mr. Mercier. Town counsel, who we can infer reports to the Town Administrator and the Board of Selectmen, has participated in every phase of this matter. The selectmen have voted to authorize legal expenditures of over $100,000.00 to pursue various appeals, and have voted at each stage to continue those appeals. (Par. 69) Most recently they voted to appeal the decision of the Civil Service Commission to the Massachusetts Court of Appeals.

The Civil Service Decision points to conspiratorial actions, including the attempt to coerce witnesses and manufacture evidence, by past and present Burlington police chiefs and ranking officers. It was distributed to the selectmen and to Town Meeting members. The current police chief continues to retaliate against Mr. Downer on a regular basis, despite letters sent by Mr. Downer's counsel to counsel for the town and grievances sent to and heard by defendant Mercier. (Par. 72)

15

Based on these facts the actions against Mr. Downer are being taken by the Town through its top administrators, defendant Mercier and the Board of Selectmen. (Par. 74) The Town has actual knowledge of what is being done. Lest there be any doubt, the Civil Service decision, the disciplinary decisions, the appeals and the Town hearings have all been the subject of numerous articles in the local newspapers and consequential public debate. (Par. 76). Thus the policymakers of the Town have actual and constructive knowledge of what is being done to the plaintiffs and have taken no action to stop it. To the contrary, they continue to fund and approve the actions being taken against Mr. Downer.

Under the case law cited above, the Town is acting pursuant to "policy" set by its Town Administrator in consultation with its selectmen, its past and present police chiefs and town counsel. Note that among the Civil Service findings are findings that the entire investigation of Mr. Downer was designed from its inception to "get" him, and was improper in form and motivation. See <u>Putnam v. Town of Saugus, Mass.,</u> 365 F.Supp.2d 151 (D.Mass. 2005)(Discussion of municipal liability by Judge Young finding that intentional deprivation of rights by authorized policy and decision maker was sufficient to impose municipal liability)

<u>MASSACHUSETTS CIVIL RIGHTS ACT</u>

Plaintiffs' do not dispute that a claim under the Massachusetts Civil Rights Act (MCRA) may not be brought against the municipality or as an official capacity claim. The remaining motion to dismiss the MCRA claim is primarily based on the same grounds as its challenge to the Section 1983 claims. The argument above as to protected

First Amendment speech and matters within the statute of limitations applies equally to the MCRA.

This court has found that allegations of a conspiracy to discipline a civil service employee in retaliation for First Amendment speech were sufficient to state a MCRA claim.  Cignetti v. Healy, 967 F.Supp 10 (D. Mass. 1997).  In that case a threat to discipline the employee was sufficient to satisfy the MCRA's requirement of threats, intimidation or coercion.  Moreover, placing the employee on sick leave, doctoring evidence, and preferring charges were sufficient to constitute overt acts in furtherance of a conspiracy.  See Murphy v. Cruz, 52 Mass.App.Ct. 314, 753 N.E.2d 150 (2001) (Transfer of prisoner allegedly in retaliation for filing suit was sufficient to satisfy intimidation or coercion requirement.  Dismissal reversed.); Murphy v. Cruz, 52 Mass.App.Ct. 314, 753 N.E.2d 150 (2001) ("Adverse administrative action which is part of a scheme of harassment may amount to the required threats, intimidation or coercion for purposes of the MCRA."  Case involved institution of false disciplinary charges against prisoner to force him to withdraw complaint.)(Citations omitted).

Plaintiffs allege that a number of acts were taken to intimidate and coerce him from continuing to take promotional examinations, to seek promotion, to intimidate him into leaving the police force and to retaliate against him for the exercise of his rights.  They also allege, and Civil Service found, that witnesses were pressured and intimidated.  Moreover, defendant Hart has threatened Mr. Downer with new discipline repeatedly since the Civil Service Commission in retaliation for his exercising his right to pursue enforcement of that decision and in retaliation for filing this action.

The allegations in this case are sufficient to state a claim under the Massachusetts Civil Rights Act.

## INTERFERENCE WITH CONTRACT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, CONSPIRACY AND LOSS OF CONSORTIUM

Plaintiffs rely on their prior brief to the extent that the defendants seek dismissal of these claims.

## CONCLUSION

For reasons set forth above defendants' Motion to Dismiss should be denied.

                                            Respectfully Submitted
                                            By Plaintiffs' attorney,

July 7, 2006                            /s/ Brian Rogal
                                            Brian Rogal, Esq., BBO #424920
                                            LAW OFFICES OF TIMOTHY M. BURKE
                                            160 Gould Street, Suite 111
                                            Needham, MA 02494-2300
                                            (781) 455-0707